# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| JACOB ZOWIE THOMAS RENSEL, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTRA TECH, INC., SOHRAB SHARMA, RAYMOND TRAPANI, ROBERT FARKAS, WILLIAM HAGNER,<br><br>Defendants. | C.A. No. _____<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 12(a)(1) AND 15(a) OF THE SECURITIES ACT OF 1933**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Jacob Zowie Thomas Rensel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: documents and solicitation materials released by Defendants in connection with the Centra ICO (defined below), public statements made by Defendants concerning Centra Tech, Inc. ("Centra Tech"), and media publications concerning Centra Tech and the Centra ICO.  Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE AND SUMMARY OF THE ACTION

1.     Plaintiff brings this action on behalf of himself and all others similarly situated against Centra Tech, Sohrab Sharma ("Sharma"), Raymond Trapani ("Trapani"), Robert Farkas ("Farkas"), and William Hagner ("Hagner," together with Sharma, Trapani, and Farkas, the "Individual Defendants" and collectively with Centra Tech, "Defendants") for their violations of

Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1), 77o(a), of the Securities Act of 1933 (the "Securities Act").  Specifically, in connection with Centra Initial Coin Offering (the "Centra ICO"), Defendants raised over $30 million in digital cryptocurrencies by offering and selling unregistered securities in direct violation of the Securities Act.

2.     Between approximately July 30, 2017 and approximately October 5, 2017, Defendants ran the Centra ICO during which they received over $30 million in digital currency investments in exchange for Centra Tokens ("CTR Tokens").[1]  There are conflicting reports as to the actual amount raised, some reports indicate that the amount raised may have been closer to $50 million.  The purported primary purpose of the Centra ICO was to raise capital to operate the "world's first Multi-Blockchain Debit Card with a Smart and Insured Wallet" (the "Centra Debit Card").  In other words, the product to be offered was a debit card that would function on the Visa and Mastercard networks and allow instant transactions using digital currencies.  Further, the Centra ICO claimed to be intended to raise capital to create an online marketplace called "cBay" that would be similar to Amazon and eBay.  Additionally, Centra Tech recently has claimed to be creating their own Centra blockchain.

3.     Defendants have made a feeble attempt to portray the Centra ICO as a sale of "utility-based tokens" that were "not securities, shares or investments."  The core offer during the Centra ICO was 200 CTR Tokens for 1 Ether ("ETH").  The Centra ICO was a clear offer and sale of securities because, *inter alia*, Defendants touted, and Plaintiff and other Centra ICO investors reasonably expected, that the CTR Tokens received in exchange for their investments would be worth more than the ETH, Bitcoin (BTC), Litecoin (LTC), or other currencies invested. Additionally, Defendants have explicitly referred to the ICO participants as "investors" and repeatedly stressed the "growth potential" of the CTR Token.

---

[1] Defendants ran a "pre-sale" of CTR Tokens from July 30, 2017 through August 5, 2017.  The first "official ICO" was launched and open from August 5, 2017 through October 5, 2017.  In addition, Defendants also announced a second "official ICO" which ran from September 19, 2017 through October 5, 2017.

4.     The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities are able to tout their investment opportunities with no limitations whatsoever.  For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its products, business plan, business strategies, or even fabricate the existence of relationships with vendors or other business partners (*e.g.*, touting nonexistent relationships with Visa and Mastercard or celebrities, as Defendants have done here).

5.     Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent any of the protections under the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the Centra ICO was, and has been at all times, been an offer and sale of unregistered securities and thus, Defendants are strictly liable under Section 12(a)(1) of the Securities Act.

6.     Importantly, proof of Defendants' deceptive activity and calculated deprivation of investors' rights and protections under the federal securities laws is not required or determinative as to Plaintiff's claim.  This is because Defendants are strictly liable for the offering and selling of unregistered securities in connection with the Centra ICO.  Nevertheless, Defendants' deceptive actions are outlined herein to stress the urgency and need for immediate judicial intervention to preserve Plaintiff's and Centra ICO investors' significant financial interests which Defendants currently control, and to rectify existing and future irreparable harm to Plaintiff and Centra ICO investors.  For these reasons, Plaintiff on behalf of himself, and all similarly situated Centra ICO investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments into the Centra ICO, and securing and conserving such funds until repayment.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and Section 22 of the Securities Act (15 U.S.C. § 77v) because Plaintiff alleges violations of Sections 12(a)(1) and 15(a) of the Securities Act.

8.      The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, as well as under 28 U.S.C. § 1391, because: (a) the conduct at issue took place and had an effect in this District; (b) Defendant Centra Tech is headquartered in this District; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

**PARTIES AND RELEVANT NON-PARTIES**

10.      Plaintiff invested in the Centra ICO on July 30, 2017, by transmitting 16.1 ETH, valued at approximately $3,250.75, to Defendants.

11.      Defendant Centra Tech, is a Delaware corporation founded on July 27, 2017 and maintains its headquarters at, 555 Washington Ave, Miami Beach, FL 33139.  Defendants have represented that the company began in October 2016, however, there is little to no information about the company prior to July 2017.  Defendant Centra Tech was established to run the Centra ICO, create the Centra Debit Card, CTR Token, and cBay.

12.      Defendant Sharma also goes by the name of "Sam Sharma."  Defendant Sharma is a founder of Defendant Centra Tech, and has held various positions with the company, including: Chief Technology Officer ("CTO"), President, Co-Founder, and "Visionary Manager."   On

October 31, 2017, Defendant Centra Tech announced that Defendant Sharma would be resigning in an official capacity to "support the continued growth of the Company."  It has been stated by Defendant Centra Tech's current General Counsel and Chief Compliance Officer, Allan Schutt ("Schutt"), that Defendant Sharma still maintains an ownership interest in Defendant Centra Tech.  Additionally, Defendant Sharma's public LinkedIn profile lists his present employment as "Founder" of Defendant Centra Tech.  Prior to running Defendant Centra Tech, Defendant Sharma worked for Miami Exotics, Inc., ("Miami Exotics") as its "Director of Finance."  Miami Exotics is a company that rents out luxury cars.  Further, prior to founding Defendant Centra Tech, Defendant Sharma ran a different cryptocurrency project named "Coin Success."  There is little information available regarding what this project entailed, however, Defendant Sharma touted it as a "Money Making machine!" and the short description available from a snapshot of its Facebook page from September 2017 stated that their "clients [were] becoming rich overnight."[2]  Defendant Sharma also holds himself out to have been the President of "Sharma Technology" since 2010.  There is little information available about what Sharma Technology does.

13.     Defendant Trapani is a founder of Defendant Centra Tech, and has held the titles of Chief Operating Officer ("COO"), "Strategic Manager," and Co-Founder.  On October 31, 2017, it was also announced that Defendant Trapani would be "stepping aside" to "support the continued growth of the Company."  It has not been publicly acknowledged whether Defendant Trapani maintains an ownership interest in Defendant Centra Tech, however, his current public LinkedIn profile states that he is still an "Advisor" to the company.   Additionally, his grandfather, Defendant Hagner, is now the company's President & Chairman of the board.  Immediately prior to running Defendant Centra Tech, Defendant Trapani also worked for Miami Exotics as its "CEO."   Additionally, prior to, or in conjunction with, his luxury car rental

_____

[2] *See* http://archive.is/pDP8O.

vocation, Defendant Trapani marketed his services as "credit repair specialist" for "fixitupcredit.com."

14.     Defendant Farkas is a founder of Defendant Centra Tech, and is currently the company's COO.  Prior to this position, Defendant Farkas was listed as the company's Chief Marketing Officer ("CMO") and as one point held the title of "Co-Founder."  Prior to his time with Defendant Centra Tech, he also worked for Miami Exotics as its "Vice President."

15.     Defendant Hagner is Defendant Trapani's grandfather and became the President and Chairman of the board of Defendant Centra Tech on October 31, 2017.  The company has not disclosed who the members of the board are, but it has stated that prior to Defendant Hagner's new positions on October 31, 2017, he had been a board member.  There is little information available about Defendant Hagner's employment prior to running Defendant Centra Tech.  However, unsurprisingly, Defendant Hagner is also reported to have worked for Miami Exotics as its "President."

## CLASS ACTION ALLEGATIONS

16.     Plaintiff brings this action individually and as a class action on behalf of all investors in the Centra ICO who are being, and will be, harmed by Defendants' actions described herein (the "Class"), absent judicial intervention.  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendants.

17.     This action is properly maintainable as a class action under the Federal Rule of Civil Procedure 23.

18.     While the exact number of Class members is presently unknown to Plaintiff and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in this Class.  All members of the Class may be identified by records maintained by Defendants and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

19.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following: (i) whether Defendants offered and sold unregistered securities to the Class during the Centra ICO; (ii) whether Plaintiff and other Class members will suffer irreparable harm if such securities laws violations are not remedied; and (iii) whether the Class is entitled to injunctive, compensatory, and/or rescissory relief as a result of Defendants' wrongful conduct as alleged herein.

20.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.  Plaintiff and the other members of the Class have all sustained harm in a substantially identical manner as a result of Defendants' wrongful conduct as alleged herein.

21.     Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel experienced in litigation of this nature.

22.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

23.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

24.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

25.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury they will continue to suffer absent judicial intervention.

## SUBSTANTIVE ALLEGATIONS

### *Background on Centra*

26.    Defendants have released multiple "White Papers" regarding the Centra ICO. The majority of them have since been removed from Defendant Centra Tech's website. Currently, the website hosts the "Centra White Paper Version 2.0." In addition, there have been at least two different versions entitled "Centra Tech White Paper Final Version 1.0." The first was dated to sometime in August 2017 (the "August Final Version 1.0 White Paper") and the second was dated to sometime in September 2017 (the "September Final Version 1.0 White Paper"). The primary difference between the two "Final Versions" is that the September Final Version 1.0 White Paper removed some explicit language touting the profit potential of investing in the Centra ICO. For example, the August Final Version 1.0 White Paper stated, "[o]ur token deal enables clients to join our prosperity and mission while generating a profit." This language is noticeably absent from the revised September Final Version 1.0 White Paper.

27.    According to the September Final Version 1.0 White Paper, the concept for Centra was originated in May 2016. The timeline of "roadmap and milestones" presented in this White Paper showed the following:



28.     In particular, the "roadmap and milestones" element of the Centra White Paper stated that in "May 2016" "The Idea Concept [sic] of connecting cryptocurrencies together to make them spendable" was formulated.

29.     As seen, the Centra White Paper also stated that, in January 2017, Centra had a "license agreement signed with VISA USA Inc."  However, on October 27, 2017, the New York Times reported that Defendant Centra Tech did not have a partnership with Visa or Mastercard,

nor had it even applied to run on their networks.[3]  Evidently, the accuracy of the White Paper's statements is, at best, questionable.  Additionally, despite Defendants' various statements that the Centra Debit Card, CTR Tokens, and cBay have been worked on since 2016, there is a no corroborating public documentation for such claims.  By all accounts, it appears that Defendants did not begin discussing the Centra idea until July 2017.  Similarly, as noted above, Defendant Centra Tech was not incorporated until July 27, 2017.

***The Centra ICO***

30.     In July 2017, Defendants began publishing press releases marketing the Centra ICO.  For example, on July 25, 2017, Defendants published a press release on Bitcoin.com, entitled "PR: Centra Tech Announces ICO, Centra Card, & Insured Wallet."[4]  This article stated that "Centra Tech has a brilliant solution, the world's first Debit Card that is designed for use with compatibility on 8+ major cryptocurrencies blockchain assets."  Similarly, it touted that the "ICO is truly a ground floor opportunity" and that the "Centra Card works anywhere that accepts Visa and Mastercard."  As mentioned, there was no partnership or ability for the "Centra Card" to operate on Visa or Mastercard networks.

31.     The initial appeal of the Centra ICO likely stemmed from its claim that the Centra Debit Card would be able to operate on Visa and Mastercard networks and allow users to make transactions in digital currencies in "real time."  This would be an incredible feat, as it would mean that cryptocurrencies would be able to be adopted by essentially anyone with a credit card.  Had Defendants actually created this technology and somehow established partnerships with Visa and Mastercard, the CTR Token likely would have increased substantially in value.  Unfortunately, and discussed in further detail below, these claims were apparently fabricated,

---

[3]     *See*   https://www.nytimes.com/2017/10/27/technology/how-floyd-mayweather-helped-two-young-guys-from-miami-get-rich.html.
[4] *See* https://news.bitcoin.com/pr-centra-tech-announces-ico-centra-card-insured-wallet/.

and Defendants were selling the CTR Tokens by making grossly exaggerated, and, in many instances, plainly false statements regarding their products.

32. During this time period, Defendant Centra Tech listed a "Michael Edwards" as its Co-Founder and Chief Executive Officer ("CEO"). However, it has since been revealed by Harry Denly ("Denly"), a cryptocurrency and web developer blogger, that Michael Edwards was not a real person, and the photo used on Defendant Centra Tech's website was that of a Canadian professor with no relationship to the company.[5] Worse yet, Defendants had created a fake LinkedIn profile for "Michael Edwards," which was deleted after Mr. Denly's blog post questioned the legitimacy of Michael Edwards.

33. Similarly, another individual, Defendant Centra Tech's purported Chief Financial Officer "Jessica Robinson," does not appear to have existed. Her name has been removed from the company's website, and her LinkedIn profile has been deleted.

34. Eventually, the Centra ICO was scheduled to "officially" launch and operate from August 5, 2017 through October 5, 2017. However, there are indications that Defendants may have begun collecting investments even prior to August 5, 2017.

***Marketing the Centra ICO***

35. On August 1, 2017, Defendants began the "Centra Official Bounty Program."[6] Essentially this was a program under which anyone who created consistent positive press, including via social media, encouraging the public to invest in Centra was offered CTR Tokens for their efforts. Included in this "Bounty Program," was a "Blog/Media Bounty," which stated that "Centra Will Reward Experienced Writers who write quality Reviews, Articles About the Centra Project and the ICO crowdsale."

36. Participants in the "Bounty Program" generated substantial coverage of the Centra ICO by publishing numerous blog posts and articles. Defendants' marketing efforts, including

---

[5] *See* https://harrydenley.com/why-i-think-centra-tech-is-a-scam/.
[6] *See* https://bitcointalk.org/index.php?topic=2057569.0.

its bounty program, yielded numerous publications focused on the potential profit that could be made by investing in the Centra ICO.  For example, a user named "Ebenezer" published a post on Steemit on August 17, 2017, entitled "Make Huge Money With the Latest Blockchain Debit Card Online" which stated, "[t]he Centra Tech ICO offers investors great opportunity for a comprehensive reward program for both token and card holders . . . ."[7]  Similarly, this same post concluded by stating, "[j]oin Centra Tech ICO and make real huge money Online because opportunity they says [sic] comes but once. Centra Tech ICO train [sic] is moving and it's unstoppable! It is now or never!"[8]

37.    While it is possible that some bloggers or articles were written by persons not participating in the "Bounty Program," the shameless positive spin on the Centra ICO in most of these articles indicates that the majority of such publications/statements were involved in the "Bounty Program."

38.    Participants in the "Bounty Program," were not the only persons touting the Centra ICO.  In August 2017, Defendant Sharma was, for all intents and purposes, the face of the company in interviews discussing the Centra ICO.  For example, on or around August 14, 2017, Defendant Sharma was interviewed on the podcast, Neocash Radio.  During this interview, Defendant Sharma plugged the nonexistent relationships with Visa and Mastercard.  For example, he stated, "[i]nternationally we currently have our license with Mastercard to service international clients, domestically we have a Visa partnership, so we're able to issue Visa cards

---

[7] *See* https://steemit.com/bitcoin/@ebenezer/make-huge-money-with-the-latest-blockchain-debit-card-online.

[8] There are numerous examples of these types of reviews, blog posts, articles, and forum posts. For example, on August 8, 2017 an "ICO Report" was published by "Grace Whatts" on "bitsify.net" entitled "Centra Tech ICO Report – Crypto-based Debit Card System."  Under the heading "Target Audience and Reviewing Profit Potential," this "Report" stated, "Centra's profit potential is exponential, if, they manage to somewhat prove successful and live up to their mainstream adoption goals."  The same "ICO Report" concluded that "[t]he Centra ICO looks to be very appealing especially for early investors looking to get into a cryptocurrency targeting the mainstream solution by providing a full suite of available products/applications."  *See* https://bitsify.net/ico-list/centra-tech-ico-report-crypto-based-debit-card-system/.

domestically, and Mastercards internationally."[9]   *See* http://neocashradio.com/blog/centra-card-interview-president-sam-sharma/ at 2:18-2:30.   When discussing the Centra ICO, Defendant Sharma stated, "[r]ight now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th" and as related to "bonus" CTR tokens being offered to early investors, "I definitely encourage anybody to take advantage of that if they see it and jump on it while the price is low."   *Id*. at 11:35-12:08.

39.     In addition to the false statements regarding their relationships with Visa and Mastercard, Defendants also paid for endorsements from celebrities, such as Floyd Mayweather, and then issued press releases touting "partnerships" with them.   For example, on September 15, 2017, Defendants issued a press release entitled "Centra Tech KOs Cryptocurrency Limitations with Floyd Mayweather Partnership."[10]   In reality, Mr. Mayweather was paid to make social media posts supporting the Centra ICO.   As reported by *The New York Times* on October 27, 2017, "The boxing champ understood their deal differently.   A spokeswoman for Mr. Mayweather, Kelly Swanson, said he had been paid in cash for the posts and was not involved in any continuing relationship with Centra."

40.     Importantly, as stated previously, the above deceptive activity Defendants have engaged in to raise investments from Plaintiff and the Class is not determinative of Plaintiff's claims.   Rather, such activity is presented herein to stress the need for judicial immediate intervention given Defendants' clear manipulation of investors.

***The Terms of the Centra ICO Presented an Investment Offer***

41.     Defendants have crafted a flimsy façade that CTR Tokens are not securities by claiming that they are "utility tokens."   The artifice of this terminology had its clear genesis in a

---

[9] Additionally, Defendant Sharma discussed the nonexistent "Mike Edwards" and stated that the company had "one private investor who is actually Mike Edwards, he put up a lot of the capital originally."
[10]   *See*   https://www.prnewswire.com/news-releases/centra-tech-kos-cryptocurrency-limitations-with-floyd-mayweather-partnership-300520378.html.

report the SEC published on July 25, 2017 regarding the DAO Initial Coin Offering, which involved DAO Tokens being offered in exchange for ETH investments.  In this report, the SEC concluded that the DAO Tokens were securities.  More specifically, the apparent genesis was in an article on inc.com that discussed the SEC's report on DAO.  In particular, on July 29, 2017, the official "CentraTech" account responded to a question on the bitcointalk.org forums, which are dedicated to the discussion of cryptocurrencies, asking whether Defendants had read the SEC's report regarding the DAO.  Following was Defendants' response:



*See* https://bitcointalk.org/index.php?topic=2041101.200.

42.     Apparently, Defendants read an article on inc.com that discussed the SEC's report on the DAO[11] and concluded that if they simply call the CTR Tokens a "utility token," then the CTR Tokens are automatically not securities.  It must be stressed that Defendants immediately

_____

[11] This article is no longer available online.

contradict this absurd rationale in the same post when they conclude by stating the CTR Tokens "will surge in value."

43.     In reality, the Centra ICO was obviously an offer and sale of securities. Specifically, the core offer, as stated in the September Final Version 1.0 White Paper, was "[t]he tokens will be sold at 200 CTR to 1 ETH."[12]   It is abundantly obvious that investors were engaging in the Centra ICO with the expectation that the 200 CTR Tokens would subsequently be worth more than 1 ETH, or the equivalent cryptocurrency invested.[13]

44.     In addition, the Centra ICO also carried a "minimum contribution purchase" of 0.1 ETH, which objectively closely resembles a minimum investment amount in a standard securities offering.

45.     Moreover, as provided in the August Final Version 1.0 White Paper, "CTR Token holders will receive a .8% eth reward for every transaction in the network."   As reiterated by Defendant Sharma in an interview on the Neocash Radio Podcast,

> **Defendant Sharma**: [The CTR Token] gives a lot of benefits to those token holders. Currently we have a rewards system set up.  And it is based on a monthly set up that token holders get point eight percent rewards of the network profit generated inside of the terms and conditions of the token. So pretty much break that down it just means that the rewards percentage that we get from Visa and Mastercard through our revenue share, we actually give point eight percent of that away to token holders as part of our program to join the Centra Tokens.

> **Host**: How is that paid out?

> **Defendant Sharma**: That is paid out monthly in Ether to their Centra wallets.

*See* http://neocashradio.com/blog/centra-card-interview-president-sam-sharma/ at 7:42-8:21.

---

[12] One ETH ranged in value throughout the duration of the Centra ICO and was worth between $200 and $400.
[13] On December 4, 2017, 1 CTR Token was worth approximately $0.4, meaning 200 CTR Tokens would be worth $80.  In contrast, 1 ETH is currently worth approximately $460.

46.     In other words, Defendants were offering a dividend to investors in the Centra ICO.  In short, the terms of the Centra ICO clearly indicate that the Centra ICO was an offer and sale of unregistered securities in violation of the federal securities laws.

***The CTR Tokens Are Securities***

47.     The facts are indisputable that Defendants participated in the offer and sale of CTR Tokens.  Specifically, Defendants dubbed the Centra ICO the "Centra Token Sale" in the September Final Version 1.0 White Paper. The "Terms and Conditions" contained therein stated that "the Tokens are purchased on an 'as is' basis."

48.     When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiff and the Class invested ETH, BTC, and LTC in order to receive CTR Tokens, which they were conditioned to expect would be worth more than their ETH, BTC, and LTC investment.  Indeed, the August Final Version 1.0 White Paper touted the potential profit to be made from investing in the Centra ICO with language such as, "[o]ur token deal enables clients to join our prosperity and mission while generating a profit."  Moreover, the Conclusion from this White Paper was as follows:



**8. CONCLUSION**

Centra Tech proposes to offer an integrated cryptocurrency marketplace and commerce solution
- Use Centra Debit Card to spend cryptocurrencies
- cBay Marketplace
- CTR Token
- Centra Wallet
- Currency Conversion Engine and Exchange Platform

Blockchain technology has proved to be a disruptive revolution and innovation for many industries, particularly the finance industry. With its presence as one of the main 10 developing advances in 2016, its maturity has seen blue-chip companies recognize it as a potential disruptors for several industries. The Blockchain revolution however can only remain embraced by every industry.

Leveraging on the over-$100 billion market cap of cryptocurrencies, Centra Tech has brought ease to the world of online buying and selling with its cryptocurrency-based market place, where customers can use Centra Debit Card anywhere in the world that accepts Visa®

Customers will also have the capacity to use their wallets on Centra Debit card, or trade them on cryptocurrency exchanges for a profit.

49.     As noted above, the so-called "Final Version 1.0" of Defendants' White Paper marketing the Centra ICO unabashedly stated that participants would be able to use the CTR Tokens "or trade them on cryptocurrency exchanges for a profit."

50.     Additionally, Defendants made numerous emphatic positive statements concerning the "growth potential" of the value of the CTR Tokens.  For example, the September Final Version 1.0 White Paper, included the following section:

> ### 3.3 Growth Potential
> **Jonathan Vaux, Visa® Card's VP of innovations and strategic partnerships, noted that "blockchain has received a significant amount of analyst and press attention over the last few years, as this emerging technology holds significant potential."** The growth potential of the market can likewise be evaluated by the fact that market capitalization of cryptocurrencies attained a new height of $102 Billion as of June 15, 2017, an increase of 1363% since Feb. 19, 2016. Bitcoin and Ether (the cryptocurrency of the Ethereum Blockchain platform) have a market capitalization of about $42 billion and $25 billion, respectively.

51.     As such, not only were Defendants attempting to draw inferences that they were affiliated with Visa, but also that the CTR Token had substantial "growth potential."

52.     Plaintiff's and the Class' investments of ETH, BTC, and LTC constitute an investment of money in an investment contract.

53.     Plaintiff and the Class were investing in a common enterprise with Defendants, as the Centra ICO investments were pooled under the control of Defendant Centra Tech, and the success of the CTR Token, the Centra Debit Card, and cBay—and thus potential profits stemming from the future valuation of the CTR Tokens—aligned the interests of Plaintiff and the Class with Defendants.  For example, the August Final Version 1.0 White Paper explicitly stated that CTR Token holders could make a "profit" by "join[ing] in" Defendants' "prosperity and mission."  Further, as stated in the September Final Version 1.0 White Paper, "14% [of CTR Tokens] will be dispersed to Centra Tech's organizers, early financial specialists, and representatives as an *impetus to making an enduring common interest* and commitment to the tokens and their drawn out value." (emphasis added).[14]  Accordingly, it is obvious that any potential value ascribed to the CTR Tokens was expected to be for the Individual Defendants' personal benefits, in addition to Plaintiff's and the Class' benefit.

54.     The value, and existence, of the CTR Tokens, Centra Debit Card, and cBay have been at all times entirely dependent on Defendants' actions and, as explicitly provided in the September Final Version 1.0 White Paper, each "Purchaser" was required to agree and certify that they "understand[] and accept[] that while the individuals and entities, including Centra Tech, assigned to this task will make reasonable efforts to develop the Centra Tech System, it is possible that such development may fail and purchasers' CTR Tokens could become useless and/or valueless due to technical, commercial, or regulatory challenges, among other reasons." Accordingly, it is obvious that any success from creating the CTR Token, Centra Debit Card, and cBay, as well as future potential increases to the CTR Token's value was, and continues to be, entirely dependent on Defendants' actions.

---

[14] To note, there are conflicting reports, as certain articles and posts have claimed that the "Centra Tech Team" had "32% of CTR Tokens reserved."

*Defendants Viewed the Centra ICO as Selling Investments*

55.     On October 27, 2017, *The New York Times* published an article discussing the Centra ICO and its use of celebrity endorsements.  For this article, the reporters reached out to Defendant Sharma to discuss his and Defendant Trapani's perjury indictments on October 5, 2017 stemming from Defendant Trapani's testimony that Defendant Sharma had only one alcoholic beverage the night he was arrested for driving while under the influence. In response to questions on this topic, Defendant Sharma stated, "I'm obviously not comfortable with that situation," and added "[b]ut it's not that I did something so intensely crazy that *investors* need to worry." (emphasis added).   Thus, Defendant Sharma clearly viewed persons who purchased Centra Tokens in the Centra ICO as "investors."[15]

56.     Similarly, in the "Centra Official Bounty Program" Defendants stated that "Centra Will Reward Experienced Video Editors who Create Quality Video Reviews, Presentation, *Investment Instruction* [sic] about the Centra Project and its Tokensale." (emphasis added).

57.     Additionally, "Version 2.0" of the Centra White Paper explicitly stated that the CTR Token "allows users to invest in the network's future blockchain" that Defendants now claim they are creating.  Accordingly, it is indisputable that Defendants viewed the Centra ICO as selling investments in the form of CTR Tokens.

*Purchasers Saw Centra Tokens as Investments*

58.     There are countless articles, blog posts, forum posts, and online comments discussing the fact that the Centra ICO was an investment opportunity.  For example, on September 11, 2017, "Melody Crypto" posted a blog entitled "ICO Centra Card – Store Your Money on Debit Card Using Cryptocurrency" on ico-flow.blogspot.com.[16]  This blog post stated,

---

[15]   *See*    https://www.nytimes.com/2017/10/27/technology/how-floyd-mayweather-helped-two-young-guys-from-miami-get-rich.html.

[16]   *See*    http://ico-flow.blogspot.com/2017/09/ico-centra-card-store-your-money-on-debit-card-using-cryptocurrency.html.

"the total supply will be offered for sale to investors according to the following price schedule."
Similarly, a forum post entitled "Guide to buying Centra (CTR) ICO" was posted on September
21, 2017 on cryptorum.com by "V4Vendetta" which stated, "right now 1 ETH will buy you 200
CTR's so it may not be a bad investment for people who like to gamble on the ICO market."[17]
This post concludes with, "[t]hanks and happy investing!"  As stated, there are countless
examples, however a post made on bitcoinmarketjournal.com at some point prior to September
19, 2017, sums up the core idea here quite succinctly.  This post included the following,

> How to Invest
>
> Please Read **How to Invest in ICOs**
> Then see **Centra Investment Instructions**

*See* https://www.bitcoinmarketjournal.com/icos/centra/.

59.    The link to "Centra Investment Instructions" directed to a page on
https://centra.tech/ but is no longer operating.  Regardless, clearly the Centra ICO was viewed
as an investment across the board.[18]

*"Utility Tokens"?*

60.    As noted above, on July 25, 2017, the SEC issued a report on the DAO, in which
it advised those using "distributed ledger or blockchain-enabled means for capital raising, to take
appropriate steps to ensure compliance" with the federal securities laws, and stated that "[a]ll
securities offered and sold in the United States must be registered with the Commission . . ." or
qualify for an exemption from registration.  On the same day, the SEC issued an investor bulletin
urging caution when investing in ICOs and instructing investors to be mindful that promoters
that lead buyers of tokens to expect a return on their investment, or shared returns provided by

---

[17] *See* https://cryptorum.com/threads/guide-to-buying-centra-ctr-ico.421/.
[18] To note, many of the posts and articles about the Centra ICO were likely made by participants
in the "Bounty Program," in which case this would simply further evidence that Defendant
Centra Tech's affiliates were touting the Centra ICO as an investment.

the project, may be offering a security for sale. Notably, Defendants have marketed both "growth potential" for the CTR Tokens that would "surge in value" and shared returns in the form of .08% of the "network profit." Accordingly, despite Defendants' transparent insistence that the CTR Tokens are "utility tokens" and thus not securities, it is plainly apparent that they were, and are, securities. Indeed, the word "utility" appears but once in the entirety of the September Final Version 1.0 White Paper, which serves to further evidence the illusory nature of Defendants' claim that the CTR Tokens were "utility tokens,"

61.     On September 29, 2017, the SEC announced that they charged two companies with defrauding investors in connection with "so-called" ICOs that were purportedly backed by investments.

62.     On November 8, 2017, Jay Clayton, the newly appointed Chairman of the SEC, delivered a speech to the 49th Annual Institute on Securities Regulation in which he equated ICOs with securities. After this speech, the Wall Street Journal reported Chairman Clayton as stating "I have yet to see an ICO that doesn't have a sufficient number of hallmarks of a security." This statement sums up the core issue here quite succinctly. The fact of the matter is, digital currencies are a relatively new technology and various parties are taking advantage of the time it takes for regulatory agencies to address developments in the area to engage in unlawful conduct with near impunity – just as Defendants have here, *i.e.*, raising millions of dollars by promising debit cards for cryptocurrencies that would operate in real time on Visa and Mastercard networks and CTR Tokens that would "surge in value" without registering their offerings.

63.     Most recently, on December 1, 2017, the SEC filed a complaint against PlexCorps for selling unregistered securities in connection with the "PlexCoin Token" Initial Coin Offering. It is clear from recent events that the rampant disregard of federal securities laws and consequently, abuse of investors, taking place in the ICO space has been noted by regulatory agencies, including the SEC. However, federal regulators cannot be everywhere at once, and

have not yet taken action with regard to Centra Tech's offering and sale of Centra Tokens. Fortunately, the private right of action provided for by Section 12(a)(1) of the Securities Act was created for just this type of situation and provides strict liability for the sale of unregistered securities.

**CLAIMS FOR RELIEF**

**COUNT I**

**Claim for Violation of Section 12(a) of the Securities Act**

**Against All Defendants**

64.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

65.    Section 12(a)(1) grants Plaintiff a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

66.    From approximately August 5, 2017 through October 5, 2017, in connection with the Centra ICO, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of Section 5(a) and 5(c) of the Securities Act.

67.    The Centra ICO and sale of CTR Tokens was the sale of unregistered securities under controlling federal law.  CTR Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any CTR Tokens an investment of money, in the form of ETH, BTC, and/or LTC was required; (b) the investment of money was made into

22

the common enterprise that is Centra and the potential further Centra product lines; (c) the success of the investment and any potential returns on such was entirely reliant on Defendants' ability to create the promised Centra Debit Card and Centra product line.

68.     As such, Defendants have participated in an unregistered sale of securities in violation of the Securities Act, and are liable to Plaintiff and the class for rescission and/or compensatory damages.

## COUNT II

### Claim for Violation of Section 15(a) of the Securities Act

### Against the Individual Defendants

69.     Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

70.     Due to their ownership interest in and control over Defendant Centra Tech, the Individual Defendants acted as controlling persons of Defendant Centra Tech within the meaning of Section 15(a) of the Securities Act as alleged herein.  By virtue of their positions as officers and/or directors and participation in and/or awareness of Defendant Centra Tech's operations, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the Centra ICO, including the decision to engage in the sale of unregistered securities via the Centra ICO.

71.     By virtue of the foregoing, the Individual Defendants are liable to Plaintiff and the Class as control persons of Centra Tech under Section 15(a) of the Securities Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a class action and certifying Plaintiff as the Class representative and his counsel as Class counsel;

B.     Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

C.      Declaring Defendants are liable to Plaintiff and the Class under Sections 12(a)(1) and/or 15(a) of the Securities Act;

D.      Enjoining Defendants from making further transfers or dissipations of the investments raised during the Centra ICO, or using such funds in any further purchases or transactions;

E.      Requiring an accounting of the remaining funds and assets raised from Plaintiff and the Class in connection with the Centra ICO;

F.      Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiff and the Class;

G.      Ordering rescission of the investments made by Plaintiff and the Class relating to the Centra ICO and/or compensatory damages;

H.      Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

I.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.


//

//

//

Dated: December 13, 2017

Respectfully submitted,

**KOMLOSSY LAW P.A.**


/s/  Emily C. Komlossy
Emily Komlossy (FBN 7714)
eck@komlossylaw.com
Ross A. Appel (FBN 90865)
raa@komlossylaw.com
4700 Sheridan St., Suite J
Hollywood, FL 33021
Tel: (954) 842-2021
Fax: (954) 416-6223

**OF COUNSEL:**

**LEVI & KORSINSKY LLP.**
Donald J. Enright
Elizabeth K. Tripodi
John A. Carriel
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Tel: (202) 524-4290
Fax: (202) 337-1567

*Attorneys for Plaintiff*