UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:17-cv-24500-JLK

JACOB ZOWIE THOMAS RENSEL,
individually and on behalf of all others
similarly situated,

                Plaintiff,

v.

CENTRA TECH, INC., SOHRAB SHARMA,
RAYMOND TRAPANI, ROBERT FARKAS,
and WILLIAM HAGNER,

                Defendants.

**REPLY IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY AND/OR IN THE ALTERNATIVE TO DISMISS UNDER RULE 12(B)(1) AND 12(B)(6)**

Plaintiff Jacob Zowie Thomas Rensel ("Plaintiff") responds to Defendants' pending motion to compel arbitration and stay, or in the alternative to dismiss,[1] with two assertions: that he did not agree to an arbitration agreement, and that he did not profit on the sale of his Centra Tokens. Both assertions, though, are contradicted by irrefutable evidence and should be rejected.

                **I.    ARGUMENT**

**A.    Plaintiff agreed to arbitrate his claims through Centra Tech's website, which was fully operational on July 30, 2017.**

Plaintiff's response to Centra Tech's motion to compel is founded entirely on his self-serving statement that he never agreed to the Token Sale Agreement prior to his purchase of Centra Tokens through the Centra Tech ICO smart contract. But as detailed below, the

---

[1]     Defendants include Centra Tech, Inc. ("Centra Tech"), Sohrab Sharma, Raymond Trapani, Robert Farkas, and William Hagner (collectively, "Defendants," and other than Centra Tech, the "Individual Defendants").

documentary evidence proves that on July 30, 2017, Plaintiff signed up for the Centra Tech ICO through the Centra Tech website; provided his personal information; and agreed to the Token Sale Agreement—all before sending his ETH to the smart contract.

In reply to Plaintiff's contention that he provided his account information to Centra Tech for the first time in a "Google Document" in October 2017, Centra Tech conducted an additional review of its customer relationship management (CRM) system, which is maintained in software licensed to Centra Tech by a third-party vendor, Zoho. *See generally* Supplemental Declaration of Steve Sykes ("Sykes Sup. Decl.," attached hereto as Exhibit A). The records show that:

- On July 30, 2017, Zoho CRM automatically created a customer record for Plaintiff that included Plaintiff's name, email address, physical address, and other personal information. *See* Sykes Sup. Decl. at ¶¶ 4, 7; Rensel CRM Record, Ex. 1 to Sykes Sup. Decl., at 1.

- During the ICO, Zoho CRM created a Centra Tech customer record only when a customer completed the Centra Tech ICO sign-up process on Centra Tech's website. *See* Sykes Sup. Decl. at ¶¶ 4–5.

- Zoho CRM further records whenever the system is used to send an automated email to a customer. *See id.* at ¶ 4.

- Zoho CRM records show that the system was used to send an email to Plaintiff at his personal email address on July 30, 2017. *See* Sykes Sup. Decl. at ¶ 8; Rensel CRM Record, Ex. 1 to Sykes Sup. Decl., at 5.

Zoho CRM's "Knowledge Base"—a publicly accessible record maintained by Zoho—confirms that the "created date and time" details for an account cannot be modified. *See* Declaration of Ponnusamy Chinnasamy ("Chinnasamy Decl.," attached hereto as Exhibit B), at ¶¶ 4–5 & Ex. 1 to Chinnasamy Decl. As a result, the integrity of that record is beyond question. This evidence clearly and carefully establishes that Plaintiff acquired CTR tokens after signing up for the Centra Tech ICO through the Centra Tech website on July 30, 2017, and in doing so, agreed to the Token Sale Agreement.

Plaintiff alleges that Centra Tech acquired his personal information not through the process described in the Sykes Declaration, but rather *only* because Plaintiff supplied this information to Centra Tech through a Google Form. But that claim does not comport with the facts. If Plaintiff provided his email address and other personal information to Centra Tech in any fashion other than the sign-up procedure described above, Centra Tech's Zoho CRM system: (1) would not have had the information necessary to email Plaintiff on July 30, 2017; (2) would state an account creation date in October 2017, not July 30, 2017; and (3) would not have all of Plaintiff's personal information as of July 30, 2017.

Further, contrary to Plaintiff's assertion otherwise, Centra Tech's website sign-up process (as described in the Sykes Declaration) was functional at all relevant times, and many other Centra Token buyers availed themselves of that process in July, August, and September 2017 by agreeing to the Token Sale Agreement and submitting their personal information to Centra Tech through the web page:

- Declaration of Leizle Ho ("Ho Decl.," attached hereto as Exhibit C) (describing sign-up and agreement to Token Sale Agreement on July 30, 2017);

- Declaration of Aaron Casillas ("Casillas Decl.," attached hereto as Exhibit D) (describing sign-up and agreement to Token Sale Agreement on August 21, 2017);

- Declaration of Garnett Gilchrest ("Gilchrest Decl.," attached hereto as Exhibit E) (describing sign-up and agreement to Token Sale Agreement on September 21, 2017).

As with Plaintiff, the Zoho CRM records for these buyers show exactly when they agreed to the Token Sale Agreement and submitted their personal information to Centra Tech. Sykes Sup. Decl., at ¶ 11 & Ex. 2–4 (Zoho CRM records corroborating account creation on dates listed in declarations). This illustrates the total implausibility of Plaintiff's claim that the Centra Tech ICO sign-up process was unavailable at the time he bought Centra Tokens and verifies that the

Zoho CRM—as would be expected of enterprise-grade business software—accurately tracks and records the date of account creation.

To buttress his self-serving and entirely unreliable claim that he did not sign up for the Centra Tech ICO through the Centra Tech website, Plaintiff relies on unverified and internet posts from various web forums. *See* Plaintiff's Opposition to Motion to Compel ("Opp.") at 4–9 (extensively citing posts on reddit.com and bitcointalk.org). Such posts have exceedingly limited or no probative value. *See ArcSoft v. CyberLink Corp.*, 153 F. Supp.3d 1057, 1073 n.8 (N.D. Cal. 2015) ("[T]he review, which consists of a single, somewhat ambiguous sentence by an anonymous internet user, is of minimal probative value even when viewed under the relaxed evidentiary standard applicable to this motion."); *MMG Ins. Co. v. Samsung Elecs. Am., Inc.*, 293 F.R.D. 58, 66 (D.N.H. 2013) ("[T]he postings, again, are effectively anonymous and describe incidents that occurred several years ago, making it more or less impossible for the defendants to investigate them and develop facts in rebuttal."); *Doe v. Kamehameha School*, No. 08-00359 JMS-BMK, 2008 U.S. Dist. LEXIS 105088, at *9–10 (D. Haw. Dec. 31, 2008) ("Indeed, a hallmark of the internet is that people may post comments anonymously or under pseudonyms and the public may never know their true identities. This invites commentators to make outrageous statements under a veil of secrecy. . . . [U]nder the cloak of anonymity, people will make outrageous, offensive, and even nonsensical statements.")  These posts in no way undermine the credible documentary evidence that Centra Tech has put forth establishing Plaintiff's agreement to arbitrate.

In sum, Plaintiff is quick to level serious allegations of perjury and invite the Court to impose sanctions. Opp. at 13–14. Unalterable digital evidence, though, establishes that on July 30, 2017, Plaintiff went through the sign-up process on the Centra Tech website; provided his

personal information; and agreed to the Token Sale Agreement, including the arbitration clause. *See supra* at 3. Plaintiff's "irrefutable" evidence to the contrary, Opp. at 13 n.12, consists only of Plaintiff's own word. Accordingly, Plaintiff's allegations of perjury by Centra Tech employees appears to be nothing more than a tactic to conceal his own prevarications.

### B. The Centra Tech ICO sign-up process included a valid "clickwrap" agreement.

Courts routinely enforce so-called "clickwrap" agreements, whereby a website visitor agrees to certain terms (commonly including arbitration) by clicking a box certifying that they have read and assented to a specified agreement. *See Theodore D'Apuzzo, P.A. v. United States*, No. 16-62769-Civ-Scola, 2017 U.S. Dist. LEXIS 156270, at *10 (S.D. Fla. Sept. 25, 2017). Plaintiff contends that the Token Sale Agreement is not a clickwrap agreement (or even a less enforceable "browsewrap" agreement, which does not require an express affirmation of assent) because users could theoretically buy Centra Tokens through the smart contract without ever visiting the Centra Tech website. Opp. at 11–12. But Plaintiff's argument is not supported by facts or law. Centra Tech has documentary evidence that Plaintiff (and virtually all putative class members) *did* go through the sign-up process described in the Sykes Declaration, affirmatively agreed to the Token Sale Agreement by clicking boxes to that effect and have corresponding Zoho CRM records created contemporaneously to verify their account creation. *See supra* at 3. And Plaintiff cites no authority, because there is none, for the proposition that an agreed-upon arbitration clause is unenforceable simply because the consumer could have, but did not, consummate the transaction in a different way.

The case most heavily relied on by Plaintiff—*Bazemore v. Jefferson Capital Systems, LLC*—could hardly be less applicable. There, the Eleventh Circuit faulted defendant for failing to provide "documentary proof" of the content of plaintiff's computer screen during the

5

application process and "a copy of the *actual* contract" at issue.  827 F.3d 1325, 1330–32 (11th Cir. 2016).  In other words, the defendant provided literally no evidence beyond a declaration stating that the plaintiff's acquisition of a credit card required her to accept a cardholder agreement containing an arbitration clause.  *Id.* at 1327.  Here, Centra Tech has supplied both of those things.

Last, Plaintiff suggests that even if he did agree to the Token Sale Agreement, it would be unenforceable under the provision of the state statute of frauds pertaining to "the sale of goods for the price of $500 or more."  Opp. at 7 n.6.  Under the Federal Arbitration Act, however, arbitration agreements need not be signed, and instead must only be in writing.  *See Caley v. Gulfstream Aero. Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) (summarizing cases).  In any event, both Delaware and Florida exclude "investment securities" from the definition of "goods." Del. Code Ann. Tit. 6 § 2-105(1); Fla. Stat. § 672.105(1).  Because Plaintiff contends that the Centra Token is a security, he cannot now invoke the statute of frauds to disavow the contract of sale.  Both states also provide that even an unsigned contract remains enforceable "with respect to goods for which payment has been made and accepted or which have been received and accepted."  Del. Code Ann. Tit. 6 §2-201(3)(c); Fla Stat. § 672.201(3)(c).  Plaintiff admits that he paid for, received, and accepted his Centra Tokens.  D.E. 1, ¶ 10.

      C.      **Plaintiff sold his Centra Tokens for a significant profit, not a loss.**

The simple math behind Plaintiff's claim—math that Plaintiff cannot dispute—is that on July 31, 2017, he traded an asset then worth $3,250.75 (16.1 ETH)—for a quantity of Centra Tokens.  On October 27, 2017, he traded those Centra Tokens for an asset then worth $4,179.72

(0.7096997 Bitcoin (BTC)).[2]  The end economic result of Plaintiff's purchase and sale of Centra Tokens was a gain of over $900.[3]  Under the simplest articulation of the relevant standard, Plaintiff lacks standing because "the challenged transaction produced an economic benefit . . . ." *Waxman v. Cliffs Natural Res., Inc.*, 222 F. Supp. 3d 281, 289 (S.D.N.Y. 2016).

Plaintiff transparently tries to avoid that reality with a convoluted explanation of his "loss" in terms of ETH, BTC, and Centra Tokens.  Opp. at 15–16 (observing that Plaintiff purchased his Centra Tokens for 16.1 ETH, and later sold those Tokens for BTC that could have been sold the same day for only 13.723 ETH).  In other words, he argues that because "none of [his] transactions in CTR Tokens were denominated in US dollars or any other fiat currency," Opp. Ex. A, ¶ 16, his "damages," too, should be assessed in terms of ETH.

But Plaintiff's loss computation "methodology"—ETH to Centra Tokens to BTC, back to ETH—ignores that U.S. courts compute damages and award relief in terms of U.S. dollars, not virtual currency.  Where a plaintiff has sold the alleged security at issue, his potential relief is strictly limited to money damages.  *See* 15 U.S.C. § 77l(a)(2) (permitting suit "for damages if [the plaintiff] no longer owns the security.").  Those money damages are calculated and awarded in U.S. dollars.  *See Jamaica Nutrition Holdings, Ltd. v. United Shipping Co.*, 643 F.2d 376, 380 n.5 (5th Cir. 1981) ("A money judgment entered by an American court must be in United States currency.").  Where a Section 12(a) plaintiff has suffered no money damages at the time of his sale of the security, his claim must be dismissed.  See Mtn. at 14 (listing cases).

---

[2]   The Complaint describes Plaintiff's purchase of Centra Tokens in dollar terms, D.E. 1, ¶ 10, but is conspicuously silent as to his eventual disposition of those tokens for a profit, perhaps because it so obviously undermines his standing.

[3]   Plaintiff alludes to transaction fees incurred in connection with these transactions, but does not detail their amount, and so they should not be considered at this time.

The most charitable interpretation of Plaintiff's position is that whatever gain he made is unrealized because he never converted his virtual currency back to U.S. dollars. But at least one appellate court, addressing claims under the Securities Act, has rejected exactly that argument. In *Learning Company Securities Litigation v. Mattel, Inc.*, the plaintiff alleged that he received shares in The Learning Company for $17.68 based on a fraudulent registration statement. 294 F.3d 1201, 1202 (9th Cir. 2002). He was later forced to convert those shares into the stock of an acquiring company, Mattel, Inc., worth $33.45 per share, for a significant unrealized gain. *Id.* at 1202–03. But when Mattel stock plunged to under $14 per share—shifting the plaintiff's position back to an unrealized loss—he sued under Section 12(a)(1), claiming that he had been injured. *Id.* The court affirmed dismissal on the ground that as of the date of the "transaction"—i.e., the merger date—the plaintiff had disposed of his security for a significant profit, and "[t]hat he suffered a later loss on his Mattel stock is beside the point." *Id.* Last, the court recognized that the plaintiff "now attempts to change his $15.7625 per share gain into a loss. The perspicacious district judge was not persuaded that gain is loss. Nor are we." *Id.*

Here too, Plaintiff seeks to persuade the Court that gain is loss, i.e., that his $900 profit is better viewed as a 2.4 ETH shortfall. This position is at odds with logic and Plaintiff's earlier representation of the facts. The Complaint consistently describes the facts at issue in this matter in terms of U.S. dollars—dollars raised by Centra Tech in its ICO (D.E. 1, ¶¶ 1–2, 62), the dollar value of ETH (*id.* ¶ 43 nn.12–13), and the dollar value of the Centra Token (*id.* ¶ 43 n.13). In two instances Plaintiff even calculated the dollar value of his purchase of Centra Tokens based on the dollar value of the ETH transferred at the time of purchase. (*Id.* ¶ 10; *id.* Ex. A, chart). Plaintiff's sudden insistence that his harm cannot be measured in dollars and must be measured in virtual currency demonstrates the desperation inherent in this argument.

8

Because Plaintiff has failed to "clearly" satisfy the "irreducible constitutional minimum" of standing, his claim under Section 12(a) must be dismissed under Rule 12(b)(1).

### D. Plaintiff has failed to allege "control person" liability against any defendant.

Plaintiff's claim against the Individual Defendants fails foremost because, as detailed above, he has not established a primary violation of the securities laws by Centra Tech. In the absence of such a violation—including specifically where the securities at issue were sold for a profit—his claim premised on "control person" liability must be dismissed. *See*, *e.g., In re Mut. Funds Inv. Litig.*, 384 F. Supp. 2d at 867 n.21 (dismissing Section 15(a) claim along with underlying claim where plaintiffs sold the relevant securities for a profit).

But further, Plaintiff has not alleged any degree of *control* over the company by any Individual Defendant, including Sam Sharma. He alleges that Sharma was the founder of Centra Tech, held various positions at various times, has an ownership stake in Centra Tech, and at times made public statements on behalf of Centra Tech. Opp. at 17–18 (summarizing allegations). But at no point does Plaintiff allege in any fashion that Sharma had any specific power to control Centra Tech's business affairs, or to directly or indirectly control or influence the specific corporate policy allegedly giving rise to liability. *See Theoharous v. Fong*, 256 F.3d 1219, 1227 (11th Cir. 2001) (quotation marks omitted). And the allegations against the remaining Individual Defendants, as Plaintiff admits, *see* Opp. at 18, are even less substantial, consisting only of their corporate titles, which are squarely insufficient to establish liability. *See Tippens v. Round Island Plantation LLC*, No. 09-CV-14036, 2009 U.S. Dist. LEXIS 66224, at *37 (S.D. Fla. July 31, 2009) (dismissing claim under Section 15(a)).

Last, Plaintiff falls back on allegations that the Individual Defendants "had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the Centra ICO, including the decision to engage in the sale of unregistered securities

9

via the Centra ICO." Opp. at 18 (quoting D.E. 1, ¶ 70). But these boilerplate restatements of the legal standard, too, are insufficient to state a claim. *See Tippens*, 2009 U.S. Dist. LEXIS 66224, at *36–37 "[A] complaint that merely restates the legal standard for control person liability, without providing facts in support of the allegation, does not adequately plead control person liability.").

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court (i) compel Plaintiff to arbitrate his claims against Defendants on an individual basis and stay this matter until such arbitration is concluded, (ii) dismiss this action for lack of subject-matter jurisdiction and failure to state a claim, and/or (iii) grant Defendants such and further other relief as the Court deems just and proper.

| | |
|---|---|
| Date:  February 23, 2018 | Respectfully submitted, |
| **MANDEL & MANDEL LLP**<br>169 East Flagler Street, Ste. 1200<br>Miami, FL 33131<br>Tel: (305) 374-7771<br>Fax: (305) 374-7776<br><br>By: */s/ Nina Stillman Mandel*<br>NINA STILLMAN MANDEL, ESQ.<br>Florida Bar No. 843016<br>nsm@mandel.law | **BALLARD SPAHR LLP**<br>1735 Market St., 51st Floor<br>Philadelphia, PA 19103-7599<br>Telephone: (215) 864-8500<br>Facsimile: (215) 864-8999<br><br>1675 Broadway, 19th Fl.<br>New York, NY 10019-5820<br>Telephone: (212) 223-0200<br>Facsimile: (212) 223-1942<br><br>*/s/ David L. Axelrod*<br>DAVID L. AXELROD, ESQ.*<br>axelrodd@ballardspahr.com<br>MARJORIE J. PEERCE, ESQ.*<br>peercem@ballardspahr.com<br>THOMAS F. BURKE, ESQ.*<br>burket@ballardspahr.com<br><br>*admitted *pro hac vice*<br><br>*Counsel for Defendants Centra Tech, Inc., Sohrab Sharma, Raymond Trapani, Robert Farkas, and William Hagner* |

**Certificate of Service**

I hereby certify that on February 23, 2018, I electronically filed a true and correct copy of the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel or parties of record via CM/ECF.

*s/ Nina Stillman Mandel*