# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

JACOB ZOWIE THOMAS RENSEL,
individually and on behalf of all others
similarly situated,

                       Plaintiff,

v.

CENTRA TECH, INC., SOHRAB SHARMA,
RAYMOND TRAPANI, ROBERT FARKAS,
WILLIAM HAGNER,

                       Defendants.

C.A. No. 1:17-cv-24500-JLK/Simonton

**PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM OF LAW
IN SUPPORT OF PLAINTIFF'S RENEWED MOTION
FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, DOCUMENT
PRESERVATION ORDER, AND ORDER TO MAKE ACCOUNTING
AND OTHER ANCILLARY RELIEF**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

ARGUMENT ...........................................................................................................................3

    I.      STANDARDS OF LAW ...........................................................................................3

    II.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS ...5

          A.     Elements of the Claims ................................................................................5

          B.     No Registration Statement Was Filed or in Effect for the CTR Tokens Defendants Offered and Sold .......................................................................6

          C.     CTR Tokens Are Securities ..........................................................................7

               1.     Centra ICO Participants Invested Money .......................................8

               2.     Centra ICO Participants Invested in a Common Enterprise ...........9

               3.     Centra ICO Participants Invested With the Expectation of Profits Produced By the Efforts of Others .................................................10

               4.     Representations To Investors ..........................................................10

          D.     Interstate Means Were Used to Offer and Sell the CTR Tokens ...............12

          E.     All of the Evidence Clearly Indicates That the Defendants' Arbitration Argument Relies on Falsified Affidavits and Computer Records .............13

    III.    PLAINTIFF AND THE CLASS FACE IRREPARABLE HARM .......................15

    IV.   THE BALANCE OF THE EQUITIES FAVORS PLAINTIFF ...........................19

    V.    THE PUBLIC INTEREST WILL BE SERVED BY A TRO...............................19

CONCLUSION.......................................................................................................................20

**Page(s)**

**Cases**

*Balmert v. Pulte Home Corp.*,
    445 Fed. Appx. 256 (11th Cir. 2011)...................................................................10

*Eaton v. Coal Par of W. Virginia, Inc.*,
    580 F. Supp. 572 (S.D. Fla. 1984).......................................................................6

*Gordon v. Terry*,
    684 F.2d 736 (11th Cir. 1982) ...........................................................................10

*Hollywood Mobile Estates Ltd. v. Cypress*,
    2011 U.S. Dist. LEXIS 162092 (S.D. Fla. July 1, 2011)....................................3

*Hudson Nat'l Bank v. Shapiro*,
    695 F. Supp. 544 (S.D. Fla. 1988)......................................................................16

*Kreuzfeld A.G. v. Carnehammar*,
    138 F.R.D. 594 (S.D. Fla. 1991) .........................................................................19

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
    51 F.3d 982 (11th Cir. 1995) ...............................................................................4

*Mediaone, Inc. v. E&A Beepers & Cellulars*,
    43 F. Supp. 2d 1348 (S.D. Fla. 1998) ............................................................4, 19

*Miyahira v. Vitacost.com, Inc.*,
    715 F.3d 1257 (11th Cir. 2013) ............................................................................5

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)..........................................................................................5

*Pinter v. Dahl*,
    486 U.S. 622 (1988)........................................................................................5, 19

*Raiford v. Buslease, Inc.*,
    825 F.2d 351 (11th Cir. 1987) ...........................................................................5, 6

*Scheck Investments, L.P. v. Kensington Mgt., Inc.*,
    04-21160-CIV, 2009 WL 10668565 (S.D. Fla. June 17, 2009).........................6

*Schiavo ex rel. Schindler v. Schiavo*,
    403 F.3d 1223 (11th Cir. 2005) .......................................................................3, 4

*SEC v. Bar Works Capital, LLC*,
    No. 17-cv-4396, 2017 U.S. Dist. LEXIS 170983 (N.D. Cal. Oct. 16, 2017) ...............19

*SEC v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2004) ..............................................................................6

*SEC v. Comcao Ltd.*,
    855 F. Supp. 1258 (S.D. Fla. 1994) .....................................................................8

*SEC v. Edwards*,
    540 U.S. 389 (2004)...........................................................................................................7

*SEC v. ETS Payphones, Inc.*,
    408 F.3d 727 (11th Cir. 2005) ........................................................................................4

*SEC v. Friendly*,
    49 F. Supp. 2d 1363 (S.D. Fla. 1999) ........................................................................8, 11

*SEC v. Johnson*,
    2001 U.S. Dist. LEXIS 27403 (S.D. Fla. Dec. 27, 2001) ............................................15

*SEC v. Joiner*,
    320 U.S. 344 (1943)......................................................................................................10

*SEC v. Koscot Interplanetary, Inc.*,
    497 F.2d 473 (5th Cir. 1974) ..........................................................................................9

*SEC v. Lauer*,
    445 F. Supp. 2d 1362 (S.D. Fla. 2006) .....................................................................4, 20

*SEC v. Levin*,
    2013 U.S. Dist. LEXIS 20027 (S.D. Fla. Feb. 14, 2013)..............................................12

*SEC v. Merchant Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ......................................................................................10

*SEC v. Shavers*,
    No. 4:13-cv-416, 2013 U.S. Dist. LEXIS 110018 (E.D. Tex. Aug. 6, 2013) .................8

*SEC v. Unique Fin. Concepts, Inc.*,
    196 F.3d 1195 (11th Cir. 1999) ...................................................................................8, 9

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946)................................................................................................passim

*Stowell v. Ted S. Finkel Inv. Serves., Inc.*,
    489 F. Supp. 1209 (S.D. Fla. 1980) ...............................................................................8

*Textron Fin. Corp. v. Unique Marine, Inc.*,
    2008 U.S. Dist. LEXIS 90245 (S.D. Fla. Oct. 22, 2008)................................................4

*Tippens v. Round Island Plantation LLC.*,
    2009 U.S. Dist. LEXIS 66224 (S.D. Fla. July 31, 2009)................................................8

*United States v. Hornaday*,
    392 F.3d 1306 (11th Cir. 2004) ....................................................................................12

*Uselton v. Comm. Lovelace Motor Freight, Inc.*,
    940 F.2d 564 (10th Cir. 1991) ........................................................................................8

*Villeneuve v. Advanced Bus. Concepts Corp.*,
    698 F.2d 1121 (11th Cir. 1990) ......................................................................................9

*Williamson v. Tucker*,
    645 F.2d 404 (11th Cir. 1981) ......................................................................................10

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008).................................................................................................................4

**Statutes**

15 U.S.C. § 77b(a)(1).............................................................................................................7

15 U.S.C. § 77e..............................................................................................................5, 6, 12

15 U.S.C. § 77l(a)(1).....................................................................................................5, 6, 12

15 U.S.C. § 77o(a).................................................................................................................5

**Rules**

Fed. R. Civ. P. 23..................................................................................................................1

Fed. R. Civ. P. 65(b)..........................................................................................................1, 3

## INTRODUCTION

Plaintiff Jacob Zowie Thomas Rensel ("Plaintiff"),[1] who has brought the instant action as a class action (the "Action") pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public investors (the "Class") in Centra Tech, Inc.'s ("Centra Tech") initial coin offering ("Centra ICO")[2] respectfully submits this motion (the "Motion") and incorporated memorandum of law, pursuant to Fed. R. Civ. P. 65(b), renewing his request that the Court issue an order temporarily restraining and enjoining Defendants[3] from transferring or otherwise disposing of any of the assets raised in connection with the Centra ICO, including, but not limited to, Ether ("ETH"), Bitcoin ("BTC"), Litecoin ("LTC" ), other digital or fiat currencies (including US dollars), and any other assets that Defendants have since purchased with funds and assets, or any liquidations thereof, invested by the Class or collected by Defendants, in connection with the Centra ICO (the "ICO Proceeds"). In connection with the Centra ICO, Defendants unlawfully raised over $30 million in digital currencies by offering and selling unregistered securities in direct violation of the Securities Act of 1933 (the "Securities Act"). The ICO Proceeds rightfully belong to Plaintiff and the Class and, as detailed herein, there is a significant, immediate, risk that Plaintiff and the Class will suffer irreparable harm from further dissipation and misallocation of the ICO Proceeds. Accordingly, Plaintiff believes that it is necessary to have the parties brief this Motion on a shortened schedule and not pursuant to the timing set forth in Local Rule 7.1 (c). A separate form of proposed Order granting Plaintiff's request is being filed contemporaneously herewith.

This Motion is renewed because newly discovered factual developments concerning the status and safekeeping of the ICO Proceeds necessitate immediate judicial intervention.

---

[1]     Plaintiff's motion for appointment as lead plaintiff, filed jointly with Mr. Wang Yun He ("He"), is currently pending before this Court. Dkt. No. 46. Mr. He and Plaintiff are the only Class members that have sought appointment as lead plaintiff in the Action.

[2]     The Centra ICO took place from approximately July 30, 2017 and October 5, 2017.

[3]     Defendants are Centra Tech, Sohrab Sharma ("Sharma"), Raymond Trapani ("Trapani"), Robert Farkas ("Farkas"), and William Hagner ("Hagner," and together with Sharma, Trapani, and Farkas, the "Individual Defendants," and collectively with Centra Tech, "Defendants").

Specifically, on April 2, 2018, the Securities and Exchange Commission ("SEC") and the United States District Attorney's Office for the Southern District of New York and Federal Bureau of Investigation ("FBI") filed/announced separate actions (the "SEC Action" [4] and the "FBI Action")[5] against Defendants Sharma and Farkas which reveal that Defendants have dissipated a significant amount of the ICO Proceeds in recent months.  For example, the SEC Action states that as of March 30, 2018, Defendant Centra Tech's "bank accounts had been depleted and most of its employees had been terminated" and that Defendant Farkas had been arrested by United States criminal authorities on April 1, 2018, while attempting to leave the United States. Ex 1 ¶¶ 84–5. Further, given Defendant Farkas' apparent attempt to flee the United States and the ease in which digital currencies can be transferred across borders, there is a significant risk that one of the Defendants and/or their affiliates could attempt a similar scheme to escape the reach and jurisdiction of the American judicial system with the ICO Proceeds.

As further detailed herein, the factual developments identified in the SEC and FBI Actions demonstrate a significant risk that the remaining ICO Proceeds are likely to be dissipated and/or misallocated absent immediate injunctive relief, thereby rendering proper relief in this Action impossible.

Accordingly, Plaintiff seeks an order: (i) temporarily restraining Defendants from directly or indirectly, alone or in concert with others (including any officer, agent, employee and/or representative of Centra Tech), transferring or dissipating the ICO Proceeds; (ii) imposing an asset

---

[4]     The SEC Action is largely comprised of factual allegations raised in this Action, and alleges that, from July 2017 through April 2, 2018, in connection with the Centra ICO and Defendant Centra Tech's operations, Defendants Sharma and Farkas engaged in securities fraud and the unlawful offer and sale of unregistered securities in violation of the federal securities laws. A true and correct copy of the SEC Action is attached as **Exhibit 1** to the Declaration of Donald J. Enright in Support of Plaintiff's Motion ("Enright Decl.").

[5]     The United States District Attorney's Office for Southern District of New York's complaint alleges that, from July 2017 through April 2, 2018, in connection with the Centra ICO and Defendant Centra Tech's operations, Defendants Sharma and Farkas engaged in: (I) Conspiracy To Commit Securities Fraud; (II) Securities Fraud; (III) Conspiracy To Commit Wire Fraud; and (IV) Wire Fraud (the "**FBI Action**").  A true and correct copy of the FBI Action is attached as **Exhibit 2** to the Enright Decl.

freeze and constructive trust covering Defendants Centra Tech, Sharma, Trapani, Farkas and Hagner—along with Centra Tech's current or former officers, agents, affiliates and the Individual Defendants' affiliates, representatives and other relevant individuals' accounts and/or digital currency wallets holding any ICO Proceeds; (iii) prohibiting Defendants, their officers, affiliates, and other relevant individuals from destroying, erasing or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) which relate to Centra Tech or the Centra ICO; (iv) requiring Defendants to provide an interim accounting, under oath, detailing: (a) all investor monies, assets, digital currencies, virtual currencies, cryptocurrencies, collected in connection with the Centra ICO and Centra Tech's business operations; and (b) a schedule of all transactions involving the ICO Proceeds, including all transfers, liquidations, purchases and expenditures involving the ICO Proceeds from July 1, 2017 through the date of the accounting; and (v) scheduling a hearing on shortened time on Plaintiff's anticipated motion for preliminary injunction (no later than the expiration of the temporary restraining order).[6]

## ARGUMENT

### I.  STANDARDS OF LAW

The purpose of injunctive relief is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered. *See Hollywood Mobile Estates Ltd. v. Cypress*, 2011 U.S. Dist. LEXIS 162092, at *5 (S.D. Fla. July 1, 2011) (citing *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005).

If there is a possibility that irreparable injury will occur before the hearing on a PI required by Rule 65(a) can be held, a temporary restraining order ("TRO") may be available under Rule 65(b).  *See* Fed. R. Civ. P. 65(b).  The standard used to evaluate whether the issuance of a TRO is

---

[6]     The procedural history and facts relevant to this Motion are set forth in paragraphs 20 through 32 of the Enright Declaration.  The Enright Declaration is incorporated herein by reference.

warranted is the same as that used to evaluate whether the issuance of a preliminary injunction is appropriate. *See Acushnet Co. v. 168GOLFSHOP*, 2016 U.S. Dist. LEXIS 122335, at *7 (S.D. Fla. Sept. 8, 2016); *see also Textron Fin. Corp. v. Unique Marine, Inc.*, 2008 U.S. Dist. LEXIS 90245, at *12-13 (S.D. Fla. Oct. 22, 2008) ("The primary difference between the entry of a temporary restraining order and a preliminary injunction is that a temporary restraining order may be entered before the defendant has an adequate opportunity to respond, even if notice has been provided").

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). "The same four factors apply to the determination of whether to grant a temporary restraining order or preliminary injunction: '(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest.'" *Textron Fin. Corp.*, LEXIS 90245 at *12 (citing *Schiavo ex rel.*, 403 F.3d at 1225–26).

"A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *see also SEC v. Lauer*, 445 F. Supp. 2d 1362, 1367 (S.D. Fla. 2006) ("Freezing assets is a well accepted equitable remedy employed to 'preserve the status quo' and is proper in actions arising under the Securities Act.") (citing *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 734-35 (11th Cir. 2005); *see also Mediaone, Inc. v. E&A Beepers & Cellulars*, 43 F. Supp. 2d 1348, 1355 (S.D. Fla. 1998) (ordering an asset freeze where plaintiffs demonstrated dissipation or misappropriation of assets claimed and stating "[t]he asset freeze will preserve the status quo and ensure that Plaintiff can avail itself of its possible remedies."). The potential dissipation of assets claimed weighs in favor of granting an asset freeze.

4

## II.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF HIS CLAIMS

As discussed herein, Defendants violated Sections 12(a)(1) and 15(a), 15 U.S.C. §§ 77l(a)(1) and 77o(a), of the Securities Act by offering and selling unregistered securities during the Centra ICO.[7]  Defendants' actions in conducting the Centra ICO were in direct violation of the Securities Act and have deprived Plaintiff and the Class of their rights and protections under the federal securities laws.  Accordingly, Plaintiff is likely to succeed on the merits of his claim.

### A.     Elements of the Claims

Section 12(a)(1), 15 U.S.C. § 77l(a)(1), of the Securities Act creates a private right of action against any person who "offers or sells a security in violation of" Section 5, 15 U.S.C. § 77e, of the Securities Act.  *See e.g., Raiford v. Buslease, Inc.*, 825 F.2d 351, 353 (11th Cir. 1987) ("Section 12[a](1) merely provides a remedy for a violation of that section by authorizing recovery in a civil action against any person who offers or sells a security in contravention of section 5(a)").  Section 5 of the Securities Act prohibits the offer or sale of unregistered securities.  15 U.S.C. § 77e.  "The lynchpin of the [Securities] Act is its registration requirement."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015).

Due to the varied and innumerable ways in which investors are likely to be manipulated and harmed absent the protections of the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  *See Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The registration requirements are the heart of the [Securities] Act, and § 12[a](1) imposes strict liability for violating those requirements. Liability under § 12[a](1) is a particularly important enforcement tool, because in many instances a private suit is the only effective means of detecting and deterring a seller's wrongful failure to register securities before offering them for sale.") (Citation omitted); *see also Raiford*, 825 F.2d at 354 ("Section 12[a](1) will allow a purchaser to recover his investment 'regardless of whether he

---

[7]     As Plaintiff's Section 15(a) requires a primary violation under Section 11 or 12, the Court need only consider whether Plaintiff is likely to succeed on his Section 12 claims for purposes of the instant motion.  *See Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1268 (11th Cir. 2013).

can show any degree of fault, negligent or intentional, on the seller's part'") (Citation omitted); *Eaton v. Coal Par of W. Virginia, Inc.*, 580 F. Supp. 572, 576 (S.D. Fla. 1984) ("As modified by section 5, section 12[a](1) prohibits the use of interstate commerce or of the mails to aid in the offer or sale of an unregistered security . . .").

In order to plead a Section 5 violation, and thus liability under Section 12(a)(1), a "plaintiff need only allege [1] the sale or offer to sell securities, [2] the absence of a registration statement covering the securities, and [3] the use of the mails or facilities of interstate commerce in connection with the sale or offer." *Raiford*, 825 F.2d at 354; *see also SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 806-07 (11th Cir. 2004) (setting forth same three elements for a Section 5 violation); *Scheck Investments, L.P. v. Kensington Mgt., Inc.*, 04-21160-CIV, 2009 WL 10668565, at *4 (S.D. Fla. June 17, 2009) (same).

As discussed in detail below, each of these three elements are plainly met, and thus, Plaintiff is likely to succeed on the merits of his claims.

### B.   No Registration Statement Was Filed or in Effect for the CTR Tokens Defendants Offered and Sold

The facts are indisputable that there was no Registration Statement filed with the SEC relating to the CTR Tokens or the Centra ICO.  A thorough search of the SEC's EDGAR database confirms that no such registration statement was ever filed.  Indeed, the SEC itself has stated as such in the SEC Action.  SEC Action, Ex. 1 ¶94.  Thus, there is no possible dispute as to whether or not a registration statement for the CTR Tokens or Centra ICO was filed or ever became effective.

The facts are similarly indisputable that Defendants participated in the offer and sale of CTR Tokens.  Specifically, as stated in the September White Paper (defined in Enright Decl. ¶7), "[t]he tokens will be sold at 200 CTR to 1 ETH."  Enright Decl., Ex. 5 at pg. 13.  Given the fact that Defendants Sharma, Trapani, Farkas have each been referenced as "co-founders" of Defendant Centra Tech, it is indisputable that they orchestrated and directed Centra Tech's actions in

operating the Centra ICO.[8]  As relates to Defendant Hagner, it is unknown exactly when he became a director of Centra Tech.  However, Centra Tech's announcement on October 27, 2017 regarding Hagner's new role as President and Chairman of the Board stated, "[w]e are proud to announce that William Hagner, our board director, will now serve as both the President & Chairman of the board for Centra Tech, Inc."  Enright Decl., Ex. 13.  Accordingly, Hagner was already a director of Centra Tech prior to October 27, 2017.

Further, Defendants were fully-aware that they were "selling" CTR Tokens.  For example, on or about August 14, 2017, Defendant Sharma was interviewed on the podcast, Neocash Radio. During this interview Sharma stated, "[r]ight now is a great time to join our system, we have a token sale that is going on, it finished on October 5th" and as related to "bonus" CTR Tokens offered to early investors, "I definitely encourage anybody to take advantage of that if they see it and jump on it while the price is low."[9]  In short, it is absolutely undisputable that Defendants offered and sold CTR Tokens and that the CTR Tokens were never registered with the SEC.

### C.     CTR Tokens Are Securities

Under Section 2(a)(1), 15 U.S.C. § 77b(a)(1), of the Securities Act, the definition of a "security" includes an "investment contract."  "An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."  *SEC v. Edwards*, 540 U.S. 389, 393 (2004).  "This definition 'embodies a flexible, rather than a static, principle that is capable of adaption to meet the countless and variable schemes devised by those seeking to use others' money on the promise of profits.'"  *Id.* at 395 (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)).

An application of the *Howey* test concludes that the CTR Tokens are deemed securities under the "investment contract" definition in Section 2(a)(1), 15 U.S.C. § 77b(a)(1), of the

---

[8]      *See* Nathaniel Popper, *How Floyd Mayweather Helped Two Young Guys From Miami Get Rich*, New York Times (Oct. 27, 2017), Enright Decl., Ex. 8 at pg. 3.

[9]      *See* JJ Epic, *Centra Card Interview with President Sam Sharma*, Neocash Radio (August 14, 2017), *available at* http://neocashradio.com/blog/centra-card-interview-president-sam-sharma/ at 11:35-12:08.

Securities Act. *Howey Co.*, 328 U.S. at 298–99. "Under <u>Howey</u> and its progeny, an offering is an investment contract if there is: '(1) an investment of money (2) in a common enterprise, (3) with the expectation of profits to come solely from the efforts of others.'" *Tippens v. Round Island Plantation LLC.*, 2009 U.S. Dist. LEXIS 66224, at \*30 (S.D. Fla. July 31, 2009) (citing *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999). As detailed below, each element of the *Howey* test is plainly met, the CTR Tokens were securities, and thus, the Centra ICO was the offer and sale of unregistered securities.

### 1. Centra ICO Participants Invested Money

An investment of money under the *Howey* test includes digital currencies such as ETH, BTC, and LTC. Investors in the Centra ICO invested ETH, BTC, and LTC in order to receive CTR Tokens. Enright Decl., Ex. 14. Digital currencies such as BTC are deemed "money" for the purposes of the *Howey* test. *See, e.g.*, *SEC v. Shavers*, No. 4:13-cv-416, 2013 U.S. Dist. LEXIS 110018, at \*4–5 (E.D. Tex. Aug. 6, 2013) ("First, the Court must determine whether the BTCST investments constitute an investment of money . . . Bitcoin is a currency or form of money, and investors wishing to invest in BTCST provided an investment of money"). Furthermore, "in spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract." *Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991).

Moreover, as this Court has held, "[a]n 'investment of money' refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *SEC v. Friendly*, 49 F. Supp. 2d 1363, 1368–69 (S.D. Fla. 1999) (citing *Stowell v. Ted S. Finkel Inv. Serves., Inc.*, 489 F. Supp. 1209, 1220 (S.D. Fla. 1980); *see also SEC v. Comcao Ltd.*, 855 F. Supp. 1258, 1260 (S.D. Fla. 1994) (same). As stated in the August White Paper (defined in Enright Decl. ¶6), "[n]othing in the Service, in the Terms, or in any statements or information contained on the Site . . . shall be construed as the guarantee of gaining profit or benefit in any other form. The Purchaser understands that participating in the Token Sale may result in financial losses." Enright Decl., Ex. 4 at pg. 5.

In short, to participate in the Centra ICO and receive CTR Tokens, "purchasers" were required to invest financial assets in the form of ETH, BTC, or LTC, and such investment subjected investors to the risk of financial loss.  *Id.*  Thus, the first element of the *Howey* test is plainly met.

## 2.      Centra ICO Participants Invested in a Common Enterprise

The Eleventh Circuit has adopted the vertical commonality test, under which "[a] common enterprise exists where the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.'"  *SEC v. Unique*, 196 F.3d at 1199 (citing *Villeneuve v. Advanced Bus. Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1990)).  "The requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoter].'"  *Id.* at 1199–1200 (quoting *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974)).

Here, the Centra ICO investments were pooled under the control of Defendant Centra Tech and the success of the Centra Debit Card, cBay, and CTR Token—and thus any potential value and profit stemming from the future valuation of CTR Tokens—aligned the interests of Centra ICO investors with those of the Defendants.  Enright Decl. ¶26.  As explicitly stated in the August White Paper, CTR Token holders could make a "profit" by "join[ing] in" Defendants' "prosperity and mission."  Enright Decl., Ex. 4 at pg. 12.

Similarly, as stated in the September White Paper, "14% [of CTR Tokens] will be dispersed to Centra Tech's organizers, early financial specialists, and representatives as an **impetus to making an enduring common interest** and commitment to the tokens and their drawn out value." (Emphasis added), Enright Decl., Ex. 5 at pg. 13.  Given that the Individual Defendants are the "co-founders," "organizers," and/or "representatives" of Defendant Centra Tech, it is evident that a portion of any potential value ascribed to the CTR Tokens was expected to be allocated for their personal benefits, in addition to Plaintiff's and the Class' benefit.  Accordingly, it is abundantly clear that the success of the CTR Token tied the interests of the Centra ICO investors to those of the Defendants and any such success was entirely reliant on Defendants' actions.  As such, the "common enterprise" element of the *Howey* test is plainly met.

### 3. Centra ICO Participants Invested With the Expectation of Profits Produced By the Efforts of Others

The third prong of the *Howey* test is satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Balmert v. Pulte Home Corp.*, 445 Fed. Appx. 256, 262 (11th Cir. 2011) (quoting *Williamson v. Tucker*, 645 F.2d 404, 418 (11th Cir. 1981)); *see also SEC v. Merchant Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007) ("'the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other party'") (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)).

Here, it is indisputable that the value and existence of the CTR Tokens, Centra Debit Card, and cBay have been at all times entirely dependent on Defendants' actions. For example, as provided in the September White Paper, each "Purchaser" was purportedly required to agree and certify that they "understand[] and accept[] that while the individuals and entities, including Centra Tech, assigned to this task will make reasonable efforts to develop the Centra Tech System, it is possible that such development may fail and purchasers' CTR Tokens could become useless and/or valueless due to technical, commercial, or regulatory challenges, among other reasons." Enright Decl., Ex. 5 at pg. 5. Accordingly, the "essential managerial efforts" underpinning the success or failure of Centra Tech and the CTR Token were to be Defendants'. Thus, this element is satisfied.

### 4. Representations To Investors

Courts in the Eleventh Circuit also look to the representations made to investors and what they were led to expect. *See e.g.*, *Merchant*, 483 F.3d at 756 ("Consistent with *Howey's* focus on substance over form, we look at all the representations made by the promoter in marketing the interests . . ..") (citing *SEC v. Joiner*, 320 U.S. 344, 353 (1943)). The Centra ICO contained terms highly analogous to standard securities offering. For example, the amount invested was directly proportional to the amount of CTR Tokens promised (200 CTR to 1 ETH) and the Centra ICO had a minimum investment requirement. Enright Decl., Ex. 5 at pg. 13. Such terms are frequently included in a standard securities offering.

10

Additionally, the White Paper stated "CTR Token holders will receive a 0.8% eth reward for every transaction in the network."  Enright Decl., Ex. 5 at pg. 17.  As Defendant Sharma restated in an interview on the Neocash Radio podcast, "Currently we have a rewards system set up.  And it is based on a monthly set up that token holders get point eight percent rewards of the network profit generated inside the terms and conditions of the token . . . [and it] is paid out monthly in Ether to their Centra wallets." *See supra* note 9 at 7:42–8:21. This is obviously akin to a monthly dividend payment.  As the SEC stated in the *DAO Report*,[10] "[w]hether or not a particular transaction involves the offer and sale of a security—regardless of the terminology used—will depend on the facts and circumstances, including the economic realities of the transaction."  *Id*. at pgs. 17–18; *see also SEC v. Friendly*, 49 F. Supp. 2d at 1368 ("Economic substance, not form, governs whether a given investment is a security") (Citation omitted)).  Here, the "economic substance" involved Defendants conditioning investors to expect "profit" from purchasing CTR Tokens.  *See, e.g.*, August White Paper, Enright Decl., Ex. 4 at pg. 12 ("Our token deal enables clients to join our prosperity and mission while generating a profit").

Indeed, the official "CentraTech" account on bitcointalk.org touted that the CTR Tokens "will surge in value."  Enright Decl., Ex. 12 at pg. 5, msg. #210.  Similarly, prior to founding Centra Tech, Defendant Sharma had a different cryptocurrency project named "Coin Success." *See* Enright Decl., Ex. 6.  Sharma used the Coin Success Facebook to promote the Centra ICO. For example, on July 30, 2017, Coin Success made the following post:

---

[10]      SEC, The Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934; The DAO, Securities and Exchange Commission, Release No. 81207 (July 25, 2017), Enright Decl., Ex. 11.



In short, the Centra ICO was obviously marketed as an opportunity to "make some money… #Investments #Stocks #Trading". *Id.* Based on the foregoing, the CTR Tokens are undoubtedly securities—specifically, "investment contracts"—under the *Howey* test, and the Centra ICO thus constituted an offer and sale of unregistered securities.[11]

**D.    Interstate Means Were Used to Offer and Sell the CTR Tokens**

The third and final element for establishing a violation of Section 5 of the Securities Act, and thus Section 12(a)(1), is easily established because Defendants used the Internet to offer and sell the CTR Tokens.  September White Paper, Enright Decl., Ex. 5.  *See, e.g.*, *SEC v. Levin*, 2013 U.S. Dist. LEXIS 20027, at *31 (S.D. Fla. Feb. 14, 2013) ("the Internet, which necessarily includes email, is an 'instrumentality of interstate commerce.'") (quoting *United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004)).  Thus, "interstate means" were clearly used to accomplish the Centra ICO.

---

[11]    Similarly, in the SEC Action, the SEC also alleges that each CTR Token sold in the Centra ICO "is an investment contract and, therefore, a 'security' as the term is defined under the Securities Act Section 2(a)(1) [15 U.S.C. § 77b(a)(1)] and the Exchange Act Section 3(a)(10) [5 U.S.C. § 78c(a)(10)]." Ex. 1 ¶¶1,15.

**E.      All of the Evidence Clearly Indicates That the Defendants' Arbitration Argument Relies on Falsified Affidavits and Computer Records**

Defendants' only real effort at defeating Plaintiff's claims has been a motion to compel arbitration (the "MTCA").  Dkt. No.26.  In response, Plaintiff has submitted compelling evidence demonstrating that the MTCA is premised entirely on false declarations and falsified computer records.  Dkt. Nos. 31, 32, 38 and 50.

For example, in the initial MTCA papers, Defendants argued that they "know" Plaintiff agreed to mandatory arbitration using an online process (the "Process") on the Centra Tech website on July 30, 2017, because he purportedly submitted all of his information, including his wallet address, during the Process.  Plaintiff proved that this contention was demonstrably false by, *inter alia*, submitting an email from October 2017 in which Defendants requested his wallet address. Dkt. No. 31 at 13–14.

Similarly, Defendants claimed that Class members were "required" to register with Centra Tech to purchase CTR Tokens.  Dkt. No. 26 at 4.  Indeed, such "fact" was submitted under penalty of perjury by Allan Shutt, Centra Tech's General Counsel.  Plaintiff has proven this statement to be flatly false as the only "requirement" to purchase CTR Tokens was to send ETH to the CTR smart contract address.  Dkt. No. 31 at 9–11 and 17–19.  Despite the foregoing, Mr. Shutt has failed to acknowledge his false statement or even attempt to correct the record.  This particularly egregious in light of the fact that he is a licensed attorney and should be aware of his obligations to do so.

Rather than address the fact that Plaintiff refuted, in whole, the arguments in the initial MTCA papers, or explain such verifiable falsities therein, Defendants submitted a reply brief that contained additional falsities, as well as improper new evidence and arguments.  Dkt. No. 34.  As such, Plaintiff was required to file a motion to strike such new materials to alert the Court not only of Defendants procedurally improper introduction of new evidence and arguments but also of the clear false or misleading statements of fact contained therein that would significantly prejudiced Plaintiff and the Class were they to remain part of the record.  Dkt. No. 38.

Indeed, Plaintiff's motion to strike submitted compelling evidence indicating that: (i) the supplemental declaration of Sean Sykes ("Sykes") submitted false and self-contradictory statements by, *inter alia*, misrepresenting the statements contained in the first Sykes declaration; (ii) that despite Leizle Ho's ("Ho") claims to the contrary, she is undoubtedly affiliated with Centra Tech; and (iii) the newly materialized record purportedly showing that Plaintiff used the Process (the "Rensel Customer Record") appears to have been fabricated because (a) there is a less than 0.000000482253% that Ms. Ho and Plaintiff completed the Process on the exact same minute on the exact same day (July 30, 2017); (b) it does not include a record of Plaintiff ever visiting the Centra Tech website, (c) it does not include a record of the "mass email" purportedly sent to Plaintiff the day before the record was created, and (d) the fact that the "customer records" submitted are far from "unalterable digital evidence."  Dkt. No. 38 at 17–23.

Now, these new events involving the SEC and FBI corroborate the strong inference that Defendants' MTCA was premised entirely on falsehoods and fabricated evidence.  Indeed, the FBI Action recounts in detail how Defendants have intentionally falsified documents, destroyed evidence, and otherwise engaged in deceitful conduct in connection with the Centra ICO and its aftermath.  For example, the FBI Action summarizes Defendants Sharma and Farkas' "scheme to defraud" by stating that from "July 2017 up to and including the day of this Complaint" Sharma and Farkas, and others known and unknown, participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa, and Mastercard, its products, its licensing in various states, and its executive personnel."  Ex. 2 ¶15.  Additionally, the FBI Action details Farkas' destruction of documents relating to his research in preparation of plans to flee the United States. ¶¶ 33–34.

Similarly, the SEC Action details records obtained in which an investor informed Sharma that they had figured out that Centra Tech had falsely offered a 0.8% "dividend reward" to Centra ICO participants.  Ex. 1 ¶80.  Rather than deny the claim, Sharma offered to pay the investor, but only the investor, the reward so long as the investor executed a non-disclosure agreement.  *Id*.  This

evinces Sharma's willingness to use Plaintiff's and the Class' investments to bribe those who uncover his unlawful schemes.

The foregoing echoes Defendants' recent legal woes in New York State, in which defendants Sharma and Trapani have both pled guilty to felony perjury charges in connection with an arrest for driving under the influence of alcohol.  Complaint ¶55; Enright Decl. Exs. 16–17 (case details showing perjury charges against Sharma and Trapani).  This supports Plaintiff's contention that these defendants have exhibited a pattern of false statements and falsifying facts and evidence, even in court proceedings.

This same pattern has played out in this case, in which Defendants have exhibited little regard for the integrity of the judicial system throughout the pendency of this Action.  With respect to the MTCA, Defendants have repeatedly submitted demonstrably false and misleading statements of fact and evidence in their filings.  Furthermore, despite Plaintiff repeatedly identifying and disproving such falsities and misrepresentations on the record, Defendants have opted to ignore their prior statements (many of which were submitted under penalty of perjury), in favor of submitting yet additional new false or misleading statements and evidence.  Such conduct has unnecessarily wasted judicial resources and significantly delayed the progress of the Action, to the detriment of the Class' ability to recover the ICO Proceeds rightfully owed them.[12]

For these reasons, the MTCA is unlikely to succeed and Plaintiff is likely to succeed in prosecuting these claims in this Court.  Thus, Plaintiff is likely to succeed on the merits on his claim, and the MTCA is extremely unlikely to prevent Plaintiff from doing so.

## III.   PLAINTIFF AND THE CLASS FACE IRREPARABLE HARM

An asset freeze is appropriate where there is a likelihood of dissipation of assets claimed and absent such injunctive relief the equitable remedies claim may become unavailable.  *See, e.g.*, *SEC v. Johnson*, 2001 U.S. Dist. LEXIS 27403, at *12-13 (S.D. Fla. Dec. 27, 2001) (stating that

---

[12]     Had Defendants adhered to the terms of the agreement and provided the discovery agreed upon in open court, Enright Decl. ¶¶20–24, Plaintiff would have received substantially similar productions to those the SEC received and may well have preempted the additional dissipations of the ICO Proceeds that occurred throughout January and February 2018

the potential "dissipation of assets and destruction of records make an asset freeze necessary so that a detailed accounting may be undertaken. Otherwise, these funds may be further disbursed, transferred, and/or dissipated to the degree that any permanent relief the District Court may order may be rendered meaningless.").  Here, there is substantial threat that the ICO Proceeds will be dissipated or misappropriated long before this matter can be brought to judgment.  As such, Plaintiff and the Class are clearly threatened with irreparable harm.  *Id.*

The Initial TRO argued that Plaintiff and the Class were threatened with irreparable harm because, *inter alia*, the egregious deceptive activities Defendants engaged in to solicit investments in the Centra ICO and Defendant Sharma's history relating to alleged fraudulent activity indicated that Defendants could not be trusted to safeguard and manage the ICO Proceeds pending resolution of the Action.  *See, e.g.*, *Hudson Nat'l Bank v. Shapiro*, 695 F. Supp. 544, 548 (S.D. Fla. 1988) (ordering an asset freeze and stating that "[t]he past practice of [defendant] in utilizing different factoring agents, different fictitious names, and different bank accounts present a very immediate danger of dissipation of funds . . .").

As evidence of the deceptive activities Defendants engaged in, the Initial TRO stated that Defendants solicited investments in the Centra ICO by, *inter alia*, creating false identities, including one for Centra Tech's purported CEO, "Michael Edwards" (who does not exist), and marketing non-existent business relationships with VISA and Mastercard.  Dkt. No. 4 at 16–17. These facts have been confirmed by the SEC and FBI.  SEC Action, Ex. 1 ¶¶52–68, 72–77; FBI Action, Ex. 2 ¶¶22–25, 28–31.  Similarly, the Initial TRO papers focused on the fact that Defendant Sharma: has had numerous run-ins with the law relating to alleged fraudulent activity and the mismanagement of money, which reasonably call into question his trustworthiness to maintain the ICO Proceeds, and has been publicly accused of misappropriating ICO Proceeds by attempting to pay an online blogger who wrote a negative review about the Centra ICO to remove said review. Dkt. No. 4 at 17–18.  In addition to the foregoing, the Initial TRO argued that the ease with which cryptocurrencies can be dissipated anywhere in the world—effectively instantaneously—

16

significantly increased the risk that Plaintiff's and the Class' investments could vanish overnight. *Id*. at 18.

The recent factual developments revealed in the SEC and FBI Actions have established the validity of Plaintiff's concerns regarding the Defendants ability to safeguard the ICO Proceeds. The SEC and FBI Actions show that Defendants have been actively dissipating the ICO Proceeds and cannot not be entrusted with the safekeeping of the remaining proceeds.  For example, as stated in the SEC Action, as of March 30, 2018, Centra Tech's "bank accounts had been depleted and most of its employees had been terminated."  Ex. 1 ¶84; *see also* FBI Action, Ex. 2 ¶34.e–f (stating that Centra Tech had "terminated virtually all of its employees except certain top executives . . .").  Clearly Defendants must have been dissipating the ICO Proceeds at an alarming rate to prompt the termination of "virtually all" of Centra Tech's employees and completely deplete the company's bank accounts.

Additionally, the FBI Action reveals that Defendant Farkas had recently requested, and obtained, research regarding foreign extradition laws and had planned to flee the United States on April 1, 2018.  Ex. 2 ¶34–35.  Based, in part, on the foregoing, the FBI Action requested an arrest warrant for Farkas, *id*, and he was arrested prior to boarding his flight.  SEC Action, Ex. 1 ¶85. The foregoing sequence of events give rise to substantial concerns regarding the safekeeping of the remaining ICO Proceeds.

On December 29, 2018, Defendants provided Plaintiff with the Assurances Letter, which referenced the Wallet containing portions of the ICO Proceeds.  Enright Decl. ¶21.  The Assurances Letter stated that the Wallet was secure because the private key to said Wallet was split in half and only accessible by two individuals jointly.  *Id*.  One of these individuals was Defendant Farkas, and the other is Centra Tech attorney Allan Shutt.  *Id*.  As noted, Centra Tech's bank accounts are depleted and thus, the Wallet presently contains the only readily identifiable funds rightfully belonging to Plaintiff and the Class.  SEC Action, Ex. 1 ¶84.  In light of the fact that the United States criminal authorities evidently suspected that Farkas was attempting to flee

the United States and avoid extradition, it is abundantly clear that Farkas should have no access whatsoever to the Wallet, let alone be one of only two persons who to have such access.[13]

Additionally, given the fact that Mr. Shutt is the only individual that has been referenced on the record as being employed by Centra Tech as an "attorney,"[14] it is reasonable to infer that Mr. Shutt is the Employee who conducted the legal research into foreign extradition laws for Defendant Farkas and communicated such events to the FBI's Witness.  Enright Decl. ¶27.  Thus, it appears that control of the Wallet containing the Class' ICO Proceeds is currently accessible by Mr. Farkas, who was arrested attempting to flee the country, and Mr. Shutt, who likely assisted Farkas with his plans to flee the country.[15]  Further, even if Mr. Shutt is not the Employee, his propensity to submit false statements of fact under penalty of perjury (discussed *supra*), his failure to correct such falsities, and his continuous assistance with Defendants' unlawful conduct clearly demonstrates that he should not be entrusted with any role in safeguarding Plaintiff's and the Class' funds.  Based on the foregoing, it is imperative that Wallet be secured, along with any additional ICO Proceeds yet to be identified, by Court order.

In light of recent developments, Plaintiff and the Class run the very real risk with each passing day that Defendants will dissipate the rest of their investments, and consequently, the remedies sought may become unavailable.  *See Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594,

---

[13]    Additionally, the FBI Action confirms that as of April 2, 2018, Defendant Sharma was still employed by Centra Tech as a "top executive."  FBI Action, Ex. 2 ¶34.  This is particularly concerning given the fact that Defendants have publicly claimed that Sharma ceased his employment with Centra Tech in October, 2017. Enright Decl., Ex. 13.

[14]    Plaintiff is only aware of one other Centra Tech employee who is an attorney, David Brill.  However, Mr. Brill was hired as the CEO of Centra Tech and thus, it is fairly unlikely that Farkas would ask the CEO of the company to conduct research on his behalf.

[15]    Moreover, review of the Ethereum blockchain reveals that the Wallet does not appear to be a multisignature wallet.  Multisignature wallets increase security by requiring multiple addresses to sign transactions and transfer funds, and it is standard practice to use multisignature wallets to secure large amounts of cryptocurrency.  Without this multisignature protection, a single individual could transfer all the funds from the Wallet with access to its private key.  There is thus the very real risk that Farkas, Shutt, their respective affiliates, or another Centra Tech officer or employee could dissipate the funds in the Wallet in a matter of moments.

605 (S.D. Fla. 1991) ("Indeed, it cannot be doubted that remedy for the Plaintiff class would be meaningless if [defendants] were permitted to place the assets . . . beyond the reach of this court . . ."). Accordingly, Plaintiff and the Class are likely to suffer irreparable harm absent injunctive relief.

## IV.     THE BALANCE OF THE EQUITIES FAVORS PLAINTIFF

Here, there is no question that the equities favor the entry of the injunctive relief. Absent injunctive relief, Plaintiff and the Class may be unable to obtain the equitable relief of rescission, let alone compensatory damages. *See, e.g.*, *Mediaone, Inc.*, 43 F. Supp. at 1355 (ordering an asset freeze and stating "[t]he asset freeze will preserve the status quo and ensure that Plaintiff can avail itself of its possible remedies."); *see also SEC v. Bar Works Capital, LLC*, No. 17-cv-4396, 2017 U.S. Dist. LEXIS 170983, at *19-20 (N.D. Cal. Oct. 16, 2017) ("The equities weigh in favor of granting the asset freeze. Without a freeze, defrauded investors may not be able to recover moneys wrongfully obtained from them."). Furthermore, as the SEC and FBI Actions have alleged, and supported with substantial non-public evidence, the ICO Proceeds were raised unlawfully and Centra Tech's business has, for all intents and purposed, already shut down. As such, there is no lawful purpose for Defendants to use or have any access to the ICO Proceeds and thus, there is no harm to Defendants to even slightly counter-balance the significant harm facing Plaintiff and the Class. Simply stated, the equities plainly favor freezing the ICO Proceeds for the benefit of investors who put their money into an unregistered securities scheme, before the invested funds are completely hidden, depleted or dissipated.

## V.     THE PUBLIC INTEREST WILL BE SERVED BY A TRO

The grant of a temporary restraining order by the Court would be in the public interest here. As demonstrated above, public policy strongly supports preserving funds rightfully owned by Plaintiff and the Class, as Defendants have clearly attempted to evade federal securities laws and deprive investors of rights and protections provided thereunder. Given that "[t]he registration requirements are the heart of the [Securities] Act," *Pinter*, 486 U.S. at 638, public policy clearly supports judicial intervention where parties brazenly flout these requirements, as Defendants have

done here.  The ultimate remedy sought here is the rescission of the investments made by the Class, which were in the form of ETH, BTC, or LTC and/or compensatory damages.  As discussed, these assets are easily transferred and could be dissipated quickly be Defendants.  Accordingly, the grant of injunctive relief will preserve the assets at issue, and thereby serve the public interest.  *See e.g.*, *SEC v. Lauer*, 445 F. Supp. 2d at 1367 ("Freezing assets is a well accepted equitable remedy employed to 'preserve the status quo' and is proper in actions arising under the Securities Act.") (Citation omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the instant Motion.

Dated: April 5, 2018

Respectfully submitted,

**KOMLOSSY LAW P.A.**

/s/ *Emily C. Komlossy*
Emily Komlossy (FBN 7714)
eck@komlossylaw.com
Ross A. Appel (FBN 90865)
raa@komlossylaw.com
4700 Sheridan St., Suite J
Hollywood, FL 33021
Phone: (954) 842-2021
Fax: (954) 416-6223

**OF COUNSEL:**

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

*Attorneys for Plaintiff*

Donald J. Enright (*admitted pro hac vice*)
Elizabeth K. Tripodi
John A. Carriel (*admitted pro hac vice*)
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Fax: (202) 333-2121

20

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2018, I caused to be served the foregoing Renewed Motion for a Temporary Restraining Order, along with the accompanying Declaration of Donald J. Enright with exhibits, by filing with the CM/ECF system, which in turn will serve all following parties electronically through the system:

David L. Axelrod
Thomas F. Burke
**Ballard Spahr LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500
Fax: (215) 864-8999
AxelrodD@ballardspahr.com
BurkeT@ballardspahr.com

Marjorie J. Peerce
**Ballard Spahr LLP**
919 Third Avenue, 37th Floor
New York, NY 10022-3915
Telephone: (646) 223-0200
Fax: (212) 223-1942
PeerceM@ballardspahr.com

Nina Stillman Mandel
**Mandel & Mandel LLP**
1200 Alfred I. duPont Building
169 East Flagler Street
Miami, Florida 33131
Telephone:  305.374.7771
Facsimile:    305.374.7776
nsmandel@mandel-law.com

*Attorneys for Defendants*