**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| JACOB ZOWIE THOMAS RENSEL, WANG YUN HE, CHI HAO POON, KING FUNG POON, JAE J. LEE, MATEUSZ GANCZAREK, and RODNEY WARREN, individually and on behalf of all others similarly situated, | C.A. No. 1:17-cv-24500-JLK/Simonton |
| Plaintiffs, | **CLASS ACTION** |
| v. | **JURY TRIAL DEMANDED** |
| CENTRA TECH, INC., SOHRAB SHARMA, ROBERT FARKAS, RAYMOND TRAPANI, STEVEN STANLEY, STEVEN SYKES, ALLAN SHUTT, CHASE ZIMMERMAN, FLOYD MAYWEATHER JR, and KHALED MOHAMED KHALED A/K/A DJ KHALED, | |
| Defendants. | |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE**
**FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

**Page**

NATURE OF THE ACTION ............................................................................................1

JURISDICTION AND VENUE ......................................................................................7

CLASS ACTION ALLEGATIONS .................................................................................8

PARTIES ........................................................................................................................10

    I.       Plaintiffs ...........................................................................................10

    II.     Defendants .........................................................................................16

          A.     The Founder Defendants..................................................16

          B.     The Executive Defendants ...............................................19

          C.     The Promoter Defendants .................................................21

SUBSTANTIVE ALLEGATIONS .................................................................................22

    I.       Background on Blockchain Technology, ICOs, and Smart Contracts..................22

          A.     Blockchains.......................................................................22

          B.     ICOs ..................................................................................23

          C.     Smart Contracts.................................................................23

    II.     Centra Tech's Founding and the Centra ICO's Mechanics .................................24

          A.     Centra Tech's Formation and Leadership Structure .................................24

          B.     The Centra ICO's Offer and Mechanics ..........................25

    III.    Marketing the Centra ICO ...................................................................27

          A.     Press Releases and the Centra Tech White Papers ....................28

          B.     Social Media and the Centra Tech Bounty Program ................31

    IV.    The Centra ICO Never Ended..................................................................35

          A.     Continuous Solicitations and Purchase and Sale of CTR Tokens on the Open Market ...................................................36

          B.     The Centra Card and Centra Wallet..................................41

          C.     "Partnerships" ...................................................................43

    V.     CTR Tokens Are Investment Contract Securities..................................................44

          A.     The Terms of the Centra ICO Sale Presented an Investment Offer..........44

i

|       | B.   | The Economic Realities of Purchasing CTR Tokens | 47 |
|       | C.   | Purchasers Saw CTR Tokens as Investments | 51 |
|       | D.   | "Utility Tokens"? | 52 |
| VI.   |      | Each of the Defendants Were "Sellers" of CTR Tokens | 53 |
|       | A.   | Centra Tech and the Founder Defendants | 54 |
|       | B.   | The Executive Defendants | 57 |
|       | C.   | The Promoter Defendants | 64 |
| VII.  |      | Materially False and Misleading Statements Issued During the Class Period | 68 |
|       | A.   | False Claims Regarding Visa and Mastercard | 68 |
|       | B.   | False Claims Regarding Bancorp | 83 |
|       | C.   | Fictional Executives | 86 |
|       | D.   | False Claims Regarding Insurance | 90 |
|       | E.   | False Claims Regarding State Licenses | 92 |
|       | F.   | False Claims Regarding Partnerships with the Promoter Defendants | 94 |

CONTROL PERSON ALLEGATIONS ................................................................97

THE SECURITIES ACT CLAIMS ...................................................................98

COUNT I .........................................................................................98

COUNT II .........................................................................................99

THE EXCHANGE ACT CLAIMS ....................................................................100

SCIENTER .......................................................................................100

LOSS CAUSATION ...............................................................................101

APPLICATION OF PRESUMPTION OF RELIANCE:  FRAUD-CREATED-THE-MARKET
  DOCTRINE ....................................................................................102

NO SAFE HARBOR ...............................................................................102

COUNT III .......................................................................................103

COUNT IV .......................................................................................106

PRAYER FOR RELIEF ...........................................................................107

DEMAND FOR TRIAL BY JURY .....................................................................109

Co-Lead Plaintiffs Jacob Zowie Thomas Rensel ("Rensel") and Wang Yun He ("He," and together with Rensel, "Co-Lead Plaintiffs"), along with additional plaintiffs Chi Hao Poon, King Fung Poon, Jae J. Lee ("Lee"), Mateusz Ganczarek ("Ganczarek"), and Rodney Warren ("Warren") (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, by their undersigned attorneys, allege in this First Amended Class Action Complaint for violations of the federal securities laws (the "Complaint") the following, based upon personal knowledge with respect to their own acts, and upon information and belief based upon facts obtained through investigation conducted by their counsel, which included, *inter alia*: (a) documents and solicitation materials released by Defendants (defined below) in connection with the Centra ICO (defined below); (b) public statements made by Defendants concerning Centra Tech, Inc. ("Centra Tech" or the "Company"); (c) media publications, web blogs and other web sources concerning Centra Tech and the Centra ICO, and (d) related civil and criminal actions filed by the Securities and Exchange Commission ("SEC") and the United States Attorney's ("DA") Office for the Southern District of New York ("SDNY"), respectively, against Sohrab Sharma ("Sharma"), Robert Farkas ("Farkas"), and Raymond Trapani ("Trapani") (collectively, the "Founder Defendants").

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  Many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within their control.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased Centra Tokens ("CTR Tokens") from approximately July 23, 2017, through April 20, 2018, inclusive (the "Class" who purchased CTR Tokens during the "Class

1

Period").  The Class is comprised of three subclasses: (1) all persons and entities who purchased CTR Tokens directly from Defendants (defined below) during Centra Tech's "official" initial coin offering from approximately July 23, 2017 through October 5, 2017; (2) all persons and entities who purchased CTR Tokens directly from Defendants during the remainder of Centra Tech's initial coin offering from approximately October 6, 2017 through April 20, 2018, inclusive (the "Centra ICO");[1] and (3) all persons and entities who purchased CTR Tokens on the open market during the Centra ICO as a result of Defendants' successfully soliciting their purchases of CTR Tokens.  This action seeks to recover damages for violations of the federal securities laws under Sections 12(a)(1) and 15(a) of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by SEC, against Centra Tech, certain of its top officials, and certain influential promoters that received compensation in exchange for selling CTR Tokens or soliciting the general public to purchase CTR Tokens.

2.     This action alleges violations of Section 12(a)(1) of the Securities Act [15 U.S.C. § 77l(a)(1)] against Defendants Centra Tech, the Founder Defendants, Steven Stanley ("Stanley"), Steven Sykes ("Sykes"), Allan Shutt ("Shutt"), Chase Zimmerman ("Zimmerman," and together with Stanley, Sykes, and Shutt, the "Executive Defendants"), Floyd Mayweather Jr. ("Mayweather") and Khaled Mohamed Khaled a/k/a "DJ Khaled" ("Khaled," and together with Mayweather, the "Promoter Defendants") (collectively, "Defendants"); violations of Section 15(a)

---

[1] The "Centra ICO" includes the period covering: (i) the so called "pre-sale" of CTR Tokens which took place between approximately July 23, 2017 and August 5, 2017; (ii) the Centra Tech initial coin offering that took place between August 5, 2017 and October 5, 2017 (collectively, the "official" Centra ICO); and (iii) Defendants' continuous offer and sale of CTR Tokens and successful solicitations for the purchase of CTR Tokens from early-August 2017 until the Company was effectively shut down on or about April 20, 2018.

of the Securities Act [15 U.S.C. § 77o(a)] (the "Securities Act Claims") against the Founder

Defendants; violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5

promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] (the "Exchange Act Claims") against

all Defendants; and violation of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] against

the Founder Defendants.

3.     Between approximately July 23, 2017 and approximately April 20, 2018, Centra

Tech and the Founder Defendants ran the Centra ICO during which they received at least 113,000

Ethereum ("ETH") and other virtual currency investments, including Bitcoin ("BTC") and

Litecoin ("LTC"), in exchange for CTR Tokens.[2]

4.     Centra Tech was never permitted to solicit investments from the general public.

The Company was created to serve as a fraudulent vehicle for the sole purpose of selling patently

worthless, unregistered CTR Tokens to enrich Centra Tech's executives, directors, founders, and

affiliates.  Absent Defendants' fraudulent conduct, CTR Tokens could not have been offered and

sold to investors at any price.

5.     The purported primary purpose of the Centra ICO was to raise capital to operate

the "world's first Multi-Blockchain Debit Card with a Smart and Insured Wallet" (the "Centra

Debit Card" and the "Centra Wallet").  In other words, the product offered was a debit card that

would purportedly function on the Visa and Mastercard networks and allow instant transactions

---

[2] The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering, and in which the United States is a member, describes "virtual currency" as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."  Importantly, virtual currencies do not have legal tender status like real currencies (*e.g.*, U.S. dollar and the Euro).  The most widely used virtual currencies are BTC and ETH.

using digital currencies.  As the Centra ICO progressed, Centra Tech claimed to be creating a "pre-paid" Centra card rather than an actual debit card (the "Centra Pre-Paid Card," and together with the Centra Debit Card, the "Centra Card").  Additionally, throughout the Centra ICO, Centra Tech claimed to be using investor funds to create: (i) an online marketplace called "cBay" that would be similar to Amazon and eBay; (ii) a virtual currency exchange where users could buy, sell and trade various virtual currencies (the "Centra Exchange"); and (iii) a Centra Tech blockchain (the "Centra Blockchain," and collectively with the Centra Card, Centra Wallet, cBay, and Centra Exchange, the "Centra Products").

6.      The Securities Act Claims are based on Defendants' unlawful solicitation, offer and sale of unregistered securities in violation of Section 5 of the Securities Act.  The Centra ICO was an unlawful offering of unregistered securities, in the form of CTR Tokens, for which no exemption from registration was available under the federal securities laws.

7.      Centra Tech, the Founder Defendants and the Executive Defendants have made a feeble attempt to portray the offer and sale of CTR Tokens as a sale of "utility-based tokens" that were "not securities, shares or investments."  In the early stages of the Centra ICO, the offer was 400 CTR Tokens for 1 ETH or the equivalent in other virtual currencies (*e.g.*, BTC and LTC).  As the Centra ICO progressed, CTR Tokens were offered and sold for various amounts of multiple virtual currencies.

8.      The Centra ICO was a clear offer and sale of securities because, *inter alia*, Defendants touted, and Plaintiffs and other CTR purchasers were conditioned to expect, and did reasonably expect, that the CTR Tokens received would be worth more than the ETH, BTC, LTC, or other virtual currencies invested.  Additionally, Defendants explicitly referred to participants in

the "official" Centra ICO as "investors" and repeatedly stressed the "growth potential" of the CTR Token.

9.      The Securities Act's registration requirements are designed to protect investors by ensuring they are provided adequate information upon which to base their investment decisions. Absent registration, issuers of securities are able to market their securities with no disclosure requirements whatsoever.  For example, an issuer could omit any information that would make a potential investor think twice before investing (*e.g.*, conflicts of interest or major setbacks to core product lines), or peddle its securities using unbounded exaggerations regarding the progress of its product development and business plan, or even fabricate the existence of relationships with vendors or other business partners (*e.g.*, touting nonexistent relationships with Visa, Mastercard, and The Bancorp [the "Bancorp"], as was the case here).

10.      Due to the varied and innumerable ways in which investors can be, and are likely to be, manipulated and harmed absent the protections of the federal securities laws, Sections 5 and 12(a)(1) of the Securities Act provide for strict liability against any person who offers or sells an unregistered security.  As detailed herein, the Centra ICO was, at all relevant times, an offer and sale of unregistered securities.  Accordingly, Defendants are strictly liable under Section 12(a)(1) of the Securities Act.

11.      The Exchange Act Claims are based on Defendants' fraudulent and manipulative scheme to enrich themselves by issuing false and materially misleading statements concerning, *inter alia*: (1) relationships with Visa and Mastercard; (2) relationships with Bancorp; (3) the experience and existence of Centra Tech's executive team; (4) the value of CTR Tokens and the benefits from owning CTR Tokens; (4) Centra Tech's insurance covering investors' funds; (5) the listing of CTR Tokens on virtual exchanges; (6) state licenses Centra Tech had acquired to operate

the Centra Products; and/or (7) the nature of Centra Tech's relationships with the Promoter Defendants.

12.     The Founder Defendants fabricated, *inter alia*: Defendant Trapani's resume and qualifications; the existence of a Chief Executive Officer ("CEO") named "Michael Edwards"; a document purporting to grant Centra Tech a money transmitter license; a contract with Bancorp; and relationships with Visa and Mastercard.  Additionally, throughout the CTR Offering, Centra Tech and the Founder Defendants purchased and sold CTR Tokens on the open market to both manipulate and prop up the market price of CTR Tokens and further enrich themselves by selling CTR Tokens at favorable prices.

13.     The Executive Defendants offered and sold CTR Tokens by issuing false and/or misleading statements concerning, *inter alia*, Centra Tech's relationships with Visa and Mastercard and/or the value and uses for CTR Tokens.

14.     With respect to the Promoter Defendants, both falsely claimed to have personally purchased CTR Tokens when in reality, Centra Tech paid them for their endorsements.

15.     Defendants' false and materially misleading statements appeared in press releases, Centra Tech's website, online chat rooms or forums located on websites such as Reddit.com ("Reddit"), white papers, postings on social media websites such as Twitter and Facebook, promotional videos posted on websites such as YouTube, internet podcast interviews and/or other materials relating to Centra Tech and the Centra Products, which were disseminated widely to the investing public.

16.     Each of Defendants' misrepresentations and omissions were material because they were designed to, and did, entice the public into purchasing unregistered securities (CTR Tokens) which were nothing more than a vehicle for the individual Defendants' personal enrichment.  As

detailed *infra*, when the magnitude of Centra Tech's fraudulent conduct was revealed, the trading price of CTR Tokens plummeted.

17.     Plaintiffs allege that Defendants acted with scienter in connection with their claims under the Exchange Act.  Proof of Defendants' scienter comes, in part, from text messages between the Founder Defendants obtained by the DA's Office for SDNY and the New York City Police Department on or about October 5, 2017.  These text messages were publicly quoted in related actions brought against the Founder Defendants by the SEC and DA's Office for SDNY.  These text messages show, among other things, that Centra Tech and the Centra ICO was a fraudulent scheme since the Company's inception, CTR Tokens have at all times been patently worthless, and that no investor would have purchased any CTR Tokens absent Defendants' fraudulent acts.

18.     Today, investors in the Centra ICO have little to show for their investments other than broken promises. For these reasons, Plaintiffs on behalf of themselves, and all similarly situated Centra ICO investors, seeks compensatory, injunctive, and rescissory relief, providing rescission and repayment of all investments made to purchase CTR Tokens during the Centra ICO, and the right to secure and conserve such funds until repayment.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), under Section 22 of the Securities Act [15 U.S.C. § 77v] because Plaintiffs allege violations of Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Plaintiffs allege violations of Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)].  In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the

means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications and the Internet.

20.     The Court has personal jurisdiction over each of the Defendants because each either conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this District under Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1391 because: (a) the conduct at issue took place and had an effect in this District; (b) Centra Tech was headquartered in this District; (c) a substantial portion of the corporate transactions and wrongs complained of herein occurred here; and (d) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect in this District.

## CLASS ACTION ALLEGATIONS

22.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased CTR Tokens from approximately July 23, 2017 through April 20, 2018, inclusive, and were damaged thereby.

23.     The Class is comprised of three subclasses: (1) all persons and entities who purchased CTR Tokens directly from Defendants during Centra Tech's "official" initial coin offering from approximately July 23, 2017 through October 5, 2017; (2) all persons and entities who purchased CTR Tokens directly from Defendants during the remainder of Centra Tech's initial coin offering from approximately October 6, 2017 through April 20, 2018; and (3) all

persons and entities who purchased CTR Tokens on the open market as a result of Defendants' successfully soliciting their purchases of CTR Tokens.

24.     Excluded from the Class are Defendants and other officers, directors and employees of the Company, at all relevant times, as well as members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which one or more Defendant has or had a controlling interest.

25.     The members of the class are so numerous that joinder of all members is impracticable.  This action is properly maintainable as a class action under the Federal Rule of Civil Procedure 23.

26.     While the exact number of Class members is presently unknown to Plaintiffs and can only be ascertained through discovery, Plaintiffs believe that there are thousands of members in each subclass.  All members of the Class and subclasses may be identified by records maintained by Defendants and/or virtual currency exchanges and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

27.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

28.     The prosecution of separate actions by individual members of the Class or subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

29.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include whether: (i)

Defendants offered and sold unregistered securities to the Class during the Centra ICO; (ii) Defendants violated the federal securities laws as alleged herein; (iii) Defendants engaged in a fraudulent and manipulative scheme in connection with the Centra ICO; (iv) Defendants omitted and/or misrepresented material facts in their publicly disseminated press releases and statements during the Class Period; (v) Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (vi) Defendants acted purposefully, knowingly or recklessly in omitting and/or misrepresenting material facts; (vii) CTR Token have at all times been worthless; (viii) CTR Token's price was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and (ix) the members of the Class have sustained damages as a result of Defendants' sale of unregistered securities and/or Defendants' fraudulent conduct alleged herein, and if so, what the appropriate measure of damages is.

30.     Plaintiffs will fairly and adequately protect the interests of the Class and have retained competent counsel experienced in litigation of this nature.  Plaintiffs have no interests antagonistic to or conflicting with those of the Class.  Plaintiffs anticipate that there will be no difficulty in the management of this litigation.

31.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PARTIES

### I.     Plaintiffs

32.     On April 11, 2018, this Court appointed Rensel and He to serve as Co-Lead Plaintiffs for the class in this class action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

33.     Each of the Plaintiffs actively researched Centra Tech and the Centra Products, prior to making their purchases of CTR Tokens and throughout the periods in which they held their CTR Tokens.  Accordingly, each of the Plaintiffs were personally, and successfully, solicited by each of the Defendants in connection with Defendants' public representations and active solicitations to purchase CTR Tokens outlined herein.

*Co-Lead Plaintiff Jacob Zowie Thomas Rensel*

34.     Rensel used 16.1 ETH to purchase 8,050 CTR Tokens in the "official" Centra ICO on July 30, 2017.  Rensel used a Centra smart contract (defined below) to purchase these CTR Tokens, and did not agree to any token sale agreement in making his purchase.  On October 27, 2017, Plaintiff Rensel exchanged those CTR Tokens for 0.7096997 BTC worth, at that time, approximately 13.723 ETH.  In short, Rensel purchased 8,050 CTR Tokens with 16.1 ETH and when he sold these 8,050 CTR Tokens, he received BTC that was worth 13.72 ETH, which reflects a loss of 2.38 ETH.  These calculations do not include any transaction fees that occurred from converting CTR Tokens to BTC or that would have occurred from converting the 0.7096997 BTC to ETH.

35.     Additionally, on August 10, 2017, Rensel received 404 CTR Tokens from Centra Tech as a free "bonus."  Rensel did not purchase these 404 CTR Tokens and thus such tokens are not included in his loss calculation.  However, even if these free CTR Tokens were included, Rensel still received BTC worth less than 16.1 ETH when he divested all of his CTR Token holdings on October 27, 2017.  More specifically, in exchange for selling 8,454 CTR on October 27, 2017, Rensel received 0.745 BTC, which was worth approximately 14.4 ETH.  Given that Rensel's initial investment was 16.1 ETH, this still represents a loss of 1.7 ETH.

36.     On August 11, August 25 and October 18, 2017, respectively, Rensel expended 1 ETH, 6 ETH, and 1.2 ETH, to purchase 815 CTR Tokens, 4,100 CTR Tokens, and 531 CTR Tokens on the secondary market.  Upon information and belief, the 4,100 CTR Tokens Rensel purchased on August 25, 2017, were purchased directly from Defendants or their agents.  As discussed *infra*, it has since come to light that certain Defendants were actively selling CTR Tokens on the open market outside of the "official" Centra ICO.  Rensel used the "Ether Delta" virtual currency exchange to purchase these 4,100 CTR Tokens from the following account: 0x1C146D77bBDE00824867aF4b98ee7E8150dd0bc7 (the "First Centra Delta Account").  This account actively purchased and sold CTR Tokens on the Ether Delta Exchange throughout August and September 2017.  For example, the First Centra Delta Account sold 146,325 CTR Tokens in exchange for 681.815 ETH on the open market in August 2017.[3]  The First Centra Delta Account is believed to have been controlled by Centra Tech or its agents because it received 100 ETH on August 3, 2017 to fund its trading activities from the following account, which Centra Tech has acknowledged   it   owned   and   used   in   connection   with   the   Centra   ICO: 0x387792f7d2AA6e7Fa1312261cF36F5F6f6b97c00.

37.     It is presently unknown whether ownership to the remaining CTR Tokens Rensel purchased on the secondary market was transferred directly to him from Defendants or their agents.  However, Plaintiffs will be able to determine whether this is the case upon obtaining discovery from Defendants and/or virtual currency exchanges where Defendants held accounts.  In total, Rensel expended 24.3 ETH to purchase 13,496 CTR Tokens and received 404 CTR Tokens

---

[3] It should be noted that some of these purchases and sales involved other Centra-affiliated accounts and were designed to simulate market activity for the CTR Token.  For example, the First Centra Delta Account conducted multiple trades with another account linked to Centra Tech: 0xeb976c0ac7f630808ebb64449212e3d2cc47cad8 (the "Second Centra Delta Account").

for free.  On October 27, 2017, Rensel sold all 13,900 CTR Tokens in exchange for 1.225 BTC, worth, at the time approximately 23.69 ETH.  In short, Rensel expended 24.3 ETH to purchase 13,900 CTR Tokens (including the free 404 CTR Tokens he received), and when he sold these 13,900 CTR Tokens, he received BTC that was worth 23.69 ETH, which reflects a loss of 0.61 ETH.  Additional details regarding the calculations for these transactions is contained in Rensel's amended certification submitted herewith.

*Co-Lead Plaintiff Wang Yun He*

38.     He expended 511.35 ETH between September 21, 2017 and September 24, 2017, to purchase 102,269.4 CTR.  Between September 26, 2017 and October 1, 2017, He invested 150 BTC to purchase 600,000 CTR.  In total, in connection with the "official" Centra ICO, Mr. He purchased 702,269.42079 CTR Tokens.  On December 16 and 17, 2017, He sold those CTR Tokens and received 30.355 BTC, which reflects a loss of 119.645 BTC and 511.35 ETH.  Co-Lead Plaintiff He's transactions in the Centra ICO are set forth in further detail in the PSLRA certification previously filed in this proceeding.  He did not agree to any token sale agreement in making his purchases.

39.     He also purchased approximately 581,448 CTR Tokens on the Binance virtual currency exchange for approximately 53 BTC between October 12, 2017 and November 22, 2017. He sold that CTR for approximately 36.34356 BTC, reflecting a loss of an additional 16.656 BTC. It is presently unknown whether the CTR Tokens He acquired on the Binance virtual currency exchange were purchased directly from Defendants or from third parties.  In total, Mr. He expended approximately 511.35 ETH and 203 BTC to purchase approximately 1,283,717.42 CTR Tokens.  In exchange for selling all of his CTR Token holdings, Mr. He received approximately 66.7 BTC, which reflects a total loss of approximately 136.3 BTC and 511.35 ETH.

*Plaintiff Chi Hao Poon*

40.    Chi Hao Poon expended 100 ETH to purchase 56,000 CTR Tokens and 60 ETH to purchase 12,000 CTR Tokens in the "official" Centra ICO on August 17, 2017 and September 15, 2017, respectively.  Plaintiff Chi Hao Poon used multiple Centra smart contracts to purchase the CTR Tokens and did not agree to any token sale agreement in making his purchase.  Chi Hao Poon still holds the original CTR Tokens he purchased in the Centra ICO and he did not make any additional purchases of CTR Tokens on secondary markets.

41.    As of October 8, 2018, CTR Tokens have been delisted from all exchanges and thus, lack any value whatsoever.  Accordingly, as of October 8, 2018, Chi Hao Poon's 68,000 CTR Tokens were worth approximately 0.00 ETH, representing a loss of 160 ETH.

*Plaintiff King Fung Poon*

42.    King Fung Poon expended 100 ETH to purchase 56,000 CTR Tokens in the "official" Centra ICO on August 25, 2017.  King Fung Poon used a Centra smart contract to purchase the CTR Tokens and did not agree to any token sale agreement in making his purchase. King Fung Poon still holds the original CTR Tokens he purchased in the Centra ICO and he did not make any additional purchases of CTR Tokens on secondary markets.

43.    As of October 8, 2018, King Fung Poon's 56,000 CTR Tokens were worth approximately 0.00 ETH, representing a loss of 100 ETH.

*Plaintiff Jae J. Lee*

44.    Lee expended 30 ETH to purchase 6,000 CTR in the "official" Centra ICO on September 12, 2017.  Lee used a Centra smart contract to purchase the CTR Tokens and did not agree to any token sale agreement in making his purchase.  Lee still holds the original CTR Tokens

14

he purchased in the Centra ICO and he did not make any additional purchases of CTR Tokens on secondary markets.

45.     As of October 8, 2018, Lee's 6,000 CTR Tokens were worth approximately 0.00 ETH, representing a loss of 30 ETH.

*Plaintiff Mateusz Ganczarek*

46.     Ganczarek expended 25 ETH and 15 ETH on September 11, 2017 and September 16, 2017, respectively, to purchase a total of 8,000 CTR Tokens.  Plaintiff Ganczarek used a Centra smart contract to purchase the CTR Tokens and did not agree to any token sale agreement in making his purchase.  Ganczarek still holds the original CTR Tokens he purchased in the Centra ICO.

47.     Additionally, on October 25, 2017, Ganczarek expended 0.026111 BTC to purchase 204.99 CTR Tokens on the secondary market.  Ganczarek has not sold the additional 204.99 CTR Tokens he purchased.

48.     As of October 8, 2018, Ganczarek's 8,204.99 CTR were worth approximately 0.00 ETH, representing a loss of approximately 40 ETH and 0.026111 BTC.

*Plaintiff Rodney Warren*

49.     Warren expended 1.75796768 BTC on December 17, 2017 to purchase 39,528 CTR Tokens.  Warren purchased these CTR Tokens on the Binance virtual currency exchange.  Warren still holds all of the CTR Tokens he purchased.  It is presently unknown whether Warren purchased these CTR Tokens directly from Defendants.  However, as noted, Plaintiffs will be able to determine whether title to the CTR Tokens Warren purchased transferred directly from Defendants upon obtaining discovery from Defendants and/or virtual currency exchanges where they held accounts.

50.     As of October 8, 2018, Warren's 39,528 CTR Tokens were worth approximately 0.00 BTC, representing a loss of approximately 1.75796768 BTC.

## II.     Defendants

51.     Centra Tech is a Delaware corporation incorporated on or about July 27, 2017.  The Company maintained its headquarters at 555 Washington Ave, Miami Beach, Florida 33139.  The Founder Defendants have represented that the Company began in May 2016, however, there is little to no publicly available information about the Company prior to July 2017.  Centra Tech was established for the specific purpose of enriching Defendants and their affiliates by selling patently worthless CTR Tokens via the Centra ICO.  Centra Tech was effectively shut down following the arrest of Sharma and Farkas on April 1, 2018, and Trapani on April 20, 2018.

### A.     The Founder Defendants

*Sohrab Sharma*

52.     Sharma also goes by the name of "Sam Sharma."  Sharma held 100% ownership of Centra Tech when it was formed and has held various positions with the Company, including: Chief Technology Officer ("CTO"), President, Co-Founder, and "Visionary Manager."   On October 31, 2017, Centra Tech announced that Sharma would be resigning in an official capacity to "support the continued growth of the Company."   Despite this public representation, Sharma remained actively involved in Centra Tech's operations until on or about March 26, 2018 -- one (1) week prior to his arrest on April 1, 2018.

53.     Sharma also held himself out to have been the President of "Sharma Technology" since 2010.  There is little information available regarding the business of Sharma Technology.  Prior to running Centra Tech, Sharma worked for Miami Exotics, Inc., ("Miami Exotics") as its

"Director of Finance."[4]  Additionally, prior to founding Centra Tech, Sharma ran a different virtual currency project named "Coin Success."  There is little information available regarding what this project involved, but Sharma touted it as a "Money Making machine!" and the short description available from a snapshot of its Facebook page from September 2017 stated that their "clients [were] becoming rich overnight."

*Robert Farkas*

54.     Farkas goes by the nicknames "Bob" and "RJ." Farkas was a co-founder of Centra Tech and was the Company's Chief Operating Officer ("COO") from approximately October 27, 2018, until his arrest on April 1, 2018.  Prior to this position, Farkas was the Company's Chief Marketing Officer ("CMO") and for at least some period of time held the title of "Co-Founder." It has not been publicly acknowledged whether Farkas maintains or ever held an ownership interest in Centra Tech.

55.     Prior to his time with Centra Tech, Farkas also worked for Miami Exotics as its "Vice President."  Farkas has described his role with the Centra Tech as being "[r]esponsible for keeping the public informed of each and every move involved with the Centra Card, Centra Wallet, cBay.io and the Currency Conversion Engine (CCE) Module."

*Raymond Trapani*

56.     Trapani was a founder of Centra Tech and has held the titles of COO, "Strategic Manager," and Co-Founder.  On October 31, 2017, it was also announced that Trapani would be "stepping aside" to "support the continued growth of the Company."  However, a promotional video released by Centra Tech on November 17, 2017, showed Trapani still working in Centra

---

[4] Miami Exotics is, or was, a company that rents out luxury cars.

Tech's offices.  As of March 2018, Trapani's public LinkedIn profile stated that he was still an "Advisor" to the Company.  It has not been publicly acknowledged whether Trapani maintains or ever held an ownership interest in Centra Tech.  Additionally, Trapani's grandfather, the late William Hagner, was publicly held out to have been the Company's President and Chairman of the board from October 2017 through January 2018.

57.     Immediately prior to his time managing Centra Tech, Trapani also worked for Miami Exotics as its "CEO."  Additionally, prior to, or in conjunction with, his luxury car rental vocation, Trapani marketed his services as "credit repair specialist" for "fixitupcredit.com."

*** 

58.     On March 31, 2018, the DA's Office for the SDNY initiated a criminal action against Sharma and Farkas (the "**Criminal Complaint**," or "Crim. Compl.").[5]  The Criminal Complaint alleges that, from July 2017 through March 31, 2018, in connection with the Centra ICO and Centra Tech's operations, Sharma and Farkas engaged in: (I) Conspiracy To Commit Securities Fraud; (II) Securities Fraud; (III) Conspiracy To Commit Wire Fraud; and (IV) Wire Fraud.  The Criminal Complaint resulted in Sharma and Farkas being arrested on April 1, 2018.

59.     On April 2, 2018, the SEC filed a civil action against Sharma and Farkas alleging that, in connection with the Centra ICO and Centra Tech's business operations, Sharma and Farkas engaged in securities fraud and the unlawful offer and sale of unregistered securities in violation of the federal securities laws (the "**SEC Complaint**," or "SEC Compl.").[6]

---

[5] A true and correct copy of the Criminal Complaint is attached to this Complaint as **Exhibit 1**.

[6] The SEC Complaint is substantially comprised of factual allegations echoing those raised in Co-Lead Plaintiff Rensel's initial complaint filed in this proceeding on December 13, 2017, Dkt. No. 1.  A true and correct copy of the SEC Complaint is attached to this Complaint as **Exhibit 2**.

60.    On April 18, 2018, the DA's Office for SDNY initiated a criminal action against Trapani (the "**Second Criminal Complaint**," or "Second Crim. Compl.).[7]  The Second Criminal Complaint alleges that from July 2017 through April 18, 2018, in connection with the Centra ICO and Centra Tech's business operations, Trapani engaged in: (I) Conspiracy To Commit Securities Fraud; (II) Securities Fraud; (III) Conspiracy To Commit Wire Fraud; and (IV) Wire Fraud.  The Second Criminal Complaint resulted in Trapani being arrested on April 20, 2018.

61.    On April 20, 2018, the SEC filed an amended complaint against Sharma, Farkas, and Trapani (the "**Amended SEC Complaint**," or "SEC Am. Compl.").[8]  The Amended SEC Complaint alleges that, from July 2017 through April 2018, in connection with the Centra ICO and Centra Tech's business operations, the Founder Defendants engaged in securities fraud and the unlawful offer and sale of unregistered securities in violation of the federal securities laws.[9]

62.    On May 14, 2018, a grand jury in the Southern District of New York returned an Indictment charging each of the Founder Defendants with conspiring to commit, and the commission of, securities and wire fraud in connection with their offer and sale of unregistered securities (CTR Tokens).

B.    The Executive Defendants

*Steven Stanley*

63.    Stanley was Centra Tech's Director of Public Relations ("Director of PR").  Stanley appears to have been the first employee hired by the Founder Defendants.  It is unknown when, or

---

[7] A true and correct copy of the Second Criminal Complaint is attached to this Complaint as **Exhibit 3**.

[8] A true and correct copy of the Amended SEC Complaint is attached to this Complaint as **Exhibit 4**.

[9] The SEC Complaint, Amended SEC Complaint, Criminal Complaint and Second Criminal Complaint are each incorporated herein by reference.

if, his employment with Centra Tech ceased.  However, Stanley was still publicly representing that he was an employee of the Company as of mid-October 2017.  Stanley has overseen the marketing of over a dozen initial coin offerings ("ICO") and runs a company named P.R.D. Press Release Distribution -- doing business as "ICO PR Marketing Services."   The website for Stanley's company offers "ICO Press Release Packages" such as "The ICO P.R. Dominator Package" which "comes with a custom written Press Release that is keyword optimized, distribution to hundreds of International & News Publications, as well as targeted distribution to specific Cryptocurrency Publications . . . ."

*Steven Sykes*

64.     Sykes was the CTO of Centra Tech from early-August 2017 through April 2018 -- when the Company was effectively shut down as a result of the Criminal and SEC actions.  During the pendency of this case, Sykes has represented under oath that he was: (i) "responsible for all customer experiences related to Centra Tech's website"; (ii) "personally familiar with the content and maintenance of Centra Tech's website"; and (iii) "personally familiar with the process customers had to complete to purchase Centra Tokens during the Centra Tech ICO."  When Sykes was hired by Centra Tech, he was described as being "responsible for driving the delivery of the Centra product to completion," which was touted as a "smart card and mobile app-based solution that allows the user to carry out debit transactions against their cryptocurrency accounts at any POS terminal that accepts Visa or Mastercard."

*Allan Shutt*

65.     Shutt was Centra Tech's General Counsel, Chief Compliance Officer, and Bank Secrecy Officer from October 2017 until the Company was effectively shut down in April 2018. Shutt was responsible for ensuring that Centra Tech complied with all federal and state regulatory

requirements.  On October 28, 2017, Shutt's public LinkedIn profile stated that his responsibilities at Centra Tech included: "[r]eport[ing] directly to the President and Board of Directors"; serving as "a member of the Executive Committee and Audit Committee"; and "[n]egotiat[ing] NDAs, Master Service Agreements, SOWs, WOs, technology agreements, credit services, [and] leases." During the Centra ICO, Shutt actively solicited the purchase of CTR Tokens and interest in the Centra Products by, *inter alia*, providing interviews wherein he attested to Centra Tech's compliance with regulatory requirements, attending conferences throughout the United States to personally solicit interest from potential CTR Token investors and assuring the public that Centra Tech was "certainly not a scam."

### Chase Zimmerman

66.     Zimmerman was Centra Tech's CMO from October 2017 until the Company was effectively shut down in April 2018.  Zimmerman was responsible for marketing Centra Tech, CTR Tokens, and the Centra Products, which included, *inter alia*, responding to questions from current and prospective Centra ICO investors on video and attending conferences throughout the United States to deliver presentations about Centra Tech and personally solicit interest from potential CTR Token investors.  Zimmerman also reportedly worked with Miami Exotics as a "strategic partner."  In light of this fact, it is reasonable to infer that Zimmerman had a personal relationship with the Founder Defendants prior to Centra Tech's creation.

C.     The Promoter Defendants

### Floyd Mayweather Jr.

67.     Mayweather is a professional boxer and a well-known celebrity.  Mayweather frequently touts his money-making abilities, posing with large amounts of cash, nicknaming himself Floyd "Money" Mayweather, and naming his brand "The Money Team."  Mayweather

has also been heavily involved with promoting several ICOs, so much so that on August 23, 2017, he posted a Tweet stating: "You can call me Floyd Crypto Mayweather from now on . . ." Mayweather promoted the Centra ICO by encouraging the public to purchase CTR Tokens in social media posts on Twitter, Facebook and Instagram.  For example, on September 18, 2017, Mayweather published a "Tweet" stating: "Centra's (CTR) ICO starts in a few hours. Get yours [CTR Tokens] before they sell out[.] I got mine."

*Khaled Mohamed Khaled a/k/a DJ Khaled*

68.     Khaled is a record producer, radio personality, and a well-known celebrity.  Khaled promoted the Centra ICO by encouraging the public to purchase CTR Tokens in social media posts on Twitter and Instagram.   For example, in September 2017, Khaled posted two pictures on Instagram alongside a caption stating: "The Centra Card & Centra Wallet app is the ultimate winner in Cryptocurrency debit cards powered by CTR tokens! . . . This is a game changer here. Get your CTR tokens now!"  Additionally, Khaled continued to solicit the purchase of CTR Tokens by posting endorsements of Centra Tech and the Centra Products in late-October 2017.

## SUBSTANTIVE ALLEGATIONS

**I.     Background on Blockchain Technology, ICOs, and Smart Contracts**

   A.     Blockchains

69.     A "blockchain" is essentially a digitized, decentralized, public ledger that cryptographically records, preserves and presents information.  The general idea is that each "block" contains information, such as details on transactions that are made.  After a "block" is created (with cryptography so as to verify its contents), the information inside of it cannot be changed. The "block" then becomes part of the "blockchain" and an encrypted version of the information contained therein becomes publicly available along with all the previous "blocks" in

the chain.  After this process is complete, another block is created with additional information and so on and so forth.

70.    To date, most "blockchains" are used to record transactions involving virtual currencies, *e.g.*, BTC and ETH.  However, a "blockchain" could be used to record all types of information.  For example, a blockchain could be used for deed recordation/transfers or even transfers of stock certificates.

B.    ICOs

71.    An ICO is a capital raising event in which an entity offers investors a unique "coin" or "token" in exchange for consideration—most commonly in the form of established virtual currencies (typically BTC and ETH) or fiat currency.  These tokens are issued on a blockchain and are oftentimes listed on online platforms, called virtual currency exchanges, where they are tradable for virtual or fiat currencies.

72.    To participate in an ICO, investors are typically required to transfer virtual currencies to the issuer's address, online wallet, or other account.  During an ICO, or after its completion, the issuer will typically distribute its unique "tokens" to the participants' unique address on the blockchain.  Similar to stockholders in an initial public offering ("IPO"), holders of these tokens are then entitled to certain rights related to a venture underlying the ICO, such as profits, shares of assets, use of certain services provided by the issuer, and/or voting rights.

C.    Smart Contracts

73.    A "smart contract" is a system running on a "blockchain" that enables transactions to automatically execute according to pre-specified rules.  In other words, a "smart contract" performs one or more functions automatically when initiated by a certain event.  Importantly, "smart contracts" run on "blockchains" and thus, the execution of "smart contracts" and

transactions accomplished thereby, are also recorded in the public ledgers that "blockchains" create.  Currently, the Ethereum Blockchain is the most popular "blockchain" that enables "smart contracts."  In contrast, the Bitcoin Blockchain does not enable "smart contracts" to operate on it.  This is one of the primary differences between BTC and ETH.

74.     To date, most "smart contracts" are used in connection with ICOs operating on the Ethereum Blockchain (*e.g.*, the Centra ICO).  That is, they are primarily used to automatically send the custom "tokens" (*e.g.*, CTR Tokens) to the "public wallet address" that initiated the "smart contract" by sending ETH to the "smart contract address" during the ICO.

**II.     Centra Tech's Founding and the Centra ICO's Mechanics**

A.     Centra Tech's Formation and Leadership Structure

75.     The Founder Defendants created Centra Tech in July 2017.  Sharma initially owned 100% of Centra Tech.

76.     Sharma was heavily involved in all aspects of Centra Tech's operations, including managing all of the Company's day to day activities and marketing.  Additionally, during the majority of the Centra ICO, Sharma was the face of the Company in interviews regarding the Company.

77.     Farkas' role was also substantial and included, *inter alia*, responding to emails from CTR Token investors, marketing the Centra ICO, managing Centra Tech's social media accounts, and attempting to get the CTR Token listed on virtual currency exchanges.

78.     Similarly, Trapani's role with the Company included, *inter alia*, distributing CTR Tokens to investors, hiring employees, and responding to questions from potential and actual CTR Token investors.

79.     In short, the Founder Defendants were intimately involved with, supervised, and directed, effectively all of Centra Tech's conduct described in this Complaint.

B.     The Centra ICO's Offer and Mechanics

80.     As noted above, the Centra ICO was purportedly intended to raise capital to create a variety of Centra Tech Products, including the Centra Card.

81.     The Centra ICO involved the offer of CTR Tokens in exchange for ETH, BTC, LTC, or other virtual currencies.

82.     No registration statement was ever filed with the SEC in connection with the Centra ICO or CTR Tokens.

83.     In the early stages of the Centra ICO, the offer was 400 CTR Tokens for 1 ETH. The offer was reduced to 200 CTR Tokens for 1 ETH, or the equivalent in other virtual currencies (*e.g.*, BTC and LTC).  As the Centra ICO progressed, the offer and sale of CTR Tokens was for a variety of prices in exchange for numerous virtual currencies.

84.     The Centra ICO offered different Centra Cards dependent on the number of CTR Tokens purchased.  For example, in August 2017, Centra Tech offered a "Centra Black Card founders edition" to the "first 500 ICO backers whom purchase with 100+ETH."  SEC Am. Compl. ¶73.d.  Centra Tech purported to have created multiple "Debit Cards," including the "Centra Titanium Card," "Centra Black Card," Centra Gold Card," and "Centra Blue Card."  The different "levels" of cards purportedly offered different "rewards."  The Centra Card was purportedly "a major debit card that with [sic] which clients and users can shop at more than 36 million places around the world" which would "provide[] Access to 36+million points of sale, in 200+ countries, where Visa® and/or Mastercard® are accepted."

85.     When the Centra ICO began, it was run using multiple Ethereum smart contract addresses.  As noted above, in the context of a typical ICO, an Ethereum smart contract is often initiated when it receives ETH and then automatically sends the token/coin being offered to the same address that sent the ETH to the smart contract address.  Accordingly, in the early stages of the Centra ICO, the only external information that was required to invest in the Centra ICO was one of Centra Tech's "smart contract addresses."  Centra Tech made its smart contract addresses publicly available through a variety of mediums.  For example, the Centra ICO's primary smart contract address used to receive ETH and send CTR Tokens to investors in September 2017 was: 0xbDB45d02D8eF8dc5E59aa58B26b99A4af3806bAa.  Centra Tech made this address publicly available on its website as well as on numerous virtual currency forums and social platforms. Indeed, as stated by a Centra Tech moderator on an online forum message board dedicated to the discussion of virtual currencies, Bitcointalk.org ("Bitcointalk"), on September 19, 2017: "THE WEBSITE IS NOT REQUIRED TO ENTER THE ICO. Just sent ETH to this contract: 0xbDB45d02D8eF8dc5E59aa58B26b99A4af3806bAa." (Capitalization in original).  Trapani reiterated this fact in the Centra Slack messaging group, stating once again: "THE WEBSITE IS NOT REQUIRED TO ENTER THE ICO."  Plaintiffs did not consent to a token sale agreement that purportedly contained a class action waiver or arbitration clause.

86.     The Centra ICO also involved Defendants offering and selling, and soliciting the purchase of, CTR Tokens on various virtual currency exchanges.  To purchase CTR Tokens on such exchanges, all that was required was to send Centra Tech or the Founder Defendants virtual currency and receive CTR Tokens in exchange.  This method also did not require any CTR Token purchaser to ever visit or use Centra Tech's website, let alone agree to any token sale agreement.

87.     Additionally, Defendants actively solicited the purchase of CTR Tokens from third parties on virtual currency exchanges for their own financial benefit.  More specifically, Defendant Centra Tech's only income came from selling CTR Tokens, and thus, increased market activity was expected to increase the CTR Token's market price and result in profits to Centra Tech. Similarly, with respect to the Founder Defendants, Executive Defendants, and the Promoter Defendants, according to Centra Tech's public representations, each received CTR Tokens, or fiat currency, in exchange for their work soliciting interest in purchasing CTR Tokens and thus, they too expected to financially benefit from the general public purchasing CTR Tokens on the open market.

88.     To drive demand for their CTR Tokens, Centra Tech paid cryptocurrency exchanges to list the CTR Token, and even sponsored contests that provided rewards to users who purchased the most CTR Tokens.  Defendants sponsored one such contest, dubbed the "Top 50 CTR Purchases Leaderboard Reward Program," on the Binance virtual currency exchange between October 14 and October 20, 2017.

89.     Under the "Reward Program," the "top 50 users with the highest CTR net purchases (total = buy – sell) on Binance platform [sic] [would] be awarded with a bounty of 10% of the purchase (max. 1000 CTR Tokens per user)."  The "reward [would] be paid out by Centra."  Centra Tech promoted this contest by tweeting: "Our $CTR Contest is now live on the @binance_2017 Exchange! Binance.com."

## III.   Marketing the Centra ICO

90.     Centra Tech and the Founder Defendants used various methods to market the Centra ICO, including, *inter alia*, by: (i) issuing numerous press releases and blog posts touting the Centra ICO and CTR Tokens as an investment opportunity; (ii) disseminating "White Papers"

promoting the Centra ICO; (iii) creating a "bounty program" to reward those who promoted and publicized the Centra ICO; (iv) engaging on social media platforms such as YouTube, Twitter, Instagram, and Facebook; and (v) hiring the Promoter Defendants to provide celebrity endorsements to the Centra Products.

      A.    <u>Press Releases and the Centra Tech White Papers</u>

      91.    Centra Tech began marketing the Centra ICO in July 2017.  On July 23, 2017, Centra Tech published a press release on cointelegraph.com (a virtual currency news website), entitled "Centra Tech, Inc. Announces Initial Coin Offering (ICO) – Launching Centra Card" (the "July 23 Press Release").  The July 23 Press Release stated that Centra Tech had created the "world's first Debit Card that is designed for use with compatibility on 8+ major cryptocurrency blockchain assets" and that the Centra ICO was "truly a ground floor opportunity . . . that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees."  Additionally, this press release stated that the "Centra Card works anywhere that accepts Visa or Mastercard."

      92.    Similarly, on July 25, 2017, Centra Tech published a press release on Bitcoin.com, entitled "PR: Centra Tech Announces ICO, Centra Card, & Insured Wallet" (the "July 25 Press Release").  The July 25 Press Release also touted the Centra ICO as a "truly a ground floor opportunity" and that the "Centra Card works anywhere that accepts Visa and Mastercard."

      93.    Such statements and promotional materials conditioned Centra ICO investors to expect profit from purchasing CTR Tokens, as if the Centra Card did function on Visa and Mastercard networks, this would lead to additional persons purchasing CTR Tokens thereby increasing the CTR Token's market price as well as the so-called "rewards" promised from usage of the network (detailed below).

94.     Throughout the Centra ICO, Centra Tech released multiple "White Papers" describing the ICO's offer and terms.  All of these documents have since been removed from Centra Tech's website and multiple versions are no longer publicly available elsewhere.  There have been at least three different versions entitled "Centra Tech White Paper Final Version 1.0." The first is dated to early-August 2017 ("White Paper-1"), the second is dated to sometime between late-August and early-September 2017 ("White Paper-2"), and the third is dated to sometime in early-mid-September 2017 ("White Paper-3") (collectively, the "Centra White Papers").

95.     As the Centra ICO progressed, Centra Tech released additional iterations such as the Centra Tech White Paper "Version 2.0" which touted that owning CTR Tokens "allows users to **invest** in the network's future blockchain."  (Emphasis added).

96.     The primary difference between the three "Final Versions" of the Centra White Papers is that each iteration removed additional explicit language touting the profit potential from investing in the Centra ICO.  For example, both the White Paper-1 and White Paper-2 stated that investors would be able to "trade them [CTR Tokens] on cryptocurrency exchanges for a profit" and that "[o]ur token deal enables clients to join our prosperity and mission while generating a profit."  The foregoing language is noticeably absent from the revised White Paper-3.

97.     According to the White Paper-3, the concept for Centra Tech originated in May 2016.  The timeline of "roadmap and milestones" presented in this White Paper was displayed in the following graphic:



98.     This graphic of "roadmap and milestones" stated that in "May 2016" "The Idea

Concept [sic] of connecting cryptocurrencies together to make them spendable" was formulated.[10]

Additionally, this graphic also stated that, starting in January 2017, Centra had a "license

agreement signed with VISA USA Inc."  Such claims were patently false given the fact that, as

detailed below, Centra Tech did not have a partnership with Visa or Mastercard, nor had it even

---

[10] Similarly, Sharma's public LinkedIn profile on October 29, 2017 stated his employment as "Co-Founder" of Centra Tech since May 2016.

applied to run on their networks.  In fact, Visa contacted Centra Tech numerous times demanding that the Company remove references to their brand.  SEC Am. Compl. ¶¶82–4.

      B.    <u>Social Media and the Centra Tech Bounty Program</u>

      99.    The Centra ICO was marketed on various social media platforms, including Twitter and Facebook.  For example, on July 22, 2017, the official Centra Tech Twitter account -- @centra_card -- Tweeted: "I just published 'How to Participate in the Centra ICO?'" and provided a link to instructions on how to purchase CTR Tokens.

      100.    Similarly, on July 30, 2017, @centra_card tweeted "The Centra Tech Public Pre-Sale ICO is now open. Contribute between now and 8/5/2017 to get a 25% Bonus!"

      101.    Moreover, Centra Tech made emphatic statements touting the purported profit to be made from purchasing CTR Tokens.  For example, on August 6, 2017, @centra_card responded to a post regarding the Centra ICO with the following:



      102.    As part of the Founder Defendants' efforts to generate interest in purchasing CTR Tokens, they created and used fictional online identities in online chat rooms or forums such as Reddit.  SEC Am. Compl. ¶54.  For example, on or about August 13, 2017, Trapani texted Sharma and stated that he was using the pseudonym "kingbit26" for his posts: "I'm kingbit26 they don't know who that is."  *Id.*  The Founder Defendants used these pseudonyms to harass or bully other users that posted critical information about Centra Tech.  *Id.*

103.    For example, on August 26, 2017, when users where making critical comments about Centra Tech and the Centra ICO, Sharma texted Trapani and instructed him to "[h]op in the ethe[r] delta chat and shut people up."  SEC Am. Compl. ¶54.  Trapani responded "Ok."  *Id*. Similarly, in connection with silencing another critic of Centra Tech, Sharma also instructed Trapani to use the "mike" pseudonym, which Trapani did.  *Id*.

104.    The Founder Defendants also paid to boost the view counts of their videos and receive positive comments.  For example, in September 2017, Sharma texted Trapani and Farkas: "When one of you guys wake up plz boost our video. Buy likes comments. The most we can[.] Let's get it pumping."  Farkas responded: "On it."  Later Farkas boasted that he "[b]oosted the f[*]ck out of it."  SEC Am. Compl. ¶55.

105.    In further efforts to silence critics, the Founder Defendants also attempted to bribe posters of critical information to remove such information by offering them CTR Tokens.  For example, in August 2017, the Founder Defendants participated in a text message conversation regarding a video posted online that was critical of Centra Tech.  SEC Am. Compl. ¶56.  Farkas asked Sharma if he had been successful in his attempt to bribe the poster of the critical video to remove it.  *Id*.  Sharma responded: "Yea 2k CTR [Tokens]."  *Id*.  Sharma further expounded: "**To him it's 2 racks.  To us its air Lol**."  *Id*. (Emphasis added).[11]

106.    Similarly, in early October 2017, Sharma reportedly contacted the author of a blog post that was critical of Centra, telling the author that he had "discussed [the post] with [his] team," and then asking, "what can we work out to get this article removed in full, and a new article written, 20 ETH fair? or 10K CTR, up to you . . ."

107.     Each of the foregoing actions were taken in furtherance of soliciting investments in the Centra ICO and ensuring that potential CTR Token purchasers believed the claims regarding the profit potential from purchasing and owning CTR Tokens.

108.     In addition to promoting the Centra ICO directly, Centra Tech also created a "bounty program" wherein they offered CTR to those who marketed the Centra ICO and solicited additional investors -- thereby making these bounty program promoters agents acting on behalf of Centra Tech and the Founder Defendants.

109.     On July 29, 2017, the official Centra Tech account on Bitcointalk announced that Centra Tech "just hired [their] Bounty Manager" and so the Company's bounty program would begin soon.

110.     On August 1, 2017, Centra Tech launched the "Centra Official Bounty Program" (the "Centra Bounty Program").  The Centra Bounty Program was designed to offer CTR Tokens to any person who generated positive press or social media coverage of the Centra ICO and encouraged the general public to purchase CTR Tokens in the Centra ICO.  Included in this program was a "Blog/Media Bounty," which stated that "Centra Will Reward Experienced Writers who write quality Reviews, Articles About [sic] the Centra Project and the ICO crowdsale." Similarly, the program stated: "Centra Will Reward Experienced Video Editors who Create Quality Video Reviews, Presentations, Investment Instruction [sic] about the Centra Project and its Token Sale."

111.     Trapani was the person primarily responsible for managing the Centra Bounty Program.  SEC Am. Comp. ¶61.

112.     Participants in the Centra Bounty Program generated tremendous hype surrounding the Centra ICO by publishing numerous blog posts, articles, and videos.  Centra Tech's marketing

efforts, including its bounty program, yielded numerous publications focused on the potential profit that could be made by investing in the Centra ICO.  For example, a user named "Ebenezer" published a post on Steemit on August 17, 2017, entitled "Make Huge Money With the Latest Blockchain Debit Card Online" which stated, "[t]he Centra Tech ICO offers investors great [sic] opportunity for a comprehensive reward program for both token and card holders . . . ."  Similarly, this same post concluded by stating, "[j]oin Centra Tech ICO and make real huge money Online because opportunity they says [sic] comes but once.  Centra Tech ICO train [sic] is moving and it's unstoppable! It is now or never!"

113.    Spurred by the Founder Defendants' efforts, and in particular by the Centra Bounty Program, countless articles, blog posts, forum posts, and online comments were published discussing the Centra ICO as an investment opportunity with a strong prospect for profit.  For example, on September 11, 2017, "Melody Crypto" posted a blog entitled "ICO Centra Card – Store Your Money on Debit Card Using Cryptocurrency" on ico-flow.blogspot.com.  This blog post stated, "the total supply will be offered for sale to investors according to the following price schedule."

114.    To track participants in the Centra Bounty Program, and the work they had done, the Founder Defendants created a Google spreadsheet where participants could input details on their promotional efforts.[12]  This spreadsheet shows that "Ebenezer" (the author of the "Make Huge Money With the Latest Blockchain Debit Card Online" blog post) and "Melody Crypto," were both participants in the Centra Bounty Program.  Accordingly, promotional efforts made by

---

[12] This Google Document was publicly available at: https://goo.gl/UWpZKX, but has since been made private.  Counsel for Plaintiffs obtained a copy of the spreadsheet prior to it becoming unavailable.

"Ebenezer," "Melody Crypto," and the thousands of other participants in the Centra Bounty Program were made on behalf of Centra Tech, for compensation, and thus are attributed to Centra Tech and the Founder Defendants.

## IV.    The Centra ICO Never Ended

115.    Centra Tech claimed that the Centra ICO ended on October 5, 2017.  By this date, Centra Tech had already collected at least 113,000 ETH from selling CTR Tokens.  However, based on Defendants' own representations, Centra Tech appears to have collected substantially more than 113,000 ETH as of that date.  For example, in a post on Reddit.com in October 2017, Trapani stated "our ICO sold out and hit our 170K ETH cap."  Similarly, in this same forum thread, Trapani stated:

> [W]e sold out already. Our products simply speak for them selves [sic]. That is the bottom line. We are sim [sic] plying [sic] crypto for the masses. Also [sic] people like Floyd Mayweather and DJ Khaled would not risk their future over being a partner to a company that is not as real as it gets.

116.    Additionally, it is unknown whether Centra Tech converted the BTC and LTC investments it received in exchange for CTR Tokens into ETH.  As such, Centra Tech may have collected substantially more than even 170,000 ETH by October 2017.

117.    Despite Centra Tech's contentions, the Centra ICO never actually ended.  Indeed, Defendants continued to offer and sell CTR Tokens by, *inter alia*, (a) Centra Tech and the Founder Defendants selling CTR on the open market; (b) Centra Tech, the Founder Defendants and Executive Defendants arbitrarily requiring those who were interested in obtaining a Centra Card or Centra Wallet to purchase CTR Tokens; and (c) Centra Tech, the Founder Defendants and the Executive Defendants engaging in so-called "partnerships" with companies conducting their own ICOs pursuant to which a percentage of the unique tokens or coins offered in those ICOs could

only be purchased with CTR Tokens -- forcing the general public to purchase CTR Tokens for no reason whatsoever.

A.   Continuous Solicitations and Purchase and Sale of CTR Tokens on the Open Market

118.   During the Centra ICO, Defendants each offered and sold CTR Tokens and/or solicited investments in CTR Tokens on the open market.

119.   CTR Tokens became listed on at least one virtual currency exchange in August 2017, and therefore, any and all solicitation efforts that took place from that point onward solicited purchases of CTR Tokens, *inter alia*, on the open market.

120.   Centra Tech and the Founder Defendants purchased and sold CTR Tokens on the open market continuously beginning in August 2017.  Each of the Defendants participated in accomplishing those purchases and sales at various points throughout the Centra ICO.

121.   Further, Centra Tech actively solicited the general public, including Plaintiffs, to purchase CTR Tokens on the open market from Defendants and third parties for Defendants' financial benefit.  For example, Centra Tech frequently posted images, and videos containing these images, such as the following:



122.    Additionally, to generate increased interest in purchasing CTR Tokens, the Founder
Defendants actively manipulated the price of CTR Token on the open market.  SEC Am. Compl.
¶65.  The Founder Defendants were concerned that if the price of CTR Token fell too low, the
public's interest in purchasing CTR Tokens would also fall.  *Id*.  As Sharma stated to Trapani:
"Can't have more FUD [fear, uncertainty and doubt] . . . There's FUD around[.]  Mainly about
price."  *Id*.

123.    To dispel this "FUD," the Founder Defendants engaged in active trading of CTR
Tokens designed to increase CTR Token's market price.  *Id*. ¶66.  For example, from August 26–
27, 2017, Trapani purchased CTR Tokens solely to artificially inflate its price.  *Id*.  Indeed, on
August 27, 2017, Sharma explicitly instructed Trapani to conduct market trades so as to increase
the CTR Token's price in the following exchange:

**Sharma**: Ray keep bumping the price. Do [larger] buys.

**Trapani**: what size

**Sharma**: 10 ETH plus

*Id*.

124.    Trapani agreed to do as Sharma instructed.  *Id*.  On that same day, Sharma again instructed Trapani to conduct trades to push CTR Token's price upwards, and Trapani replied: "yeah I am doing big buys."  *Id*.  Following Trapani's trading of CTR Tokens, Sharma stated "we already pushed the price higher By doing that pump[.]  Naturally We gotta keep doing that[.]  Price is rising."  *Id*.  Trapani continued to push CTR Token's value upwards the following day, after which Sharma encouraged him to make even larger buys at higher prices: "Gotta do higher than 60."  *Id*.  Trapani agreed and Sharma then stated "[g]et . . . [r]eady for the pump Lol."  *Id*.

125.    Following this one instance of market manipulation, Sharma messaged Trapani that they had "[b]urned through like 250 ETH" and moved CTR Token's "price higher by 30%."  *Id*. ¶67.

126.    Publicly available data indicates that efforts to increase CTR Token's market price yielded its intended effect.   From August 26–28, 2017, CTR Token's price increased from approximately $0.50 per CTR Token to over $1.  Indeed, on August 27, 2017, in the midst of these efforts, CTR Token's price had reached $6.91 -- the highest it ever reached.

127.    It appears based on market data that the Founder Defendants also engaged in open market trades to increase CTR Token's market price in late-December 2017 through early-January 2018.  During this period, CTR Token's price movement was in stark contrast with the broader market for virtual currencies.  For example, the following three charts from coinmarketcap.com for BTC, ETH, and LTC exhibit the parallel movements in their values relative to USD from December 13, 2017 through December 24, 2017:



128.    As demonstrated by these charts, by December 22, 2017, BTC, ETH, and LTC, respectively, lost approximately 40%, 37%, and 48% of their values.  Following this crash -- which affected the virtual currency market as a whole and culminated on December 22, 2017 -- BTC, ETH, and LTC, were all unable to meaningfully recover their valuations relative to USD by the end of December 24, 2017.

129.    In stark contrast to the trading values of these widely used virtual currencies, during this same time period CTR Token's price surged an improbable 865% in value, as exhibited in the following chart -- also obtained from coinmarketcap.com:



130.     The unexplained and mysterious rise in CTR Token's price was noted by investors during this period. For example, on December 16, 2017 -- the day after the hearing in this proceeding on Co-Lead Plaintiff Rensel's first Motion for a Temporary Restraining Order -- CTR Token's price began its upward ascent and on December 17, 2017, a user on Bitcointalk named "vegaed1," stated the following with regard to Centra Tech's public response to this action having been initiated, "[w]ow you think the value would drop after that but it's going up! . . . Was there any recent good news? It's currently at $.81 cents."   In response to this post, a user named "msukairi" stated, "[t]his is just weird, the price increased with bad news such as lawsuit.  Is it good time to sell now?"  Similarly, on December 22, 2017, "vegaed1" submitted a post in which they noted that "[w]hile everything is bleeding ctr is growing!"  Users on this forum also raised questions as to potential manipulation of the CTR Token market.  For example, on December 23, 2017, a user named "andrejka" stated, "Coinmarketcap shows more than 140% of growth today! What's going on? [] Is it just a pump or any important news came out?"

131.     Additionally, it is worth noting that CTR continued its improbable surge in value until January 4, 2018, hitting a price of $4.43 -- representing a surge of 1,107.5% in value from December 13, 2017, the date on which the instant action was filed.  In short, the significant increase to CTR Token's market price for no apparent reason is highly suspect -- especially in light of the

40

fact that it is indisputable that the Founder Defendants' engaged in similar trading activity in August 2017.

132.     The only income Centra Tech ever received was from the sale of CTR Tokens. Indeed, Centra Tech and the Founder Defendants sold a significant amount of CTR Tokens on the open market for a profit.  Moreover, given the fact that Centra Tech and the Founder Defendants were actively manipulating CTR Token's market price, they were able to profit by selling their CTR Tokens at peak prices.

133.     Each of the foregoing instances of potential or actual market manipulation support Plaintiffs' Securities Act Claims as well as their Exchange Act Claims.  With respect to the Securities Act Claims, the foregoing provides additional evidence of Centra Tech and the Founder Defendants' efforts to solicit additional purchases of CTR Tokens by propping up the price of CTR Tokens as well of Centra Tech and the Founder Defendants having engaged in the continuous purchase and sale of CTR Tokens throughout the Class Period.  As relates to the Exchange Act Claims, the foregoing events plainly evince Defendants' fraudulent scheme to create and sustain a public market for Centra Tech's unmarketable securities by artificially propping up and inflating the price of CTR Tokens.

B.     The Centra Card and Centra Wallet

134.     Following the Centra ICO, Centra Tech, the Founder Defendants and the Executive Defendants engaged in the offer and sale of CTR Tokens by arbitrarily requiring the public to purchase CTR Tokens in order to obtain a Centra Card and/or use the Centra Wallet.

135.     For example, on October 28, 2017, Centra Tech issued a press release on *Cision PR Newswire* entitled "DJ Khaled Recommends Downloading Centra Wallet App (Another One)." This press release stated as follows:

> As part of Centra's greater mission to make the Centra ecosystem available to as
> many users as possible, the Centra Tech team has announced their plan to expand
> the Centra Wallet App usage to non-contributors with a 50 CTR participation. With
> this exciting update, users will be able to deposit the 50 CTR into their wallet to get
> full functioning access to the Centra Wallet and to order their cards directly from
> the mobile or desktop app.

136.    As seen, if a member of the public wanted to use the Centra Wallet (which never

fully functioned), they had to purchase 50 CTR Tokens.   Similarly, on December 18, 2017,

Zimmerman released a video in which he responded to questions about Centra Tech from the

public.   In this video, Zimmerman first repeated the question and then provided the answer.

Zimmerman stated:

> **Q**: 'I'm a Centra ICO participant and I'm expecting to receive a blue card based
> ICO contribution level. After I receive my blue card, can I also apply for a Black
> card based on post-ICO purchases?'
>
> **A**: Yes, absolutely.  If you are looking to.  It can go a couple different ways, if
> you're looking to get a blue card and you'd like to upgrade, we have that option
> available to you.  There are different um, if you have specific levels of CTR, you
> can stake, um specific different, um variations of that for different levels of cards.
> So we have the blue card, the black card and the gold card.  We also have the option,
> **if you're going for the Black Card and you stake that amount of CTR, which
> I believe is a hundred thousand CTR, you can add a five thousand CTR
> purchase on top of that to have the black card in a metal finish**.

(Emphasis added).

137.    In other words, Zimmerman was stating that the Centra Tech investor needed to

purchase approximately 100,000 CTR Tokens to acquire a Centra Black Card with a metal finish.

138.    Requiring the public to purchase CTR Tokens in order to use the Centra Card and/or

the Centra Wallet served no genuine purpose and was entirely self-serving because CTR Tokens

never had any actual use nor were they necessary to conduct any of the Centra Card or Centra

Wallet's purported functions.  Perhaps more to the point, the Centra Card never had the capacity

to function as a "debit card" or actually convert various cryptocurrencies to fiat currency in "real

time" on the Visa and Mastercard networks.  Hence, it is obvious that these requirements were only implemented to incentivize the public to purchase CTR Tokens, thereby securing profits for Centra Tech, the Founder Defendants and/or any Executive Defendants holding (and often selling) CTR Tokens.

C.      "Partnerships"

139.    In order to further solicit purchases of CTR Tokens from the general public, Centra Tech engaged in so-called "partnerships" with various companies that were in the process of conducting their own ICOs.  For example, on January 13, 2018, Centra Tech announced that it had formed a "partnership" with NPER Inc. ("NPER").  On January 17, 2018, NPER published a post on Medium entitled "NPER Crowdsale & KYC Details."  This post detailed the nature of NPER's "partnership" with Centra Tech and its interplay with the ICO that NPER had been planning (the "NPER ICO").  In this post, NPER stated "[r]ecently NPER signed a partnership with crypto debit card CENTRA, and in order to strengthen its partnership, NPER carries out some of crowd sales with CENTRA's CTR token.  Therefore, you can purchase NPER with CENTRA token or Ethereum."  This post also explained that the NPER ICO would have a "CENTRA/NPER sale amount [of] 1,200,000 CTR."

140.    Centra Tech engaged in so-called "partnerships" with similar terms with other companies conducting ICOs, including "Baasid," and the "Rootproject."

141.    Each of these "partnerships" had the practical effect of causing investors interested in those companies' ICOs to purchase CTR Tokens.  In short, these partnerships were little more than schemes under which Centra Tech could induce the public into purchasing more unregistered securities (CTR Tokens).

## V.    CTR Tokens Are Investment Contract Securities

142.    It is indisputable that Defendants offered and sold CTR Tokens.  For example, the core offer in the early stages of the Centra ICO, as stated in the White Paper-3, was "[t]he tokens will be sold at 200 CTR to 1 ETH."[13]  Indeed, Centra Tech dubbed the early stages of the Centra ICO, the "Centra Token Sale" in the White Paper-3.  Similarly, the "Terms and Conditions" contained therein stated that "the Tokens are **purchased** on an 'as is' basis." (Emphasis added).

### A.    The Terms of the Centra ICO Sale Presented an Investment Offer

143.    Centra Tech, the Founder Defendants, and the Executive Defendants have crafted a flimsy façade that CTR Tokens are not securities by claiming that they are "utility tokens."  The artifice of this terminology had its clear genesis in a report the SEC published on July 25, 2017 regarding the DAO Initial Coin Offering, which involved DAO Tokens being offered in exchange for ETH investments.  In this report, the SEC concluded that the DAO Tokens were securities. More specifically, the apparent genesis was in an article on inc.com that discussed the SEC's report on DAO.  In particular, on July 29, 2017, Centra Tech's official account responded to a question on Bitcointalk forums asking whether Centra Tech's representatives had read the SEC's report regarding the DAO.  Following was Centra Tech's response:

---

[13] One ETH ranged in value throughout the duration of the Centra ICO and was worth between $200 and approximately $1,400.



144.    Apparently, the Founder Defendants read an article on inc.com that discussed the

SEC's report on the DAO[14] and concluded that if they simply call the CTR Token a "utility token,"

then the CTR Tokens are automatically not securities.  It must be stressed that Centra Tech and

the Founder Defendants immediately contradict this absurd rationale in the same post when they

conclude by stating the CTR Tokens "will surge in value."

145.    In reality, the Centra ICO was obviously an offer and sale of securities.  Indeed, it

is evident that investors were purchasing CTR Tokens with the expectation that CTR Tokens

would provide "rewards" (a/k/a dividends) and that the CTR Tokens purchased would increase in

value and become worth more than the virtual currencies invested.  For example, investors in the

Centra ICO in September 2017 purchased CTR Tokens with the expectation that the 200 CTR

---

[14] This article is no longer available online.

Tokens received would subsequently be worth more than one (1) ETH, or the equivalent virtual currency invested.[15]

146.   Additionally, as provided in the White Paper-1 and White Paper-2, "CTR Token holders expected to receive a .8% eth reward for every transaction in the network."

147.   In other words, Centra Tech was offering a dividend to all investors in the Centra ICO.   Indeed, Sharma explicitly acknowledged this and referred to this purported reward as a "dividend reward."  SEC Am. Compl. ¶123.  Furthermore, on or about September 13, 2017, Centra Tech announced that this reward would be available to all CTR Token holders: "We have recently got approval to offer the CTR Token Reward to **ALL** token holders that hold a Centra Card® & CTR Tokens."  (Capitalization in original).   Accordingly, all Centra ICO investors, whether they purchased such on the open market from Defendants or third parties, or from Centra Tech pursuant to the Company's token sale, were also led to believe that they would receive the 0.8% reward.

148.   Additionally, early investments in the Centra ICO also carried a "minimum contribution purchase" of 0.1 ETH, which objectively closely resembles a minimum investment amount in a standard securities offering.  Similarly, in order to obtain a Centra Card or access to the Centra Wallet, the public was required to purchase and hold a minimum amount of CTR Tokens.  For example, in order to have a Centra Black Card, an investor was required to purchase approximately 100,000 CTR Tokens -- regardless of where they purchased CTR Tokens.  This requirement is also akin to a minimum investment amount.

---

[15] On May 10, 2018, 1 CTR Token was worth approximately $0.015, meaning 200 CTR Tokens would be worth $3.  In contrast, 1 ETH was worth approximately $760.

149.    In short, the terms of the Centra ICO clearly evidence that Defendants' offer and sale of CTR Tokens was the offer and sale of unregistered securities in violation of the federal securities laws.

B.    <u>The Economic Realities of Purchasing CTR Tokens</u>

150.    When determining whether a security has been offered and sold, the focus must be on the economic realities underlying the transaction.  Here, the economic realities are that Plaintiffs and the Class invested ETH, BTC, LTC, and various other virtual currencies in order to receive CTR Tokens, which they were conditioned to expect would be worth more than their initial virtual currency investments.  Indeed, the White Paper-2 touted the potential profit to be made from investing in the Centra ICO with language such as, "[o]ur token deal enables clients to join our prosperity and mission while generating a profit."  Moreover, the Conclusion from the White Paper-2 was as follows:



8. CONCLUSION

Centra Tech proposes to offer an integrated cryptocurrency marketplace and commerce solution
- Use Centra Debit Card to spend cryptocurrencies
- cBay Marketplace
- CTR Token
- Centra Wallet
- Currency Conversion Engine and Exchange Platform

Blockchain technology has proved to be a disruptive revolution and innovation for many industries, particularly the finance industry. With its presence as one of the main 10 developing advances in 2016, its maturity has seen blue-chip companies recognize it as a potential disruptors for several industries. The Blockchain revolution however can only remain embraced by every industry.

Leveraging on the over-$100 billion market cap of cryptocurrencies, Centra Tech has brought ease to the world of online buying and selling with its cryptocurrency-based market place, where customers can use Centra Debit Card anywhere in the world that accepts Visa®

Customers will also have the capacity to use their wallets on Centra Debit card, or trade them on cryptocurrency exchanges for a profit.

47

151.    As seen, the White Paper-2 soliciting purchases of CTR Tokens unabashedly stated that participants would be able to use the CTR Tokens "or trade them on cryptocurrency exchanges for a profit."

152.    Additionally, Centra Tech made numerous emphatic positive statements concerning the "growth potential" of the value of the CTR Tokens.  For example, the White Paper-3 included the following section:

> **3.3 Growth Potential**
> Jonathan Vaux, Visa® Card's VP of innovations and strategic partnerships, noted that "blockchain has received a significant amount of analyst and press attention over the last few years, as this emerging technology holds significant potential." The growth potential of the market can likewise be evaluated by the fact that market capitalization of cryptocurrencies attained a new height of $102 Billion as of June 15, 2017, an increase of 1363% since Feb. 19, 2016. Bitcoin and Ether (the cryptocurrency of the Ethereum Blockchain platform) have a market capitalization of about $42 billion and $25 billion, respectively.

153.    As such, not only was Centra Tech attempting to draw inferences that it was affiliated with Visa, but also that the CTR Token had substantial "growth potential."

154.    Plaintiffs and the Class' investments of ETH, BTC, LTC, and other virtual or fiat currencies constitute an investment of money in an investment contract.

155.    Plaintiffs and the Class were investing in a common enterprise with Defendant Centra Tech, as the Centra ICO investments and proceeds from selling CTR Tokens were pooled under the control of Centra Tech, the Founder Defendants, and the Executive Defendants. Additionally, the success of the CTR Token and the Centra Products -- and thus potential profits stemming from the future valuation of the CTR Tokens -- aligned the interests of Plaintiffs and the Class with Defendants.  Indeed, the White Paper-2 explicitly stated that CTR Token holders could make a "profit" by "join[ing] in" Defendants' "prosperity and mission."

156.    Further, as stated in the White Paper-3, "14% [of CTR Tokens] will be dispersed to Centra Tech's organizers, early financial specialists, and representatives as an *impetus to making*

*an enduring common interest* and commitment to the tokens and their drawn out value." (Emphasis added).[16]  Each of the Founder Defendants, Executive Defendants, and Promoter Defendants were Centra Tech's "co-founders," "organizers," and/or "representatives."  Accordingly, it is obvious that any potential value ascribed to the CTR Tokens was expected to be for the Founder Defendants, Executive Defendants, and Promoter Defendants' personal benefits in addition to Plaintiffs and the Class' benefit.

157.    The value, and existence, of the CTR Tokens and the Centra Products have been at all times entirely dependent on Defendants' actions.  In fact, the White Paper-3 explicitly stated that each "Purchaser" was required to agree that they "understand[] and accept[] that while the individuals and entities, including Centra Tech, assigned to this task will make reasonable efforts to develop the Centra Tech System, it is possible that such development may fail and purchasers' CTR Tokens could become useless and/or valueless due to technical, commercial, or regulatory challenges, among other reasons."  Similarly, as stated in the White paper-2: "Nothing in the Service, in the Terms, or in any statements or information contained on the Site . . . shall be construed as the guarantee of gaining profit or benefit in any other form.  The Purchaser understands that participating in the Token Sale may result in financial losses."

158.    With respect to the Promoter Defendants, their anticipated success at soliciting additional purchases of CTR Tokens was expected to increase value of CTR Tokens.

159.    In short, the anticipated value of CTR Tokens was explicitly tied to, and dependent upon, the success of the Centra Products, and thus the future potential increases to the CTR Token's value was at all times dependent on Defendants' actions.

---

[16] There are conflicting reports on this point, as certain articles and posts have claimed that the "Centra Tech Team" had "32% of CTR Tokens reserved."

160.    Additionally, Centra Tech routinely led Plaintiffs and the Class to expect profit from their purchase of CTR Tokens.  For example, both the White Paper-1 and White Paper-2 stated that "CTR Token holders will receive a 0.8% eth reward for every transaction in the network."  As reiterated by Sharma in an interview on the Neocash Radio Podcast (the "Neocash Interview"),

> **Sharma**: [The CTR Token] gives a lot of benefits to those token holders. Currently we have a rewards system set up.  And it is based on a monthly set up that token holders get point eight percent rewards of the network profit generated inside of the terms and conditions of the token. So pretty much break that down it just means that the rewards percentage that we get from Visa and Mastercard through our revenue share, we actually give point eight percent of that away to token holders as part of our program to join the Centra Tokens.

> **Host**: How is that paid out?

> **Sharma**: That is paid out monthly in Ether to their Centra wallets.

161.    Farkas also touted this "reward" in a public chat forum.  More specifically, on August 31, 2017, Farkas listed "Centra's 5-point Advantage" in a public chat, the first "point" stated that "Centra tokens will give .8% returns in Eth quarterly to all CTR [Token] holders based on network usage (not personal purchases)."  SEC Am. Compl. ¶122.  In other words, Centra Tech and the Founder Defendants were offering a dividend to all purchasers of CTR Tokens.  Indeed, Sharma has referred to 0.8% as a "**dividend reward**."  *Id*. ¶123. (Emphasis added).

162.    Similarly, even the official Centra Tech account on Bitcointalk touted that the CTR Token "will surge in value."  Clearly, CTR Token purchasers were led to expect profits from purchasing CTR Tokens.

163.    The 0.8% ETH reward increased investor participation in the Centra ICO and interest in purchasing and holding CTR Tokens.  For example, as stated by a user on Reddit.com on September 13, 2017:

So the Centra team have confirmed that people holding both a Centra card and CTR in their wallet will be rewarded with CTR cashback on [their] spending and ETH for the tokens they hold.

The wallet rewards will come in the form of **0.8% share of the merchant fees generated from Centra transactions in the Mastercard and Visa networks**. As the use of Crypto increases those rewards are going to grow exponentially. **I see this as a huge reason to hold onto the CTR token for the long term.**

 (Emphasis added).

C.    Purchasers Saw CTR Tokens as Investments

164.    It is abundantly clear that the CTR Token purchasers were conditioned to view their purchases as investments.  For example, a forum post entitled "Guide to buying Centra (CTR) ICO" was posted on September 21, 2017 on cryptorum.com (an online message board dedicated to discussing virtual currencies) by "V4Vendetta" which stated, "right now 1 ETH will buy you 200 CTR's so it may not be a bad investment for people who like to gamble on the ICO market." This post concludes with, "[t]hanks and happy investing!"

165.    There are numerous instances of these types of reviews, blog posts, articles, and forum posts.  For example, on August 8, 2017, an "ICO Report" was published by "Grace Whatts" on "bitsify.net" entitled "Centra Tech ICO Report – Crypto-based Debit Card System."  Under the heading "Target Audience and Reviewing Profit Potential," this "Report" stated, "Centra's profit potential is exponential, if, they manage to somewhat prove successful and live up to their mainstream adoption goals."  The same "ICO Report" concluded that "[t]he Centra ICO looks to be very appealing especially for early investors looking to get into a cryptocurrency targeting the mainstream solution by providing a full suite of available products/applications."

166.    As stated, there are countless examples, however a post made on bitcoinmarketjournal.com at some point prior to September 19, 2017, sums up the core idea here quite succinctly: CTR Tokens were an **<u>investment</u>**.  This post included the following,

How to Invest

Please Read **How to Invest in ICOs**
Then see **Centra Investment Instructions**

167.    The link to "Centra Investment Instructions" directed to a page on https://centra.tech/ but is no longer operating.  Regardless, clearly the Centra ICO and the purchase of CTR Tokens were viewed as profit-oriented investment opportunities because Defendants conditioned the market to view them in that manner.

D.    <u>"Utility Tokens"?</u>

168.    As noted above, on July 25, 2017, the SEC issued a report on the DAO, in which it advised those using "distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance" with the federal securities laws and stated that "[a]ll securities offered and sold in the United States must be registered with the Commission . . ." or qualify for an exemption from registration.  On the same day, the SEC issued an investor bulletin urging caution when investing in ICOs and instructing investors to be mindful that promoters that lead buyers of tokens to expect a return on their investment, or shared returns provided by the project, may be offering a security for sale.  Notably, Centra Tech marketed both "growth potential" for the CTR Tokens that would "surge in value" and shared returns in the form of 0.8% of the "network profit."  Accordingly, despite Centra Tech, the Founder Defendants and the Executive Defendants' baseless insistence that the CTR Tokens are "utility tokens" and thus not securities, it is plainly apparent that they were, and are, securities.  Indeed, the word "utility"

appears but once in the entirety of the White Paper-2, which serves to further evidence the illusory nature of the claim that CTR Tokens were "utility tokens,"

169.    A "utility token" does not have a concrete definition.  The reason there is no concrete definition for such term is because the "utility token" is a legal fiction created by virtual currency market professionals, law firms, special interest groups, and bloggers.  There is no "exemption" in the Securities Act for a "utility token."  Rather, following the SEC's issuance of the *DAO Report*, various parties invented the "utility token" by latching onto the following language from the investor bulletin released in conjunction with the *DAO Report*: "Depending on the facts and circumstances of each individual ICO, the virtual coins or tokens that are offered or sold may be securities."  Indeed, the word "utility" is entirely absent from the *DAO Report*. Despite this fact, various parties mutated the words "depending on the facts and circumstances" into the absurd rationale that so long as ICO operators call their tokens "utility tokens" then they are not securities.  In short, the determination of whether CTR Tokens are investment contract securities is reached by an application of the *Howey* test and under this analysis, they plainly are.

## VI.    Each of the Defendants Were "Sellers" of CTR Tokens

170.    Liability for selling unregistered securities extends to any person who successfully solicits the purchase of an unregistered security, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.

171.    As noted, each of the Plaintiffs were actively involved in researching Centra Tech and its products prior to purchasing their CTR Tokens.  Such research included reviewing virtual currency online forums, reading Centra Tech's publications and viewing the Company's promotional videos.  Accordingly, each of the solicitations outlined below were successful in soliciting Plaintiffs to purchase CTR Tokens.

172.    Each of the Defendants are considered "sellers" as each successfully solicited the purchase of CTR Tokens for their own or Centra Tech's financial benefit.

A.    Centra Tech and the Founder Defendants

173.    It is indisputable that Centra Tech and the Founder Defendants participated in the offer and sale of CTR Tokens.  For example, as stated in the White Paper-3, "[t]he tokens will be sold at 200 CTR to 1 ETH."  Indeed, this White Paper also referred to Centra ICO investors as "purchasers."

*Sohrab Sharma*

174.    On October 27, 2017, *The New York Times* published an article discussing the Centra ICO and its use of celebrity endorsements.  For this article, the reporters reached out to Sharma to discuss his and Trapani's perjury indictments on October 5, 2017 stemming from Trapani's testimony that Sharma had only one alcoholic beverage the night he was arrested for driving while under the influence.[17]  In response to questions on this topic, Sharma stated, "I'm obviously not comfortable with that situation," and added "[b]ut it's not that I did something so intensely crazy that *investors* need to worry." (Emphasis added).  Thus, Sharma clearly viewed persons who purchased Centra Tokens as "investors."

175.    Sharma made numerous statements claiming CTR Token purchasers could expect increases in value to their CTR Tokens because Centra Tech purportedly had a relationship with Visa and Mastercard and thus, as Centra Products -- which arbitrarily required the purchase of CTR Tokens -- were widely adopted, CTR Token's value would increase.  For example, during the Neocash Interview, Sharma discussed the fact that Centra ICO investors would receive an

---

[17] On or about February 21, 2018, both Sharma and Trapani pleaded guilty to committing perjury in the first degree -- a class D felony.  Second Crim. Compl. ¶11.d.

additional 25% CTR Tokens for investing early and stated: "I definitely encourage anybody to take advantage of that if they see it and jump on it while the price is low."

176.    During this interview, Sharma also directed listeners to Centra Tech's website and the White Papers which contained further instructions on how to purchase CTR Tokens and claims that CTR Tokens would lead to profit.

177.    Sharma was involved in every aspect of editing and revising the White Papers, including selecting fonts and graphics used therein.  SEC Am. Compl. ¶48.  Additionally, Sharma also oversaw revisions to Centra Tech's website and was an administrator for the Company's social media accounts.  *Id*. ¶49.

178.    Sharma also actively solicited investments in CTR Tokens from his personal Twitter Account.  *Id*. ¶74.  Indeed, Sharma even solicited CTR Token investments from the Facebook account for a different cryptocurrency project, "Coin Success," that he ran prior to running Centra Tech.  More specifically, on July 30, 2017, Coin Success made the following post:



179.    Sharma actively solicited investments through direct statements to the investing public.  For instance, during the Neocash Interview, Sharma also stated, "right now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th.  We're currently

a little bit north of $10 million raised in our first eight days of our crowd sale so I definitely want to thank all of my contributors and anyone who is listening for joining as well."

*Robert Farkas*

180.    Similarly, Defendant Farkas was involved in editing Centra Tech's promotional materials.  SEC Am. Compl. ¶76.  Additionally, Farkas attended multiple conferences throughout the United States during the Centra ICO for the purpose of soliciting interest in the Centra Products -- which as noted, arbitrarily required the purchase of CTR Tokens.  For example, Centra Tech's YouTube channel and Facebook page contains videos of Farkas engaging in discussions with potential CTR Token investors at the "Consensus Invest 2017" conference in New York City, New York.  In short, Farkas was plainly a "seller" of CTR Tokens.

*Raymond Trapani*

181.    Trapani was also involved with editing the White Papers, managing Centra Tech's social media accounts, and editing the Company's website.  SEC Am. Compl. ¶¶30–1, 110. Furthermore, Trapani actively directed CTR Token investors to the Centra Tech website, which had additional information on how to purchase CTR Tokens.  *Id*. ¶77.

182.    Additionally, in the "Centra Official Bounty Program" -- which Trapani was primarily responsible for -- Centra Tech and the Founder Defendants stated that "Centra Will Reward Experienced Video Editors who Create Quality Video Reviews, Presentation, **Investment Instruction** [sic] about the Centra Project and its Tokensale." (Emphasis added).

183.    Centra Tech also repeatedly claimed that CTR Tokens would be listed on Kraken. Such touts necessarily led CTR Token purchasers to expect profit as if CTR Token was listed on a large exchange, the token's trading volume would increase and thus, the value of CTR Token would increase.

184.     Additionally, as the Centra ICO progressed, in November 2017, Centra Tech's "Version 2.0" of the Centra White Paper explicitly stated that the CTR Token "allows users to **invest** in the network's future blockchain." (emphasis added).

185.     Based on the foregoing, it is indisputable that Centra Tech and the Founder Defendants were each "sellers" of unregistered securities (in the form of CTR Tokens) under the federal securities laws.

   B.     The Executive Defendants

         *Steven Stanley*

186.     In addition to actions Stanley likely undertook in connection with his role as Centra Tech's "PR Director," Stanley also personally solicited investments in CTR Tokens on the public online forum, Bitcointalk.  Stanley was an active user of the official Centra Tech message boards on Bitcointalk.  In connection with this use, Stanley solicited the general public to purchase CTR Tokens.  For example, on July 31, 2017, Stanley, acting on behalf of Centra, made the following post announcing the "smart contract" address that was used to sell CTR Tokens during the early stages of the Centra ICO:



187.     Similarly, on August 6, 2017, a CTR Token investor on Bitcointalk asked on if "there [was] any way for investors to get a refund of their money if they wish?"  Stanley used the official Centra Tech account to reply as follows:

Thanks we just saw this. No[,] no refunds will be made.  We are offering 5% bonus to all contributors. If you want to liquidate, you may do so later on post the ICO.

Thanks,

Steve Stanley

188.    Hence, in these two posts, Stanley provided the information necessary to purchase CTR Tokens (the smart contract address), described a "bonus" Centra Tech would be offering CTR Token purchasers, and refused to refund an early investor.

189.    Stanley also disseminated information regarding the 0.8% ETH reward that would purportedly be paid to all who held CTR Tokens -- regardless of the method in which such unregistered securities were purchased.  For example, on September 12, 2017, Stanley posted a link on Bitcointalk to Centra Tech's "official announcement on Centra Card & CTR Token reward program."  The link provided led to a medium post by Centra Tech that has since been deleted.  However, the announcement was picked up on other outlets, and stated as follows:

Centra Tech is pleased to announce the recent update of our CTR Token Reward Program.  We have recently got approval to offer the CTR Token Reward to **ALL** token holders that hold a Centra Card® & CTR Tokens.  This is a massive win for all of our contributors and supporters as they will now receive a 0.8% (0.9% for Titanium) ETH network reward of the revenue share that comes in from our card issuers worldwide on card transaction.

These ETH reward points will be distributed to Centra Card® & CTR Token Holders based on the amount of CTR tokens they hold in accordance to the percentage of tokens the individual owns in the ecosystems.

. . .

Centra's upcoming Card & Token Sale is set to resume on September 19, 2017 at 12:00 AM EST. . . .

Thank you,

Centra Team

190.     Stanley also solicited interest in the Centra ICO and purchases of CTR Tokens by claiming that the virtual currencies held by Centra Tech were fully insured.  More specifically, on October 13, 2017, Stanley responded to a question on Bitcointalk regarding Centra Tech's insurance policy with the following:

> Very similar policy written like Coinbase, Inc., (Also DE Based Corp).  They do not disclose that information, and neither do we, on who our policy issuer is for this internal coverage that we, as Centra Tech Inc, offer to our clients, and there is no Federal/State requirement to do so as well.  The coverage is black and white as we put it.  If an employee steals your funds it would be reimbursed, if there is a network hack where accounts are compromised, it would be fully reimbursed.  We do have a policy in place, and we wouldn't legally disclose it everywhere if we did not.  . . . .
>
> Thanks,
>
> Steve Stanley
>
> PR Director

191.     Encouraged by Defendants, CTR Token investors viewed Centra Tech's purported insurance policy as a significant factor in their decision as to whether or not to purchase CTR Tokens.  For example, on or about August 5, 2017, a user on the Bitcointalk online forum posted: "[the White Paper] says it's insured by the Protarian Insurance Group.  Then they must trust Centra will be very secure and/or very profitable."

192.     Additionally, on August 7, 2017, on the Bitcointalk online forum, Stanley also touted that CTR Tokens would be listed on Kraken (an online virtual currency exchange):

> We have 3 US based Exchanges that will be listing this utility token, Kraken and Poloniex will be first then Bitrrex.
>
> Thanks,
>
> Steve Stanley

193.    As noted, claims that CTR Tokens would be listed on more exchanges led investors to expect that the value of CTR Tokens would increase as its trading volume increased from additional market participation.

194.    Based on the foregoing, Stanley was clearly a "seller" of unregistered securities (in the form of CTR Tokens) under the federal securities laws.

*Steven Sykes*

195.    Sykes has represented under oath that he was: (i) "responsible for all customer experiences related to Centra Tech's website"; (ii) "personally familiar with the content and maintenance of Centra Tech's website"; and (iii) "personally familiar with the process customers had to complete to purchase Centra Tokens during the Centra Tech ICO."  Based on Sykes' own representations, any and all solicitations for the purchase of CTR Tokens contained on Centra Tech's website are equally attributable to him and hence, he was a "seller" of unregistered securities (CTR Tokens) alongside Centra Tech.

*Allan Shutt*

196.    Shutt was Centra Tech's General Counsel, Chief Compliance Officer, and Bank Secrecy Officer.  In connection with these roles, Shutt solicited investments in CTR Tokens by, *inter alia*, touting the Centra Card's ability to function on Visa and Mastercard networks.  Because investors were required to hold CTR Tokens to use the Centra Card (for absolutely no reason other than Defendants' desire to sell CTR Tokens for their own financial aggrandizement), soliciting interest in the Centra Card necessarily meant soliciting the purchase of CTR Tokens.  Shutt also directly engaged with, and solicited, prospective CTR Token investors throughout the United States.

197.     More specifically, shortly after Shutt was hired, he participated in a series of interviews in which he described his role with the Company, discussed his background, and touted the Centra Products.  For example, on or about November 4, 2017, Centra Tech published a video of Shutt discussing his role with the Company.  In this video, Shutt stated:

> We have a third-party provider for our international cards and we have a provider for our domestic cards.  And those individuals have the relationships with Mastercard and Visa.  Um.  They have a relationship with banks who have the relationship with Mastercard and Visa to offer pre-paid cards on their network.  So I think we're on track with where we want to be and what we've been telling individuals.[18]

198.     Similarly, in another video posted shortly thereafter, Shutt also stated that the Wallet and the Centra Card,

> [w]ill allow the user to go into a store, with that card, and actually make a purchase, in real-time, converting the digital currency into fiat currency and paying the merchant in U.S. dollar.  This process allows the everyday person to actually spend their digital currencies, in a normal store, like Best Buy or Walmart or Walgreens or if you're international, in a store that accepts a Visa or Mastercard.

199.     Each of the foregoing statements served to solicit additional interest in the Centra Products -- and thus, the purchase of CTR Tokens.

200.     Additionally, Shutt attended multiple conferences with Farkas and Zimmerman throughout the United States for the purpose of soliciting interest in the Centra Products -- which

---

[18] Curiously, Centra Tech later deleted the first version of this video and re-uploaded another copy in December 2017 which cut out certain portions.  However, Centra Tech failed to replace the original copy contained on the Company's Facebook page.  The original copy is accessible at: https://www.facebook.com/CentraCard/videos/159430934657517/; and the edited version is available at: https://www.youtube.com/watch?v=Txmzl3NtfGk.  The primary difference between the two copies is that the new version deletes claims that the Centra Card was going to ship internationally within 15–30 days and all references to Ballard Spahr LLP's involvement with Centra Tech's compliance programs.  Similarly, Centra Tech also deleted references to Ballard Spahr from this video: https://www.facebook.com/CentraCard/videos/168383713762239/.  The edited version is available at https://www.youtube.com/watch?v=2szrvlAyGwE.

as discussed, required the purchase of CTR Tokens for no reason whatsoever.  For example, Centra Tech's YouTube channel and Facebook page contains videos of Shutt engaging in discussions with potential CTR Token investors at the "Consensus Invest 2017" conference in New York City, New York.  Similarly, during one of these conferences, videos depict Shutt conducting a raffle with Farkas to award winners with a "Centra Black Card," after which Shutt appears to take down the winner's information and discuss the mechanics of such a "prize."  In short, Shutt was plainly a "seller" of unregistered securities (in the form of CTR Tokens) under the federal securities laws.

*Chase Zimmerman*

201.    Zimmerman became Centra Tech's CMO in October 2017.  Thus, Zimmerman was directly responsible for Centra Tech's marketing efforts from that point forward.  In connection with this role Zimmerman actively solicited investments in CTR Tokens.  In fact, soliciting interest in the Centra Products -- and thus purchases of CTR Tokens -- was literally Zimmerman's job.

202.    Zimmerman posted multiple videos between on or about November 10, 2017 and March 16, 2018, responding to CTR Token investors' questions concerning various topics, including, *inter alia*, delivery dates for the Centra Card, the listing of CTR Tokens on additional virtual currency exchanges, the development of the Centra Products, and the rewards program Centra Tech offered.  In one such video posted on December 11, 2017, Zimmerman explained that investors were required to purchase 100,000 CTR to obtain a metal "Centra Black Card."

203.    Similarly, in a different video, Zimmerman touted that "CTR [would] be listed on a top exchange on February 9th" and that "this is exciting news" but he was "not going to release who it is, but you guys will have that coming up on February 9th."

204.    The foregoing statement increased investor participation in the Centra ICO as it led investors to believe that CTR Tokens were going to increase in value from listing on larger virtual

currency exchanges.  Indeed, when one investor realized that CTR Tokens were not going to be listed on a certain virtual currency exchange, he requested a refund of his investment.  SEC Am. Compl. ¶97.

205.    Additionally, on November 10, 2017, a video of Zimmerman was posted in which he touted that:

> Centra's registration with FINCEN as a money service business is complete now. It will allow us to offer our digital asset—uh digital wallet solutions to our users. We begin launching in the following states . . . Arizona, California, Colorado, Delaware, Washington D.C., Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, West Virginia, and Wisconsin.

206.    The foregoing statement increased investor participation in the Centra ICO as it led investors to believe that Centra Tech was compliant with regulatory requirements (permitting mass adoption) and that the Centra Card and Wallet were functioning and could therefore conduct transactions in "real time" throughout the world (leading to increased adoption and more investors being -- arbitrarily -- required to purchase CTR Tokens, thereby increasing CTR Token's market price).

207.    Additionally, Zimmerman attended multiple conferences with Farkas and Shutt throughout the United States for the purpose of soliciting interest in the Centra Products, and consequently, CTR Tokens.  For example, Centra Tech's YouTube channel and Facebook page contains videos of Zimmerman engaging in discussions with potential CTR Token investors at the "Consensus Invest 2017" conference in New York City, New York on or around November 28, 2017.  Furthermore, during the "Blockchain Expo" in December 2017, Zimmerman provided a presentation on Centra Tech, the success it had had with the Centra ICO and raising capital via ICOs.  One of the slides during this presentation indicates that Zimmerman was discussing "[h]ow

cryptocurrencies and blockchains" had created a "new funding source" in the form of "Initial Coin Offerings." Based on the foregoing, Zimmerman was plainly a "seller" of unregistered securities (in the form of CTR Tokens) under the federal securities laws.

    C.    <u>The Promoter Defendants</u>

        *Floyd Mayweather Jr.*

208.    Mayweather was offered and paid compensation for the sole purpose of soliciting investments in the Centra ICO and encouraging the public to purchase CTR Tokens. Mayweather made multiple social media posts encouraging the purchase of CTR Tokens in September 2017. For example, on September 14, 2017, Mayweather posted the following on his Twitter account:



209.    As seen, Mayweather is holding a Centra branded card, emblazoned with the Visa Logo. Mayweather captioned this photo with "Spending bitcoins Ethereum and other types of

cryptocurrency in Beverly Hill . . . ."  This activity falls squarely within the definition of "seller."

In this post, Mayweather is clearly attempting to garner interest in Centra Tech, the Centra

Products and CTR Tokens.

210.    Similarly, on September 18, 2017, Mayweather posted the following on his Twitter

account:



211.    As seen, Mayweather was clearly soliciting his social media fans and followers:

"**Get yours before they sell out, I got mine**." (Emphasis added).  It has since been revealed that

Centra Tech paid Mayweather cash to make this and similar social media posts.  In reality,

Mayweather was not a CTR Token investor, rather he was soliciting investor purchases of CTR Tokens for his personal financial gain in the form of payments from Centra Tech.

212.   Based on the foregoing, it is clear that Mayweather was a "seller" of unregistered securities (in the form of CTR Tokens) under the federal securities laws.

*Khaled Mohamed Khaled a/k/a "DJ Khaled"*

213.   Like Mayweather, Khaled also received compensation to solicit investments in the Centra ICO and encourage the public to purchase CTR Tokens.   Khaled made multiple social media posts soliciting the purchase of CTR Tokens.   For example, in September 2017, Khaled posted the following on his Instagram account:



214.    In this post, Khaled, holding a Centra card with the Visa logo emblazoned on it, dubs the Centra Card and Centra Wallet the "ultimate winner in Cryptocurrency debit cards powered by CTR tokens!"  As seen, Khaled directed his fans and followers to "**Get your CTR tokens now!**" (Emphasis added).  Similarly, on September 27, 2018, Khaled posted the following on his Instagram account:



215.    This post also urged the public to purchase CTR Tokens.  Additionally, Khaled's post stated that the Centra Card and Centra Wallet were the "ultimate winner in Cryptocurrency debit cards powered by CTR Tokens!" and that the Centra Card and Centra Wallet enabled CTR Token purchasers to "[u]se your bitcoins, ethereum, and more cryptocurrencies in real time across the globe."  Khaled further dubbed the Centra Tech and its offering a "Game changer."  It has

since been revealed that, like Mayweather, Khaled was paid to provide endorsements of Centra Tech and solicit investments in CTR Tokens. Khaled was not a CTR Token investor, rather he was soliciting purchases of CTR Tokens for his personal financial gain in the form of payments from Centra Tech. Based on the foregoing, Khaled was a "seller" of unregistered securities (in the form of CTR Tokens) under the federal securities laws.

**VII.    Materially False and Misleading Statements Issued During the Class Period**

      A.    <u>False Claims Regarding Visa and Mastercard</u>

216.    The initial appeal of purchasing CTR Tokens appears to have stemmed from Centra Tech's claim that the Centra Debit Card would be able to operate on Visa and Mastercard networks and allow users to make transactions in digital currencies in "real time." This would be an incredible feat, as it would mean that cryptocurrencies would be able to be adopted, used and spent by essentially anyone with a credit card. Had Centra Tech actually created this technology and somehow established partnerships with Visa and Mastercard, the CTR Token undoubtedly would have increased in value. Unfortunately, Centra Tech was never authorized to use the Visa or Mastercard networks, directly or indirectly, and thus this capability was simply impossible.

                    *Centra Tech and the Founder Defendants*

217.    As noted, each of the Founder Defendants were intimately involved with all aspects of Centra Tech's marketing, including as relates to the Company's offer and sale of CTR Tokens. Accordingly, each of Centra Tech's statements are equally attributed to the Founder Defendants.

218.    During the Centra ICO, Centra Tech routinely disseminated promotional materials containing images such as the following:



219.    Similarly, both the July 23 and 25 Press Releases emphatically stated: "The Centra Card works anywhere that accepts Visa or MasterCard" and that the Company's "Currency Conversion Engine" gives "the user the ability to spend their assets anywhere in the world that accepts Visa and/or Mastercard."

220.    Centra Tech also took to Twitter to tout their false relationships with Visa, Mastercard. For example, on August 4, 2017, @centra_card replied to users on posts from other Twitter users with the following:



221.    The Centra White Papers each contained numerous false and misleading statements concerning Centra Tech's relationship Visa and Mastercard.  More specifically:

222.    The Centra White Papers each stated:

"For our United States clients the Centra Card will be a visa card while for international users the Centra card issued will be a Mastercard . . . The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or Mastercard"

223.    Both the White Paper-1 and 2 included a diagram containing "milestones" and stated that that in January 2017 Centra Tech "signed [a] licensing agreement with Visa USA" and formed a "major banking partnership."

224.    The White Paper-1 contained:

a.    a product comparison table stating that "MasterCard and Visa" were the issuers of the Centra Debit Card.

b.    a statement that: "With market cap of cryptocurrencies exceeding $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."

c.    a statement that the Centra Debit Card provided: "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

d.    statements that the Centra Black Card "founders edition" was: (i) "backed by Visa;" (ii) entitled card holders to "rental coverage by Visa;" and (iii) included "protec-tion [sic] 50K by Visa."

e.    the logos for Visa. Mastercard, and Bancorp under the heading "Centra Tech Partners"; and

f.    the Visa and Mastercard logos displayed alongside Centra Tech's logo.

225.    Defendant Sharma made numerous statements falsely claiming that Centra Tech had a relationship with Visa and Mastercard.   For example, Defendant Sharma plugged the nonexistent relationships with Visa and Mastercard during the Neocash Interview.   More specifically, Sharma stated, "[i]nternationally we currently have our license with Mastercard to service international clients, domestically we have a Visa partnership, so we're able to issue Visa cards domestically, and Mastercards internationally."

226.    During this interview, Sharma also directed listeners to the centra.tech website and the White Papers which contained further false and misleading statements regarding Centra Tech's purported partnerships.

227.    Additionally, Defendant Sharma also his personal Twitter account to display a picture of a Centra Card with a Visa logo. SEC Am. Compl. ¶74.

228.    Similarly, Defendant Farkas also falsely claimed that Centra Tech had a relationship with Visa and Mastercard.   For example, on or about September 6, 2017, Farkas attempted to purchase promotional articles from an online marketer.   In doing so, Farkas emailed the marketer and stated that Centra Tech's currency conversion technology "give[s] the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard." SEC. Am. Compl. ¶75.

229.    Additionally, on October 13, 2017, Defendant Farkas emailed Defendant Sharma edits he made to an investor pitch deck promoting Centra Tech and the Centra ICO.   The pitch deck conveyed that: (i) the Centra Card provides "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) "Mastercard and Visa" "issued" the Centra Card; and (iii) in January 2017 Centra Tech had a "Major Banking Partnership and license agreement signed with VISA USA Inc."  SEC Am. Compl. ¶76.

230.    Similarly, in early-September 2017, Defendant Farkas exchanged emails with another individual employed by a marketing company that was seeking to work on certain promotional materials for Centra Tech ("Individual-1").   In these emails, Defendant Farkas described Centra Tech as follows:

> The biggest problem in the crypto world is being able to spend your cryptocurrency effortlessly. The Centra Card and Centra Wallet app are the solution. Our Currency Conversion Engine Module (CCE Module) allows real time conversion of all supported cyrptocurrencies [sic] to give the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard.
>
> ...
>
> Thanks,
> Bob

Crim. Compl. ¶19.c.

231.    On or about September 13, 2017, Individual-1 provided Defendant Farkas with a draft of promotional materials they had written regarding Centra Tech.  Farkas provided edits and comments to the draft, including:

> Title: Can we change it too [sic]: This company has brought cryptocurrency into the real world reason being is that our card is live and working and has been shipped to clients already ☺
> …
> Thanks,
> Bob

*Id*.

232.    Similarly, Defendant Trapani knowingly misled CTR Token investors into believing that the Centra Products were functional (*i.e.*, that they operated on Visa and Mastercard networks).  SEC Am. Compl. ¶77.  Furthermore, Trapani actively directed CTR Token investors to the Centra Tech website, which had numerous claims that Visa and Mastercard issued the Centra Card.  *Id*.  Indeed, in August 2017, Trapani explicitly stated to an investor: "I use my app [Centra

Wallet] and Centra Card for everything I do." *Id*. At this time, no Centra Products existed at all. *Id*.

233.    Contrary to Centra Tech and the Founder Defendants' representations, Centra Tech did not have any relationships with Visa or Mastercard. Further, the Company was not authorized to distribute Visa or Mastercard credit, debit, or even pre-paid cards. SEC Am. Compl. ¶78.

234.    The Founder Defendants were fully aware that their claims regarding Visa and Mastercard were false. For example, on or about September 29, 2017, the Founder Defendants exchanged a series of text messages regarding their false claims relating to Visa and an ICO-related SEC enforcement action: *SEC v. REcoin Group Foundation, LLC et al.*, 17-cv-05725 (E.D.N.Y. filed Sep. 29, 2017). Second Crim. Compl. ¶24. Following is a portion of this exchange:

> **Sharma**: Ray Can u have Javier remove the card with the visa logo on it. On centa [sic] Tech website[.] On the bottom And also remove white paper from the website for now I think it's best to take the white paper offline like Monaco did.

> **Trapani**: What's up

> **Sharma**: Yea let's take that b[*]tch down asap

> **Farkas**: No good?

> **Trapani**: I think we should have white paper up but maybe just take it down and reword it as proper as possible then put back up with the bonus structure everything

> **Sharma**: I rather cut any fufu[19] [o]ff right [now] [t]hen worry[.] Anything that doesn't exist current[ly,] [w]e need to remove[.] Have them do it asap

> **Sharma**: Sec just shut down REcoin[.] Read the article[.] We gotta clean up every single thing that we can't do [a]nd can't offer today[.] Google SEC REcoin.

> **Trapani**: I Peep

---

[19] The word "fufu" means "fake" or "phony".

**Sharma**: Delete all the cards have shipped info[.][20] Everything gotta get cleaned up[.] RJ can you jump on that . . . on our pages.

**Trapani**: They were pitching a straight security

**Sharma**: I Know, [b]ut fill [still?] fraud can be a word thorn [thrown?] around[.] Especially with the card limits

**Trapani**: Word

**Sharma**: I want a product page like monacos[.] Theirs is so nice.[21]

**Trapani**: lol yeah no real product.

**Sharma**: Yea but it doesn't say much [a]nd looks good[.] **We don't have a real product either right now**[,] [s]o I want to tighten up ship asap.[22]

**Trapani**: Feel you

**Sharma**: All we really need to do [i]s remove the limits.

**Farkas**: Delete everything on our chats that say cards have shipped?

**Sharma**: Yea

**Farkas**: Ok

**Sharma**: Let's play on the safe side[.] Our price is way to [sic] high for us to slip

**Trapani**: Agreed

**Farkas**: Ok thx

Second Crim. Compl. ¶24.

---

[20] Referencing Centra Tech and the Founder Defendants' false claim that the Centra Cards had already shipped.

[21] Monaco was another company that conducted an ICO and offered a product similar to the Centra Card.

235.    As seen during this exchange, the Founder Defendants acknowledged that Centra Tech did not have a "real product" and Sharma instructed Trapani and Farkas to wipe Centra Tech's marketing materials, and posts in public chat rooms, of various falsities, including those relating to Visa.

236.    Despite Sharma's instructions, in October 2017, the Centra Tech website still aggressively promoted the Centra Tech's purported relationship with Visa and displayed multiple Visa logos throughout.   SEC Am. Compl. ¶81.

237.    In early October 2017, Visa became aware that Centra Tech was using its brand to market the Centra Products.  SEC Am. Compl. ¶82.  Accordingly, on October 10, 2017, Visa's legal department sent Centra Tech and Sharma a notice directing the Company to:

> **cease-and-desist from using the Visa-Owned Marks and from promoting that it is an authorized distributor of VISA payment cards [and] that any and all uses or references to VISA-Owned Marks or any reference to Visa be immediately taken down from the [Centra website] or from any other online mediums (including social media sites and press releases).**

(Emphasis in original.)  SEC Am. Compl. ¶82.

238.    Additionally, Visa requested that Centra Tech "identify the bank or financial institution it is working with (if any) to issue a purported VISA payment card product."  Crim Compl. ¶25.a.  Sharma never provided this information -- which was to be expected given that such relationship did not exist.

239.    In response to the foregoing notice, Defendant Sharma stated:

> This matter has been brought to my attention. I will have this matter rectified in 48 hours.   We are currently in the process of finalizing our Co-branded Prepaid Card Program, but might not meet the Nov 1st lock out deadlines for submission from our issuing bank whom is an authorized visa issuer for card design approval, So can see where this issue might of came from. However, I have immediately contacted my web developers to remove all issues and I will have this document [a cease and desist acknowledgment] signed and returned within 48 hours.

Thank you,

Sam Sharma

Second Crim. Compl. ¶26.a.

240.     Forty-eight hours later, the matter had not been "rectified" and thus, on October 14, Visa sent a second notice to Sharma.  This second notice attached screenshots of Centra Tech's website which prominently displayed the Visa logo in various places.  SEC Am. Compl. ¶84.  The second notice stated:

> Despite your signed acknowledgment and agreement, we are very concerned to still find many continuing unauthorized uses of the VISA trademark connected to your alleged card product that Visa has not authorized … Without any authorization to use the VISA brand in connection with the function or promotion of its card products, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly valued and high-profile VISA brand.

SEC Am. Compl. ¶83.

241.     Similarly, Centra Tech has never had any relationship with Mastercard.  More specifically, as of April 20, 2018, based on conversations FBI Agent Brandon Racz had with a Mastercard representative, he "learned, in substance and in part, that Mastercard's internal records of licensing agreements and relationships with card-issuing banks and other third parties contains no record of any relationship either direct or indirect, with Centra Tech."  Second Crim. Compl. ¶23.b.

242.     In short, each of the Founder Defendants had actual knowledge of the fact that their claims regarding Visa and Mastercard were materially false at the time that they were made.

*Steven Sykes*

243.     Defendant Sykes has represented under oath that he was: (i) "responsible for all customer experiences related to Centra Tech's website"; (ii) "personally familiar with the content

and maintenance of Centra Tech's website"; (iii) "personally familiar with the process customers had to complete to purchase Centra Tokens during the Centra Tech ICO."  Such statements serve as an affirmative admission that he was, in part, responsible for the forgoing misrepresentations contained on Centra Tech's website.

244.   Defendant Sykes knew that claims relating to the Centra Card's functionality and ability to operate on Visa and Mastercard networks were false.  As noted, when Sykes was hired by Centra Tech, and "responsible for driving the delivery of the Centra product to completion," which was touted as a "smart card and mobile app-based solution that allows the user to carry out debit transactions against their cryptocurrency accounts at any POS terminal that accepts Visa or Mastercard."  Accordingly, it was Sykes' job to create the technology that the Centra Card was meant to operate on and thus, he necessarily knew that the Centra Card did not, and could not, work.

*Allan Shutt*

245.   Defendant Shutt also made false representations regarding the Centra Card's ability to function on the Visa and Mastercard networks.  For example, on or about November 4, 2017, Centra Tech published a video of Shutt discussing his role with the Company.  In this video, Shutt stated:

> We have a third-party provider for our international cards and we have a provider for our domestic cards.  And those individuals have the relationships with Mastercard and Visa.  Um.  They have a relationship with banks who have the relationship with Mastercard and Visa to offer pre-paid cards on their network.  So I think we're on track with were we want to be and what we've been telling individuals.[23]

---

[23]   Curiously, Centra Tech later deleted the first version of this video and re-uploaded another copy in December 2017 which cut out certain portions.  However, Centra Tech failed to replace the original copy contained on the Company's Facebook page.  The original copy is accessible at:

246.     Similarly, in another video posted shortly thereafter, Defendant Shutt also stated that the Wallet and the Centra Card

> [w]ill allow the user to go into a store, with that card, and actually make a purchase, in real-time, converting the digital currency into fiat currency and paying the merchant in U.S. dollar.  This process allows the everyday person to actually spend their digital currencies, in a normal store,  like Best Buy or Walmart or Walgreens or if you're international, in a store that accepts a Visa or Mastercard.

247.     A Mastercard representative has confirmed that it has "**no record of any relationship either direct or indirect**, with Centra Tech."   Second Crim. Compl. ¶23.b.  (Emphasis added).   Accordingly, Shutt's claim was materially false.   Shutt's job entailed negotiating such agreements.  For example, Shutt expressly stated: "With the bank, I of course as legal counsel, negotiated the contracts and worked with the outside program managers who have relationships with the banks."  Based on the foregoing, Shutt knew or was grossly reckless in not knowing that Centra Tech could not issue Visa or Mastercard branded Centra Cards, directly or indirectly.   As such, his statements to the contrary were materially false at the time that they were made.

*The Promoter Defendants*

248.     Each of the Promoter Defendants falsely represented that: (i) they actively used the Centra Debit Card; (ii) the Centra Debit Card functioned on the Visa network; and (iii) they invested in CTR Tokens.  Additionally, both of the Promoter Defendants failed to disclose the fact

---

https://www.facebook.com/CentraCard/videos/159430934657517/; and the edited version is available at: https://www.youtube.com/watch?v=Txmzl3NtfGk.  The primary difference between the two copies is that the new version deletes claims that the Centra Card was going to ship internationally within 15–30 days and all references to Ballard Sparh LLP's involvement with Centra Tech's compliance programs.  Similarly, Centra Tech also deleted references to Ballard Sparh from this video: https://www.facebook.com/CentraCard/videos/168383713762239/.  The edited version is available at https://www.youtube.com/watch?v=2szrvlAyGwE.

that they were paid endorsers unaffiliated with Centra Tech.  The Promoter Defendants were each featured in videos purporting to use the Centra Debit Card and/or the Centra Wallet.  However, as discussed elsewhere herein, the Centra Card could not function on the Visa network and thus, the Promoter Defendants' representations were materially false at the time that they were made.

249.    More specifically, on September 14, 2017, Defendant Mayweather posted the following picture on his official Twitter account:



250.    As seen, Defendant Mayweather is holding a Centra branded card, emblazoned with the Visa Logo.  Mayweather captioned this photo with "Spending bitcoins Ethereum and other types of cryptocurrency in Beverly Hill . . . ."

251.    Additionally, Mayweather was featured in a Centra Tech video purportedly using the Centra Debit Card in real time.  This video was posted in mid-September 2017 but has been deleted by Centra Tech.  Fortunately, copies of the video were saved and have been re-uploaded.

Currently, this video is available at the following link:   https://www.youtube.com/watch?v=-RH7MXKdaTk.

252.    This video features Mayweather shopping at a large department store and purporting to use his Centra Debit Card in real-time to pay for goods with BTC.  In this video, Mayweather introduces the Centra Debit Card by stating: "It's the one and only.  Your man, Floyd, "Money" Mayweather.  See right there, so go right here, go right in here.  Get my card out.  My Centra Card.  Bitcoin."  Mayweather then purports to use the Centra Card to purchase items in real time using BTC at a department store.  After which Mayweather states: "See I told ya'll.  I got my Centra Card.  Bitcoin.  I'm doing big things.  Spending some light money."  In order to provide proof that the transaction worked, he points to a cell phone with the Centra Wallet application on it and states:  "As ya'll can see, the number changed from before."  Mayweather then wraps up his endorsement by bragging about all the things he can do with his "bitcard": "[t]he new way things are done, Floyd Money Mayweather . . . The bitcard is for Rolls Royce, Bugatti, House, Yacht, PJ, meaning private jet."

253.    As noted, the Centra Debit Card simply never worked because Centra Tech never had the required relationships with Visa, Mastercard or any financial institutions for it to actually function.  In Sharma's words, Centra Tech did not have a "real product."  Second Crim. Compl. ¶24.f.ix.  The Centra Card did not work in September 2017 -- and never conducted transactions in virtual currencies in "real time" on Visa and Mastercard networks.

254.    Indeed, the receipt in this video proves that the supposed virtual currency debit transaction was staged.  More specifically, at 1:23, the bottom of the receipt from the transaction is visible for a split second.  A screenshot of this moment shows the following:



255.    As plainly visible in this screenshot, the receipt itself shows that purchase was made with Euros -- approximately 700 EUR -- not BTC.  In short, the Centra Card in the video did not operate to expend virtual currencies in real world setting, as claimed, but rather was unremarkable in that it allowed the user (Mayweather) to spend real world fiat currency, as one ordinarily would.  This fact shows that Mayweather solicited CTR Token investors, and pretended as though the card did function, solely for personal financial gain.  As the *New York Times* reported on October 27, 2017, a "spokeswoman for Mr. Mayweather, Kelly Swanson, said he had been paid in cash for the posts and was not involved in any continuing relationship with Centra."

256.    Mayweather's misrepresentations were materially false and misleading at the time that they were made because, as was actually and affirmatively known and/or ignored with extreme recklessness by Mayweather: a) Mayweather was not an investor in CTR Tokens, but instead was

paid to promote the sale of CTR Tokens; b) Mayweather had not used a Centra card to conduct any real-world purchase transactions; and c) Centra had no relationship with Visa or Mastercard and their "cards" were non-functional and not capable of debiting cryptocurrency accounts in real time for real-world transactions  Accordingly, it is indisputable that Defendant Mayweather knew his representations that he was using BTC to purchase items in real time -- with a virtual currency "debit" card, running on the Visa network -- were materially false at the time that they were made.

257.    Similarly, in mid-late September 2017, Defendant Khaled made the following post on the Instagram social media platform:



258.    In this post, Defendant Khaled, holding a Centra card with the Visa logo emblazoned on it, dubs the Centra Card and Centra Wallet the "ultimate winner in Cryptocurrency debit cards powered by CTR tokens!"  Khaled expressly stated that the Centra Card and Wallet enable users to use their BTC, ETH "and more cryptocurrencies in real time across the globe."  As noted, these representations were false because the Centra Card did not work.  Had Defendant Khaled actually invested in CTR Tokens and attempted to use his "titanium centra debit card," he would have instantly realized this fact.  Thus, Khaled's misrepresentations were materially false and misleading at the time that they were made because, as was actually and affirmatively known and/or ignored with extreme recklessness by Khaled: a) Khaled was not an investor in CTR Tokens, but instead was paid to promote the sale of CTR Tokens; b) Khaled had not used a Centra card to conduct any real-world purchase transactions; and c) Centra had no relationship with Visa or Mastercard and their "cards" were non-functional and not capable of debiting cryptocurrency accounts in real time for real-world transactions.

259.    Each of the foregoing misrepresentations were material to CTR Token investors.  Such materiality is evidenced, in part, by the fact that Visa received numerous phone calls from concerned investors following the *New York Times* article announcing that Centra Tech did not have the ability to operate on Visa and Mastercard networks.  SEC Am. Compl. ¶94.

B.    <u>False Claims Regarding Bancorp</u>

260.    As with Centra Tech's false claims regarding Visa and Mastercard, the Company's claim that Centra Tech had an agreement with Bancorp to issue the Centra Cards also generated substantial interest in purchasing CTR Tokens.

261.    These claims were false and misleading because Centra Tech did not have any kind of agreement with Bancorp.

262.     Centra Tech and the Founder Defendants explicitly claimed that Bancorp was the

bank issuing Visa and Mastercard Centra Cards.  SEC Compl. ¶61.  For example, on August 25,

2017, Centra Tech issued a press release which stated:

> The Centra Card Visa® Debit Card is issued by The Bancorp Bank, member FDIC,
> pursuant to a license from Visa, U.S.A. Inc. "The Bankcorp" and "The Bancorp
> Bank" are registered trademarks of The Bankcorp Bank © 2014. Use of the Card is
> subject to the terms and conditions of the applicable Cardholder Agreement and fee
> schedule, if any.

> The Centra Card Mastercard® Debit Card is issued by The Bancorp Bank, member
> FDIC, pursuant to a license from Mastercard International Incorporated. "The
> Bankcorp" and "The Bancorp Bank" are registered trademarks of The Bankcorp
> Bank © 2014. Use of the Card is subject to the terms and conditions of the
> applicable Cardholder Agreement and fee schedule, if any.

263.     Shortly thereafter, on August 30, 2017, Bancorp sent a notice (the "Bancorp

Notice") to Centra Tech and Defendant Sharma stating:

> Mr. Sharma: I left you a voicemail on your phone, but I am following up here as
> well.  CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST
> FROM REPRESENTING THAT THE BANCORP BANK HAS ANY
> CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS
> RELATED TO CENTRA TECH.  YOU ARE ALSO DIRECTED TO CEASE
> AND DESIST USING OUR LOGI OR OTHER IMAGES IN CONNECTION
> WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER.
> Please REMOVE any and all references to the Bancorp Bank or The Bancorp Inc.
> from any and all websites, marketing materials or other communications, including
> blogs as this has not been authorized by The Bancorp. I expect you will be hearing
> from federal banking regulators as well.

(Emphasis in original). Crim Compl. ¶19.a.

264.     Defendant Sharma immediately forwarded the Bancorp Notice to Defendants

Farkas and Trapani, stating: "We gotta get that sh[*]t [relating to Bancorp] removed everywhere

and blame freelancers lol."  SEC Am. Compl. ¶89.  Shortly after sending this e-mail, Sharma

responded to the Bancorp by assuring them that the representations were merely a mistake and that

Centra Tech's "free lancers had dropped the ball on this." *Id*.

265.    Despite the fact that the Founder Defendants were, without a doubt, aware that Centra Tech did not have any relationship with Bancorp, Defendant Sharma proceeded to solicit investments in CTR Tokens using a forged, and fictional, agreement between Bancorp and Centra Tech -- which included a fraudulent signature from a fictional Bancorp officer.  SEC. Am. Compl. ¶90.  Indeed, Sharma acknowledged the fact that this agreement with Bancorp had been fabricated in private messages to Farkas and Trapani.  *Id.*  For example, Sharma texted, that he was "worried about getting these guys the fufu [fake] . . . contract [] because they can verify it."  Second Crim. Compl. ¶26.c.  As such, Sharma texted Trapani that he was going to avoid the situation by "say[ing] our NDA [Non-Disclosure Agreement] is very tight," and that they couldn't "share the contract."  *Id*. ¶26.d.  In response to Sharma's concerns, Defendant Trapani stated: "Get any worry our of your mind you're a f[*]cking closer."  Similarly, Farkas encouraged Sharma by texting "Dance," "Do what you do." *Id*.

266.    Additionally, on or about September 22, 2017, Defendant Trapani was featured in a publicly available video promoting Centra Tech containing false statements regarding Bancorp. Second Crim. Compl. ¶24.d.  This video has since been deleted.  *Id*.  On this same date, the Founder Defendants engaged in a group text message conversation in which Defendant Farkas stated: "Says Bancorp on your video ray is that ok," to which Defendant Trapani responded: "Gotta get it edited but we have been saying Bancorp." Defendant Sharma then chimed in: "What video [f]ake it off[[.] I don't wanna get sued."  *Id*.

267.    Similarly, on or about August 30, 2017, The Founder Defendants participated in a group text message conversation and discussed removing the Bancorp logos from Centra Tech's marketing materials.  During this conversation, the following exchange took place:

**Sharma**: Yo[,] [o]ne of you login to Medium/@centra asap [a]nd remove that thumbnail[,] [f]or us [a]nd Bitsset [i]mage[.] Asap[.] Bankcorp reached out.

**Farkas**: What's login

**Sharma**: You click sign in by email [a]nd it'll send support and email . . . . I don't have wifi [j]ust remove the picture r [sic] [i]n that article.

**Sharma**: RJ[,] Google Bitsset and Centra [a]nd contact anyone that has that image [a]nd ask them to remove it . . . . [o]r that language [s]aying we work with Bancorp[.] Od bad[.] Their lawyer reached out.

**Farkas**: No Bancorp on it

**Sharma**: In the bottom? . . . . U sure  I thought I saw [o]n press releases.

**Farkas**: Just checked them all[.] No Bancorp.

**Sharma**: Okay We gotta get that sh[*]t removed everywhere and blame freelancers lol[.]  F[*]ck[.]  One f[*]cking f[*]ggot [c]aused so much . . . [r]uckess.

Second Crim. Compl. ¶24.c.

268.    Centra Tech's false claimed relationship with Bancorp was material to CTR Token investors.  Indeed, Bancorp received numerous inquiries as to whether Centra Tech's claimed relationship with the bank was a reality.  Sec. Am. Compl. ¶94.

269.    The Founder Defendants affirmatively and clearly knew at all relevant times that Centra Tech did not have any relationship with Bancorp and that such false claims were material to potential CTR Token investors.  Additionally, the Founder Defendants never attempted to correct such false statements, rather they opted to attempt covering up their fraud.

C.    Fictional Executives

270.    During the first half of the Centra ICO, Centra Tech listed a "Michael Edwards" ("Edwards") as the Company's Co-Founder and CEO.  Additionally, the White Paper-1 advertised Edwards as Centra Tech's CEO and Co-Founder.  However, the picture that Centra Tech used for Edwards was actually a picture of a Canadian professor with no relationship to the Company.  Edwards was an entirely fictional person.

271.    On or about August 3, 2017, a LinkedIn profile appeared for Edwards.  This profile stated that while employed by Centra Tech, he had "[e]stablished licensing and other partnership terms with Visa & Mastercard."  Second Crim. Compl. ¶19.c.ii.  Additionally, Edward's profile stated that he was "affiliated with Harvard University."  *Id*.  Edwards' LinkedIn has since been deleted.  *Id*. ¶20.

272.    Similarly, Centra Tech and the Founder Defendants fabricated Centra Tech's purported Chief Financial Officer "Jessica Robinson" ("Robinson").  Her name was later removed from the Company's website, and her LinkedIn profile has been deleted.  Robinson does not exist.

273.    Additionally, Defendant Trapani created fictional credentials for his own personal LinkedIn profile.  For example, Trapani claimed that he obtained a master's degree from the University of California, Los Angeles' ("UCLA") graduate school of business. Second Crim. Compl. ¶19.c.iv.  In fact, Trapani never attended UCLA in any capacity.  *Id*. ¶20.

274.    In addition to the fictional LinkedIn profiles for Edwards and Robinson, Centra Tech also displayed their profiles prominently on the Company's website.

275.    In early August 2017, the fictional Edwards' LinkedIn profile stated that he had obtained a master's in business administration from Harvard University, and had decades of experience working in the banking industry.  Second Crim. Compl. ¶19.c.ii.

276.    Similarly, the fictional Robinson's LinkedIn profile stated that she had been CFO of Johnson Communications for five years prior to working for Centra Tech.  *Id*. ¶19.c.iii.

277.    With respect to Defendant Trapani, his LinkedIn profile stated that he obtained a master's degree in "Operations Management and Supervision" from UCLA in 2015.  In fact, UCLA does not offer a master's degree in this topic and Trapani never attended the university.  *Id*. ¶19.c.iv.

278.    On or about July 29, 2017, Defendant Sharma texted Trapani multiple series of texts throughout the day regarding the fictional Edwards and Robinson and early CTR Token investments, including:

> **Sharma**: I had fufu people on there [a]nd I been getting called out[.] So gonna get it corrected Lol Lol Lol [sic].
>
> **Sharma**: Someone's gonna be like wtf[.] I had one guy literally go through every single little detail[.] I just rather cover all tracks now.
>
> **Sharma**: This is gonna pop[.] I got 60 black card orders lol[.] That's like almost a mill right there[.] 1 paid already [b]efore ICO even went live . . . . Internet can be skeptical[.] That's why I need to make it as real as possible[.] Can't run it on fufu[.] Even tho I'm all reality.
>
> **Sharma**: But it's coming to that point [w]here people wanna see whose behind the project[.] I had one girl contact me lol [a]nd said take my picture off your site [c]ause one of her friends saw it cause it's blowing up[.]  Dead ass od funny[.] I kept saying it was an honest mistake.
>
> **Sharma**: U know anyone [t]hat looks like this guy [Edwards] I need someone who kind looks like him[.] I can't just change him now[,] people are going to be like wtf.
>
> **Sharma**: Need to find someone who looks like Michael[.] He's real lol[.] Everyone real[.]  Except Jessica [a]nd Mike.
>
> **Sharma**: Gonna kill both Ceo and her[.] Gonna say they were married and got into an accident.

Second Crim. Compl. ¶20.d.

279.    On or about July 30, 2017, Sharma sent Trapani text messages instructing him to create a LinkedIn for himself with fictional credentials.  *Id.*  Sharma instructed Trapani to "[g]o make a linked in [a]nd add as many connections as you can[.]  Add yourself to centra tech [a]s Coo [a]nd add connections[.] Google Coo Linked in profiles [a]nd get all the info[.] Put precious jobs [l]ike banks etc."  After Trapani had done so, Sharma followed up and stated, "December

2016[.] Take Harvard out[.] Do Like university of Georgia[.] It would too suspect everyone from hRvard [sic][.] Add a construction company prior." *Id*.

280.    On or about September 13 and 14, 2017, the Founder Defendants each participated in a group text message conversation relating to a deal with a large investor Centra Tech was attempting to close.  During this conversation, Trapani stated: "Just gotta close this shit with Bitsset get that ETH," to which Sharma replied, "We need to remove mike Edwards and Jessica asap," "After ICO." *Id*.

281.    Defendant Farkas was connected to Edward's fictional LinkedIn profile prior to its deletion.  SEC Am. Compl. ¶113.  Additionally, on or about August 15, 2017, Farkas edited an investor presentation which included both Edwards and Robinson.  *Id*.

282.    As noted, each of the Founder Defendants were responsible for various iterations of the Centra White Papers and thus, each disseminated this false information.  Additionally, during a Neocash Interview, Defendant Sharma discussed the nonexistent "Mike Edwards" and stated that the company had "one private investor who is actually Mike Edwards, he put up a lot of the capital originally."

283.    When the public began to realize that Edwards and Robinson may not be real, Defendant Sharma simply spun additional lies by claiming that the "freelancers dropped the ball," and it was all just a misunderstanding.  Second Crim. Compl. ¶20.

284.    Similarly, in approximately early October 2017, Defendant Sharma conducted a live stream on YouTube (the "Live Stream") wherein he further attempted to rationalize the issues surrounding Edwards and Robinson.[24]  During the Live Stream, Sharma stated:

---

[24]    This live stream has been deleted, but Plaintiffs' counsel has obtained a full copy.

89

No one was pirating any photos of anybody.  We did have a lot of issues with
freelancers.  We addressed those issues.  So a lot of these people that are
consistently bringing these topics up on YouTube and Reddit and 4Chan or
wherever those channels are- you know, I feel bad for you guys, you guys have
nothing better to do with your lives than try to troll a company, instead of focusing
on your own better, good and life [sic].  But it definitely has been addressed.
There's concerns that were brought up about freelancing issues on our website, that
was addressed two months ago, so, the people that are bringing it up now, I'm sorry,
you know we've already addressed this.

285.     In sum, the Founder Defendants had actual knowledge that both Edwards and

Robinson were fictional persons and that Defendant Trapani had not attended UCLA.  Despite

such knowledge, the Founder Defendants solicited investments by repeatedly referencing Edwards

or Robinson in Centra Tech's promotional materials.   Thus, Defendants' representations

concerning the fictional executives and Trapani's UCLA pedigree were knowingly materially false

and misleading at the time that they were made, because the Founder Defendants had actual

knowledge that the fictional executives did not exist and Trapani never attended UCLA.

D.     False Claims Regarding Insurance

286.     Centra Tech, the Founder Defendants and Defendant Stanley also touted Centra

Tech's nonexistent insurance policy, which increased investor confidence and served to solicit

additional purchases of CTR Tokens.  For example, the White Paper-1 stated "[a]ll digital currency

that Centra Tech holds online is fully insured . . . The policy is provided by a syndicate of insurers

through the Protarian Insurance [sic] Group."  In fact, during the official Centra ICO, the Company

did not have any insurance policy for its virtual currency.

287.     During the Live Stream, Defendant Sharma further touted Centra Tech's purported

insurance policy:

All of our wallets are insured, so when you're hosting assets on our server, you're
fully guaranteed that if god forbid there is a network hack or coin theft, that you
know that your assets are totally secure ok? as well as insured.  My most important

> thing is to get this wallet to you guys, obviously to make sure that our backend is one hundred percent secure. We understand that we are a big target.

*Supra* Note 23.

288. Similarly, in a post on the Bitcointalk online forum, on October 13, 2017, Defendant Stanley responded to a question regarding Centra Tech's insurance policy with the following:

> Very similar policy written like Coinbase, Inc., (Also DE Based Corp). They do not disclose that information, and neither do we, on who our policy issuer is for this internal coverage that we, as Centra Tech Inc, offer to our clients, and there is no Federal/State requirement to do so as well. The coverage is black and white as we put it. If an employee steals your funds it would be reimbursed, if there is a network hack where accounts are compromised, it would be fully reimbursed. We do have a policy in place, and we wouldn't legally disclose it everywhere if we did not. . . . .
>
> Thanks,
>
> Steve Stanley
>
> PR Director

289. In reality, all of Defendants' statements concerning the insurance coverage of digital currencies held on deposit were materially false and misleading at the time that they were made because no such policies existed, and in fact such deposits were entirely uninsured. SEC Am. Compl. ¶69.

290. The Founder Defendants knew claims regarding the Company's insurance policies were false given their control over virtually every aspect of Centra Tech, including the Company's White Papers. Similarly, given the fact that Defendant Stanley appears to have been Centra Tech's first executive employee, he knew or was reckless in not knowing that Centra Tech did not have the claimed insurance coverage.

291.    CTR Token investors viewed Centra Tech's purported insurance policy as material to their decision as to whether or not to purchase CTR Tokens.  For example, on or about August 5, 2017, a user on the Bitcointalk online forum posted: "[the White Paper] says it's insured by the Protarian Insurance Group.   Then they must trust Centra will be very secure and/or very profitable."

E.    False Claims Regarding State Licenses

292.    Centra Tech also made false claims that it held various state licenses.  For example, the White Paper-1 stated that,

> Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia.

293.    The White Paper-1 also stated that these licenses were "held under the categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."   Defendant Sharma repeated these false claims during the NeoCash Interview in claiming "[w]e're licensed in 38 states or 36 I have to double check."  Additionally, Sharma stated: "the states that we are operating in currently for licensing purposes is just so the ability to withdraw and transmit your Bitcoins. As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."  In fact, during the Centra ICO, Centra Tech did not have any of the claimed licenses in any of the 38 states.

294.    Similarly, on November 10, 2017, a video of Defendant Zimmerman was posted in which he claimed:

> Centra's registration with FINCEN as a money service business is complete now. It will allow us to offer our digital asset—uh digital wallet solutions to our users. We begin launching in the following states . . . Arizona, California, Colorado,

Delaware, Washington D.C., Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, West Virginia, and Wisconsin.

295.    In reality, Defendants' statements concerning the state licenses were materially false and misleading at the time that they were made because such licenses did not exist.   As of March 12, 2018, at least the following states had no current record relating to such licenses for Centra Tech: "Arizona, Connecticut, Delaware, Florida, New Jersey, New York or South Dakota." Crim Compl. ¶27.

296.    The foregoing misrepresentations were material to investors because one they were led to believe that the Centra Card and Wallet were functioning and could conduct transactions in "real time" throughout the world.  Absent such licenses, this feat was simply not possible.

297.    The Founder Defendants were fully aware of the fact that Centra Tech did not have the claimed licenses.  For example, near the start of the Centra ICO, Defendant Sharma texted Trapani that these state "licenses are hard to get with my name just cause I have a DUI.  Other issue is net worth.  Some states want you to be over 100k."  SEC Compl. ¶100.  Similarly, on September 2, 2017, Trapani sent a message stating "[a]ll it is, is like we gotta get money transmutting [sic] bonds for all countries and all states . . ."  *Id.*

298.    Indeed, even in mid-October 2017, the Founder Defendants continued to make false representations regarding such state licenses.  For example, in an attempt to convince a small regional bank to issue Centra Cards, Centra Tech provided the bank with documents claiming that the Company held various state money transmitter licenses.  Indeed, Defendant Sharma provided the bank with a forged document -- including a forged Delaware state seal and the State Bank Commissioner's signature -- purportedly granting Centra Tech a money transmitter license.  SEC Compl. ¶102.

299.     Based on the Foregoing, each of the Founder Defendants were fully aware that their claims regarding state licenses were materially false at the time that they were made.  With respect to Defendant Zimmerman, based on his close personal friendship with the Founder Defendants -- which dated back to when they all worked for or with Miami Exotics -- and his role as a senior level executive with Centra Tech, he knew or was reckless in not knowing that these same claims were false.

F.     <u>False Claims Regarding Partnerships with the Promoter Defendants</u>

300.     Centra Tech actively promoted the Centra ICO by paying the Promoter Defendants to promote investments in the Centra ICO and solicit purchases of CTR Tokens.  For example, on September 15, 2017, Centra Tech issued a press release on *Cision PR Newswire* entitled, "Centra Tech KOs Cryptocurrency Limitations with Floyd Mayweather Partnership."  This press release stated:

> The team behind the Centra Project is excited to announce a new partnership just before the launch of its Token Sale, the World Champion Boxer, Floyd 'Money' Mayweather JR will be joining Centra Tech as an official Brand Ambassador.  The famous boxer will help spread the word to mainstream media about the benefits of the Blockchain-based ecosystem.  Regarding the sportsman addition to the team, Sam Sharma, president and co-founder of Centra, said:

> 'We are proudly welcoming World Champion Boxer, Floyd 'Money' Mayweather JR to the Centra team as an official Brand Ambassador.'

301.     Mayweather thereafter promoted the Centra ICO on multiple social media platforms.

302.     Trapani personally claimed to a Fortune magazine reporter that Mayweather and Khaled were both hired as "managing partner[s]" of Centra.  Indeed, when this reporter explicitly asked Trapani whether social media posts by one of the Promoter Defendants were paid endorsements for Centra Tech, Trapani, responded, "[n]o [he] is an official brand ambassador and

managing partner of Centra Tech now." SEC Am. Compl. ¶63. Following Fortune magazine's article about these "partnerships," Farkas tweeted "another one!!" and provided a link to the article.

303.     Similarly, when questioned regarding Centra Tech's involvement with Mayweather by a reporter with *The New York Times*, Trapani stated that Mayweather had been intrigued by Centra Tech and wanted to be a partner. Further, Trapani stated, "[h]e'll [Mayweather] do anything we ask . . . He'll go shopping around Beverly Hills if we ask him to do it with this card." However, as reported by the NYT on October 27, 2017, "[t]he boxing champ understood their deal differently. A spokeswoman for Mr. Mayweather, Kelly Swanson, said he had been paid in cash for the posts and was not involved in any continuing relationship with Centra."

304.     Additionally, on September 28, 2017, Centra Tech also issued a press release entitled "The team behind the Centra Tech cryptocurrency debit card is excited to announce a new partnership with the BET award winner, DJ Khaled." This press release announced that Khaled would be joining Centra Tech as an "official Brand Ambassador and Managing Partner."

305.     Centra Tech also published Tweets such as the following:



306.     Further, in early-October 2017, Sharma conducted a live stream on YouTube (the "Live Stream"), wherein he also touted these purported relationships.  During the Live Stream, Sharma stated:

> DJ Khaled and Money Mayweather.  They are, wherever they are in the world, I'm sure they are either in California or Las Vegas.  They have their own businesses to run.  Floyd was just in New York.  We have a lot of exciting things we're doing with them this month.  They are very involved with our company and what we're doing, our vision.  We know how to network guys, we know how to put the pieces of the puzzle together.  We know how to put connectivity of brands to us ok?

*Supra* Note 23.

307.     The Promoter Defendants' endorsements and the Founder Defendants' statements regarding purported partnerships with the Promoter Defendants induced significant interest in the Centra ICO and the purchase of unregistered securities (CTR Tokens).  In Trapani's words, "people like Floyd Mayweather and DJ Khaled would not risk their future over being a partner to a company that is not as real as it gets."

308.     Both of the Promoter Defendants explicitly encouraged their fans and social media followers to invest in the Centra ICO and purchase CTR Tokens.  For example, in September 2017,

Mayweather posted a Tweet stating "Centra's (CTR) ICO starts in a few hours. Get yours [CTR Tokens] before they sell out[.] I got mine. Similarly, in September 2017, Khaled posted a picture on Instagram with a caption that dubbed the Centra Card and Centra Wallet the "ultimate winner in Cryptocurrency debit cards powered by CTR tokens!"  Further, this post also directed his fans and social media followers to "Get your CTR tokens now!"  As discussed *infra*, neither of the Promoter Defendants were actual CTR Token investors.  Rather, they were paid to solicit investments in the Centra ICO and endorse Centra Tech.

309.    All of these statements to the effect that the Promoter Defendants were partners involved in the operations of Centra Tech were materially false and misleading at the time that they were made, and knowingly so.  In reality, the Promoter Defendants were paid to market the sale of CTR Tokens, and that was the full extent of their relationship with Centra Tech.

## CONTROL PERSON ALLEGATIONS

310.    Each of the Founder Defendants had substantial control over Centra Tech and each is thus subject to liability for Centra Tech's actions as control persons under Section 15(a) of the Securities Act and 20(a) of the Exchange Act.  The Founder Defendants possessed the power and authority to control the contents of Centra Tech's website and solicitation materials relating to the Centra ICO.  Each of the Founder Defendants were instrumental in the Centra ICO's operation and had the ability and opportunity to prevent the false or misleading statements alleged herein or cause them to be corrected.  Because of their positions within the Company and access to material, non-public information, the Founder Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and the positive representations being made were therefore materially false and misleading.

311.   For example, each of the Founder Defendants was involved in editing the materials contained on the Centra Tech website, disseminating promotional materials, and managing Centra Tech's employees.  The Founder Defendants are liable for the false statements pleaded herein.

312.   As demonstrated *supra*, each of the Founder Defendants were intimately involved with the decision-making process concerning the promotion of the Centra ICO and Centra Products, and were therefore clearly control persons of Centra Tech.

## THE SECURITIES ACT CLAIMS

313.   The Securities Act Claims are brought under Sections 12(a)(1) and 15(a) of the Securities Act [15 U.S.C. §§ 77l(a)(1) and 77o(a)], and are based solely on allegations of strict liability.

## COUNT I

### Claim for Violation of Section 12(a) of the Securities Act
### Against All Defendants

314.   Section 12(a)(1) grants Plaintiffs a private right of action against any person who offers or sells a security in violation of Section 5, and states that such person,

> Shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

315.   From approximately July 23, 2017 through April 20, 2018, in connection with the Centra ICO, all Defendants, and each of them, unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails for the purposes of offering, selling, or delivering unregistered securities in direct violation of Section 5(a) and 5(c) of the Securities Act.  Among other things, Defendants used the Internet for these purposes.

316.     The Centra ICO was a sale of unregistered securities under controlling federal law. CTR Tokens exhibit the following particular hallmarks of a security under the *Howey* test: (a) in order to receive any CTR Tokens an investment of money, in the form of ETH, BTC, LTC and/or other virtual currencies was required; (b) the investment of money was made into the common enterprise that is Centra Tech and the potential future Centra Products; (c) the success of the investment and any potential returns stemming from CTR Token "rewards" and the potential future increase in CTR Token's value were entirely reliant on Defendants' ability to create the promised Centra Debit Card and Centra Products and/or successfully solicit investments in CTR Tokens from the general public.

317.     As such, Defendants have participated in an unregistered sale of securities in violation of the Securities Act and are therefore, liable to Plaintiffs and the Class for rescission and/or compensatory damages.

## COUNT II

**Claim for Violation of Section 15(a) of the Securities Act**
**Against the Founder Defendants**

318.     Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

319.     Due to their ownership interest in and/or control over Centra Tech, the Founder Defendants acted as controlling persons of Centra Tech within the meaning of Section 15(a) of the Securities Act as alleged herein.  By virtue of their positions as officers and/or directors and participation in and/or awareness of Centra Tech's operations, they had the power to influence and control, and did influence and control, directly or indirectly, the decision making relating to the Centra ICO, including the decision to engage in the sale of unregistered securities via the offer and sale of CTR Tokens.

320.     By virtue of the foregoing, the Founder Defendants are liable to Plaintiffs and the Class as control persons of Centra Tech under Section 15(a) of the Securities Act.

## THE EXCHANGE ACT CLAIMS

321.     Separate and apart from the Securities Act claims, Plaintiffs' Exchange Act claims seek to hold Defendants liable for intentionally (or with deliberate recklessness) issuing false and misleading statements for the purpose of inducing investors to purchase CTR Tokens and/or perpetuating a fraudulent scheme or device upon Plaintiffs and the Class.

### SCIENTER

322.     For the purposes of Plaintiffs' claims under the Exchange Act only, Plaintiffs allege that the above material misrepresentations and omissions were made by Defendants either intentionally and/or with reckless disregard to accuracy for the purposes of: (a) personal financial gain; (b) inflating market demand for CTR Tokens during the Centra ICO; and (c) securing additional financing to continue as a going concern.

323.     Defendants were aware of the false claims as set forth in detail above.  As set forth *supra*, each of the Founder Defendants had actual knowledge that: (i) Centra Tech had not been authorized to use the Centra Card on the Visa or Mastercard networks; (ii) the Company was not in a "partnership" with Bancorp"; (iii) both Edwards and Robinson were fictional persons and Defendant Trapani had not attended UCLA; (iv) Centra Tech did not have insurance during the official Centra ICO; (v) the Company lacked any state money transmitter licenses during the Centra ICO; and (vi) the Promoter Defendants were not Centra Tech's "managing partner(s)."

324.    Similarly, by virtue of their positions as executive officers, responsibilities, and/or relationships with the Founder Defendants, the Executive Defendants knew or were grossly reckless in not knowing the limitations of the Centra Card.

325.    With respect to the Promoter Defendants, both knew they were paid to endorse Centra Tech, yet they falsely claimed to have independently purchased CTR Tokens. Similarly, both knew that any claims about their having conducting real-world purchase transactions utilizing a Centra Tech debit card were false and misleading at the time it was made, because such cards never functioned and were not capable of performing such a transaction.

## LOSS CAUSATION

326.    During the Class Period, Defendants made false and misleading statements and engaged in a scheme to deceive the market, as well as a course of conduct that artificially inflated the price of Centra Tech's patently worthless CTR Tokens and operated as a fraud or deceit on the Class by materially misleading the investing public.

327.    These false and/or materially misleading statements concealed the fact that Centra Tech was nothing but a vehicle for the Founder Defendants' self-dealing and personal enrichment. As the risks surrounding Centra Tech's conduct materialized during the Class Period, CTR Token's price plummeted.  When the Founder Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, CTR Token's price crash.  On February 9, 2018, Centra Tech received a subpoena from the SEC.  It can be inferred that the Founder Defendants likely ceased their manipulation of the CTR Token price on or about that date.  On February 9, 2018, one CTR Token was worth approximately $1.00.  When Defendant Trapani's arrest was announced, on April 20, 2018, CTR Token's value fell to approximately $0.015.  As a result of their purchases

of CTR Tokens during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

328.     Defendants failed to disclose to investors material information concerning the fact that Centra Tech was a fraudulent scheme since its inception, and CTR Tokens have at all times been patently worthless.  The total decline in CTR Token's price is attributable to Defendants' fraudulent and/or reckless conduct pursuant to the materialization-of-the-risk doctrine.

### APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-CREATED-THE-MARKET DOCTRINE

329.     Reliance need not be proven in this action because the action involves falsities so egregious and pervasive that they go to the very existence of CTR Tokens.  Positive proof of reliance is not a prerequisite to recovery pursuant to *Ross v. Bank S., N.A.*, 885 F2d 723 (11th Cir. 1989).  All that is necessary is that the securities are so tainted by fraud as to be unmarketable.  In other words, it must be shown that but for the fraud, CTR Tokens would not have been marketable.

330.     CTR Tokens should not have been sold to the investing public as they have at all times been objectively valueless and unmarketable.  As detailed in this Complaint, absent the Founder Defendants' fraudulent conduct, CTR Tokens could not have been sold for any price. Further, given the fact that CTR Tokens were not registered for sale, they were unlawfully offered and thus, *per se* unmarketable.  Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have manipulated all purchasers of the security at issue.  Accordingly, Plaintiffs are entitled to the presumption of reliance because all CTR Tokens were offered and sold as a result of Defendants' brazen fraud and in particular, the Founder Defendants' egregious fraudulent conduct.

### NO SAFE HARBOR

331.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

332.    The CTR Tokens at issue here were unregistered securities and thus such safe-harbors are inapplicable.  Furthermore, to the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

333.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Centra Tech who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying, or relating to, any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when they were made.

## COUNT III

### Violation of Section 10(b) and SEC Rule 10b-5(b)
### against all Defendants

334.    Plaintiffs repeat and reallege paragraphs 1 through 312 and 321 through 333 as if fully set forth herein.

335.     This Count is asserted by Plaintiffs on behalf of themselves and the Class against all Defendants and is based upon Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

336.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CTR Tokens; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire patently worthless unregistered securities, CTR Tokens, at artificially created, and inflated, prices. In Defendant Sharma's own words, CTR Tokens were merely "air."  SEC Am. Compl. ¶56.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

337.     Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

338.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or publication of the promotional materials, press releases and other statements and documents described above, including statements made to the media that were designed to influence the market for CTR Tokens.  Such promotional materials, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Centra Tech's business, CTR Token's value, and the Centra Products.

339.    By virtue of their positions at, and relationships or interactions with, Centra Tech, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

340.    The Founder Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Founder Defendants and Executive Defendants were able to and did, directly or indirectly, control the content of the statements of Centra Tech.  As officers and/or directors of a company raising investments from the general public, the Founder Defendants and Executive Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Centra Tech's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading promotional materials, releases and public statements, a public market was created for patently worthless CTR Tokens.  CTR Tokens have no use and no value whatsoever, yet Defendants' fraudulent conduct artificially created such a market.

341.    In ignorance of the adverse facts concerning Centra Tech's business and financial condition which were misrepresented and concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired CTR Tokens and were damaged thereby.

342.   Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired any CTR Tokens.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, CTR Tokens had no true value and thus Plaintiffs and the other members of the Class purchased worthless unregistered securities. The market price of CTR Tokens plummeted upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

343.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

344.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's unregistered securities during the Class Period, upon the disclosure that the Company had been disseminating false materials concerning essentially every aspect of Centra Tech's operation to the investing public.

## <u>COUNT IV</u>

### <u>Violation of Section 20(a) of the Exchange Act<br>against the Founder Defendants</u>

345.   Plaintiffs repeat and reallege paragraphs 1 through 312 and 321 through 344 as if fully set forth herein.

346.   During the Class Period, the Founder Defendants participated in the operation and management of Centra Tech, and conducted and participated, directly and indirectly, in the conduct of Centra Tech's business affairs.  Because of their senior positions, they knew the false information about Centra Tech's relationships, products, and the CTR Token.

347.     As officers and/or directors of a company raising investments from the investing public, the Founder Defendants had a duty to disseminate accurate and truthful information with respect to Centra Tech's operations, and to correct promptly any public statements issued by Centra Tech which had become materially false or misleading.

348.     Because of their positions of control and authority as senior officers, the Founder Defendants were able to, and did, control the contents of the various promotional materials, press releases and public statements which Centra Tech disseminated in the marketplace during the Class Period concerning Centra Tech's operations.   Throughout the Class Period, the Founder Defendants exercised their power and authority to cause Centra Tech to engage in the wrongful acts complained of herein.   The Founder Defendants therefore, were "controlling persons" of Centra Tech within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which created a market for patently worthless CTR.

349.     Each of the Founder Defendants, therefore, acted as a controlling person of Centra Tech.  By reason of their senior management positions and/or being directors of Centra Tech, each of the Founder Defendants had the power to direct the actions of, and exercised the same to cause, Centra Tech to engage in the unlawful acts and conduct complained of herein. Each of the Founder Defendants exercised control over the general operations of Centra Tech and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

350.     By reason of the above conduct, the Founder Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Centra Tech.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

A.      Declaring that this action is properly maintainable as a class action and certifying Plaintiffs as the Class' representatives and their counsel as Class counsel;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Declaring that Defendants offered and sold unregistered securities in violation of the federal securities laws;

D.      Declaring Defendants are liable to Plaintiffs and the Class for monetary damages under the claims set forth herein;

E.      Enjoining Defendants from making further transfers or dissipations of the investments raised in connection with the Centra ICO, or using such funds in any further purchases or transactions;

F.      Requiring an accounting of the remaining funds and assets raised from Plaintiffs and the Class in connection with the Centra ICO;

G.      Imposing a constructive trust over the funds and assets rightfully belonging to Plaintiffs and the Class;

H.      Ordering rescission of the investments made by Plaintiffs and the Class relating to the Centra ICO and/or rescissory damages;

I.      Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest;

J.      Awarding Plaintiffs the costs of this action, including reasonable allowance for Plaintiffs' attorneys' and experts' fees; and

K.      Granting such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: October 9, 2018

Respectfully submitted,

**KOMLOSSY LAW P.A.**

<u>/s/ *Emily C. Komlossy*</u>
Emily Komlossy (FBN 7714)
eck@komlossylaw.com
Ross A. Appel (FBN 90865)
raa@komlossylaw.com
4700 Sheridan St., Suite J
Hollywood, FL 33021
Phone: (954) 842-2021
Fax: (954) 416-6223

*Liaison Counsel for Plaintiffs*

**OF COUNSEL:**

**LEVI & KORSINSKY, LLP**
Eduard Korsinsky
30 Broad Street, 24th Floor
New York, New York 10004
Telephone: (212) 363-7500
Facsimile: (212) 636-7171

Donald J. Enright (admitted *pro hac vice*)
Elizabeth K. Tripodi
John A. Carriel (admitted *pro hac vice*)
**LEVI & KORSINSKY, LLP**
1101 30th Street, N.W., Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Fax: (202) 333-2121

James Taylor-Copeland (admitted *pro hac vice*)
**TAYLOR-COPELAND LAW**
james@taylorcopelandlaw.com
501 W. Broadway Suite 800
San Diego, CA 92101
(619) 400-4944

*Co-Lead Counsel for Plaintiffs*

109

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on October 9, 2018, I electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via CM/ECF.

With respect to Defendant Trapani, the foregoing document is being served via U.S. mail to his current residence at 2000 Meredith Avenue, Virginia Beach, VA 23455.


<u>/s/  *Emily C. Komlossy*</u>
Emily C. Komlossy