**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:17-cv-24500-RNS/Becerra)

FILED BY _____ *PG* _____ D.C.

APR 2 6 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

JACOB ZOWIE THOMAS RENSEL, WANG
YUN HE, CHI HAO POON, KING FUNG
POON, JAE J. LEE, MATEUSZ
GANCZAREK, and RODNEY WARREN,
individually and on behalf of all others similarly
situated,

Plaintiffs,

v.

CENTRA TECH, INC., SOHRAB SHARMA,
ROBERT FARKAS, RAYMOND TRAPANI,
STEVEN STANLEY, STEVEN SYKES,
ALLAN SHUTT, CHASE ZIMMERMAN,
FLOYD MAYWEATHER JR, and KHALED
MOHAMED KHALED A/K/A DJ KHALED,

Defendants.

**DEFENDANT ALLAN SHUTT'S MOTION TO DISMISS UNDER**
**RULE 12(B)(6) AND SUPPORTING MEMORANDUM OF LAW**

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| **I.** | **INTRODUCTION** | 1 |
| **II.** | **PROCEDURAL HISTORY** | 4 |
| **III.** | **STATEMENT OF FACTS** | 5 |
| | **A.** Centra Tech Is Founded And Makes An Initial Coin Offering | 5 |
| | **B.** Founder Defendants Allegedly Make Material Misstatements Regarding The Centra Card | 6 |
| | **C.** Shutt Is Only Mentioned A Handful Of Times In The FAC And Plaintiffs Have Not Alleged That They Viewed and Relied Upon Shutt's Two Videos And Attendance At Industry Conferences | 7 |
| | **D.** Plaintiffs Jacob Zowie Thomas Rensel, Wang Yun He, Chi Hao Poon, King Fung Poon, Jae J. Lee, And Mateusz Ganczarek's First Purchases Of CTR Tokens Pre-dated Shutt's Challenged Conduct | 9 |
| **IV.** | **LEGAL STANDARD** | 10 |
| **V.** | **LEGAL ARGUMENT** | 11 |
| | **A.** Plaintiffs' Claim For Violations of Section 12(a) of the Securities Act (Count I) Fails Because Shutt Did Not "Sell" Securities To Plaintiffs | 11 |
| |     1. Shutt Did Not "Transfer Title To" Securities To Plaintiffs | 14 |
| |     2. Shutt Did Not "Successfully Solicit" Plaintiffs To Purchase Securities | 15 |
| | **B.** Plaintiffs' Claim for Violations of Section 10(b) and Rule 10b-5(b) (Count III) Fails As a Matter of Law | 17 |
| |     1. Plaintiffs Cannot Rely On The "Fraud-Created-The-Market" Doctrine To Establish Reliance | 18 |
| |         a. The "Fraud-Created-The-Market" Doctrine Cannot Be Invoked For Rule 10-5(b) Claims Like Those Plaintiffs Have Alleged Against Shutt | 19 |
| |         b. The "Fraud-Created-The-Market" Doctrine Is Also Inapplicable Because Shutt Is Not Alleged To Have Created The Market | 22 |
| |     2. Plaintiffs Fail To Adequately Allege Scienter And Ignore The Compelling Inference Of Non-Fraudulent Intent | 25 |
| | **C.** Plaintiffs Jacob Zowie Thomas Rensel, Wang Yun He, Chi Hao Poon, King Fung Poon, Jae J. Lee, Mateusz Ganczarek, And Rodney Warren Lack Standing To Sue Shutt | 29 |
| **VI.** | **CONCLUSION** | 35 |

## **TABLE OF AUTHORITIES**

**Cases**                                                                      **Page(s)**

*In re Alstom SA,*
   *406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005)* .......................................................................18

*In re: Altisource Portfolio Sols., S.A. Sec. Litig.,*
   *2015 WL 11988900 (S.D. Fla. Dec. 22, 2015)* ...............................................................18

*Am. Dental Ass'n v. Cigna Corp.,*
   *605 F.3d 1283 (11th Cir. 2010)* ......................................................................................10

*Ashcroft v. Iqbal,*
   *556 U.S. 662 (2009)* ...............................................................................................10, 34

*Basic Inc. v. Levinson,*
   *485 U.S. 224 (1988)* .......................................................................................................19

*Bell Atlantic Corp. v. Twombly,*
   *550 U.S. 544, 557 (2007)* ...............................................................................................34

*Bonner v. City of Prichard,*
   *661 F.2d 1206 (11th Cir. 1981) (en banc)* .....................................................................19

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
   *511 U.S. 164 (1994)* .......................................................................................................22

*In re CNL Hotels & Resorts, Inc.,*
   *2005 WL 2291729 (M.D. Fla. Sept. 20, 2005)* .............................................................16

*Dapeer v. Neutrogena Corp,*
   *95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015)* .................................................................29

*Druskin v. Answerthink, Inc.,*
   *299 F. Supp. 2d 1307 (S.D. Fla. 2004)* .........................................................................25

*Dupuy v. Dupuy,*
   *551 F.2d 1005 (5th Cir. 1977)* .......................................................................................18

*Dura Pharmaceuticals, Inc. v. Broudo,*
   *544 U.S. 336 (2005)* .......................................................................................................17

*In re Galectin Therapeutics, Inc. Sec. Litig.,*
   *843 F.3d 1257 (11th Cir. 2016)* ................................................................................10, 11

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ................................................................................10

*IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
    660 F. App'x 850 (11th Cir. 2016) ...........................................................................22

*Katz v. MRT Holdings, LLC*,
    No. 07-61438-CIV, 2008 WL 4725284, at *5 (S.D. Fla. Oct. 24, 2008) ...........................24

*Kerrigan v. Visalus, Inc.*,
    2016 WL 892804 (E.D. Mich. Mar. 9, 2016) ..............................................................16

*Lipton v. Documation, Inc.*,
    734 F.2d 740 (11th Cir. 1984) .................................................................................18

*Montcalm County Bd. of Commissioners v. McDonald & Co. Sec., Inc.*,
    833 F. Supp. 1225 (W.D. Mich. 1993) .......................................................................16

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ...................................................................11, 12, 13, 14, 15, 16

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ..................................................................................22

*Raines v. Byrd*,
    521 U.S. 811 (1997) ..............................................................................................29

*Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007) ..................................................................................22

*Rosenberg v. Gould*,
    554 F.3d 962 (11th Cir. 2009) ....................................................................25, 26, 27

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ...........................................................................16, 17

*Ross v. Bank South, N.A.*,
    885 F.2d 723 (11th Cir. 1989) ....................................................................19, 22, 23, 24

*SEC v. CMKM Diamonds, Inc.*,
    729 F.3d 1248, 1256 n.5 (9th Cir. 2013). ..................................................................14

*Shain v. Duff & Phelps Credit Rating Co.*,
    915 F. Supp. 575 (S.D.N.Y. 1996). ...........................................................................16

*Shores v. Sklar,*
    647 F.2d 462 (5th Cir. 1981) ............................................................................19, 20, 22

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .................................................................................................29

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,*
    552 U.S. 148, 157 (2008) ...........................................................................................23

*In re SportsLine.com Sec. Litig.,*
    366 F. Supp. 2d 1159 (S.D. Fla. 2004) ......................................................................25

*Swenson v. Engelstad,*
    626 F.2d 421 (5th Cir. 1980) ......................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308, 314 (2007) ...........................................................................................25

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.,*
    328 F. Supp. 3d 963, 971 (N.D. Cal. 2018). ...............................................................24

*Zacharias v. SEC,*
    569 F.3d 458, 467 (D.C. Cir. 2009) ...........................................................................14

**Statutes and Regulations**

15 U.S.C. § 78u-4(b)(1) ......................................................................................................11

15 U.S.C. § 78u-4(b)(2) ......................................................................................................11

15 U.S.C. § 77l(a)(1). ..........................................................................................................11

17 C.F.R. § 240.10b-5............................................................................................17, 18, 20

17 C.F.R § 240.10b-5(a) ...........................................................................17, 18, 19, 20

17 C.F.R. § 240.10b-5(b) .........................................2, 3, 10, 11, 17, 19, 20, 23

17 C.F.R. § 240.10b-5(c) ...........................................................................17, 18, 19, 20

**Other Authorities**

Fed. R. Civ. P. 9(b) ..............................................................................................................10

Private Securities Litigation Reform Act of 1995 (PSLRA).................................3, 25, 29

U.S. Const. art. III ......................................................................................3, 4, 29, 31, 32, 33, 34

U.S. Const. art. III, § 2, cl. 1 ..............................................................................................29

Defendant Allan Shutt ("Shutt") hereby moves to dismiss Plaintiffs Jacob Zowie Thomas Rensel, Wang Yun He, Chi Hao Poon, King Fung Poon, Jac J. Lee, Mateusz Ganczarek, and Rodney Warren's (collectively, "Plaintiffs") claims against him in the amended complaint ("FAC") for violations of Section 12(a) of the Securities Act (Count I) and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder (Count III) for failure to state a claim, and as to all Plaintiffs, also for lack of standing.

## I. INTRODUCTION

Plaintiffs have filed this novel securities class action seeking to hold Shutt liable for Defendant Centra Tech, Inc.'s ("Centra Tech") alleged scheme to sell what Plaintiffs contend were unregistered, unmarketable, securities. According to Plaintiffs, Centra Tech, Inc. and its principals, Defendants Sohrab Sharma ("Sharma"), Robert Farkas ("Farkas"), and Raymond Trapani ("Trapani") (collectively, the "Founder Defendants"), told the public that Centra Tech was creating a revolutionary debit card known as the "Centra Card" that would enable users to spend cryptocurrency anywhere Visa or MasterCard is accepted. However, Plaintiffs allege, Centra Tech was a scam because they believe that Centra Tech had no relationship with Visa or MasterCard in order to permit the Centra Card to allow users to make purchases with various cryptocurrencies.

Shutt is not alleged to have participated in Centra Tech's "official" initial coin offering, which Plaintiffs describe as a "scheme." This is because Shutt was not an employee of Centra Tech during that period. Plaintiffs have nevertheless included Shutt in this action because he was an employee who was allegedly featured in two online company "videos" where he describes his job duties and discusses the Centra Card developments and because he allegedly attended industry conferences. In an attempt to invoke the broad remedies available under the Securities

1

and Exchange Acts, Plaintiffs characterize the CTR Tokens as unregistered securities that the Centra Card supposedly required. Premised on that contention, the Plaintiffs allege two claims against Shutt: (i) a claim for violations of Section 12 of the Securities Act; and (ii) a claim for violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act. As set forth below, even assuming the CTR Tokens constitute "securities" as Plaintiffs have alleged, and thus come under the purview of the Securities and Exchange Acts, Plaintiffs' claims fail as a matter of law and should be dismissed for the following three reasons.

First, the FAC does not allege that Shutt was given any CTR Tokens, bought any CTR Tokens, owned any CTR Tokens, invested in any CTR Tokens, offered to sell CTR Tokens to the Plaintiffs, sold any CTR Tokens to the Plaintiffs, transferred any CTR Tokens to the Plaintiffs, discussed CTR Tokens with the Plaintiffs, or directly solicited the Plaintiffs to buy CTR Tokens. Specifically, Plaintiffs' Section 12 claim fails because Shutt is not alleged to have sold any unregistered securities to the Plaintiffs in Centra Tech's "official" initial coin offering or at any time thereafter. Section 12 provides purchasers of unregistered securities with a rescissionary remedy against the party from whom they purchased the unregistered securities. In this case, Shutt is simply not alleged to have sold Plaintiffs the CTR Tokens that Plaintiffs contend were unregistered securities and thus he cannot be sued under Section 12.

Second, Plaintiffs' Section 10(b) and Rule 10b-5(b) claim fails because Plaintiffs have not alleged, and cannot adequately allege, actual reliance or the heightened requirement of scienter. Shutt's alleged involvement is limited to being featured in two online company "videos" where he describes his job duties and discusses the Centra Card developments and attending industry conferences ("challenged conduct"), which Plaintiffs do not specifically contend they viewed and relied upon in the purchase of CTR Tokens. For most of the Plaintiffs it is a factual

2

impossibility to do so. To circumvent their lack of actual reliance on anything Shutt allegedly did, Plaintiffs attempt to invoke the "fraud-created-the-market" presumption of reliance. But that presumption does not apply to the type of Rule 10b-5(b) claim Plaintiffs have alleged against Shutt. Simply, Shutt is not alleged to have been involved in the suggested fraud scheme in Centra Tech's "official" initial coin offering that Plaintiffs contend created the market for CTR Tokens because he was not an employee of Centra Tech at that time. Plaintiffs' allegations make clear that the alleged scheme long pre-dated Shutt's employment and challenged conduct at Centra Tech. Given Shutt's alleged lack of involvement, the Plaintiffs have failed to allege reliance on anything he did or said that enticed them to purchase CTR Tokens. The Plaintiffs have also failed to satisfy the heightened pleading standard of the *Private Securities Litigation Reform Act of 1995* ("PSLRA") for scienter because they ignore the plausible opposing inference of non-fraudulent intent.

Third, the Plaintiffs have failed to demonstrate U.S. Constitution Article III standing as they have not, and cannot, establish that the alleged injury suffered when they purchased CTR Tokens is in fact traceable to Shutt's challenged conduct. In fact, for almost all of the Plaintiffs it is a factual impossibility that they had the opportunity to rely on anything Shutt did or said. Specifically, six of the seven Plaintiffs (Rensel, He, Poon, Poon, Lee, and Ganczarek) purchased their first CTR Tokens before Shutt started employment at Centra Tech in October of 2017. Three of the seven Plaintiffs (Poon, Poon, and Lee) purchased all of their CTR Tokens before Shutt started employment at Centra Tech. Five of the seven Plaintiffs (Rensel, Poon, Poon, Lee, and Ganczarek) purchased all of their CTR Tokens before Shutt's challenged conduct. One Plaintiff (He) provided a date range for an alleged additional purchase on the secondary market of CTR Tokens before Shutt's challenged conduct but possibly after. However, the Plaintiff (He) doesn't

know when the alleged purchase was actually made. Finally, only one Plaintiff (Warren) purchased his CTR Tokens on the secondary market after Shutt' challenged conduct. However, the Plaintiff in that instance does not allege in the FAC that he was influenced or relied upon any specific conduct or information provided by Shutt when he purchased the alleged CTR Tokens on the secondary market. Thus, the Plaintiffs have failed to demonstrate U.S. Constitution Article III standing as they have not established that the alleged injury suffered when they purchased CTR Tokens is in fact traceable to the challenged conduct of Shutt.

Therefore, for the above reasons the Plaintiffs' claims against Shutt must be dismissed — with prejudice.

## II. PROCEDURAL HISTORY

Plaintiff Rensel commenced this putative class action lawsuit on December 13, 2017 by filing suit against Centra Tech and the Founder Defendants. ECF No. 1. On February 2, 2018, Defendants filed Motions to Compel Arbitration, and to Dismiss for Failure to State a Claim. ECF Nos. 24, 26. On June 14, 2018, Magistrate Judge Andrea Simonton issued a Report and Recommendation that recommend granting in part the Motion to Dismiss but giving Plaintiff Rensel leave to amend. ECF No. 77.

On May 29, 2018, Plaintiff filed a motion for leave to file an amended complaint to add Defendants Mayweather and Khaled, add four former Centra Tech executives (the "Executive Defendants - Steven Stanley, Director of Public Relations; Steven Sykes, CTO; Allan Shutt, General Counsel, Chief Compliance Officer, and Bank Secrecy Officer; and Chase Zimmerman, Chief Marketing Officer."), remove Defendant Hagner, name additional Plaintiffs, and add factual allegations that were purportedly uncovered since the filing of the original complaint. ECF No. 73. On October 9, 2018, Plaintiffs filed the FAC adding Shutt as a defendant. ECF No.

4

65.

## III.  STATEMENT OF FACTS

**A.     Centra Tech Is Founded And Makes An Initial Coin Offering**

The overwhelming majority of Plaintiffs' FAC focuses on Centra Tech and the Founder Defendants.  In broad strokes, the FAC alleges that the Founder Defendants founded Centra Tech in July 2017. FAC ¶ 75. Centra Tech's "official" initial coin offering was from approximately July 23, 2017 through October 5, 2017, in which it offered unique digital coins known as "CTR Tokens." FAC ¶ 1.  Centra Tech offered the CTR Tokens in exchange for virtual currencies such as Ethereum ("ETH"), Bitcoin ("BTC"), and Litecoin ("LTC"). FAC ¶¶ 3, 81. The purpose of the "official" initial coin offering was to sell CTR Tokens that users would allegedly need to access Centra Tech's products, such the "Centra Card" (a debit card that would purportedly function on the Visa and Mastercard networks and allow instant transactions using digital currencies). FAC ¶ 5.

Founder Defendants were the three central figures in the formation of Centra Tech and during the "official" initial coin. FAC ¶ 79. Sharma is described as having "held 100% ownership of Centra Tech when it was formed"—no one else is alleged to have ever held an ownership interest in the company. See FAC ¶¶ 52, 54, 56. Sharma also held various executive level positions including CTO and President and was "actively involved" in the company's operation until approximately March 26, 2018. FAC ¶ 52. Farkas, at various times, held the positions of Chief Operating Officer ("COO") and Chief Marketing Officer. FAC ¶ 54. In addition to leading Centra Tech's marketing efforts and managing its social media accounts, Farkas attempted to get CTR Tokens listed on virtual currency exchanges. FAC ¶ 77. Trapani, at various times, held the positions of COO and "Strategic Manager." FAC ¶ 56. Trapani also managed the "Centra Official

Bounty Program"—a marketing program that offered CTR Tokens to any person who generated positive press or social media coverage of the Centra ICO. FAC ¶ 110. The Founder Defendants are the subjects of an SEC enforcement action and separate criminal actions. FAC ¶¶ 58-62.

**B.     Founder Defendants Allegedly Make Material Misstatements Regarding The Centra Card**

The FAC alleges that Centra Tech and the Founder Defendants almost immediately began touting Centra Tech's purported relationship with Visa and MasterCard. On July 23 and 25, 2017, Centra Tech Allegedly published press releases that stated "Centra Card works anywhere that accepts Visa or MasterCard." FAC ¶¶ 91-92. On August 4, 2017, Centra Tech allegedly posted on its Twitter account that "[w]e have a licensing agreement with Bancorp and Visa/MC." FAC ¶ 220. Centra Tech also allegedly published multiple "White Papers" which purportedly contained false and misleading statements pertaining to Centra Tech's relationship with Visa and MasterCard. FAC ¶ 221. The first White Paper, which was allegedly published in "early-August 2017," contained: statements that "the Centra Card will be a visa card while for international users the Centra Card issued will be a Mastercard;" a diagram showing that Centra Tech "signed [a] licensing agreement with Visa USA" in January 2017; a comparison table stating that MasterCard and Visa were issuers of the Centra Card; and statements that "customers can use Centra Debit Card anywhere in the world that accepts Visa." FAC ¶¶ 94, 222-224. In an August 14, 2017 podcast interview, Sharma allegedly stated: "we currently have our license with Mastercard to service international clients, domestically we have a Visa Partnership." FAC ¶ 225; SEC Am. Compl. ¶ 74. The date of this "Neocash Interview" is not alleged in the FAC but is alleged in the SEC's amended complaint filed on April 20, 2018 against Sharma, Farkas, and Trapani ("SEC Am. Compl."), which Plaintiffs incorporate by reference. FAC ¶ 61 n.9. Plaintiffs allege numerous other instances in which the Founder Defendants touted the Centra Card and

other products to the public. FAC ¶¶ 217-228, 230-235. Other instances in which the Founder Defendants touted the Centra Card and other products to the public occurred through early October 2017. FAC ¶¶ 229, 236-242. These events occurred prior to Shutt being hired by Centra Tech in mid-October of 2017. FAC, ¶ 65.

**C.    Shutt Is Only Mentioned A Handful Of Times In The FAC And Plaintiffs Have Not Alleged That They Viewed and Relied Upon Shutt's Two Videos And Attendance At Industry Conferences**

Out of the 350 paragraphs contained in Plaintiffs' 110-page complaint, Shutt is only specifically mentioned in less than a dozen paragraphs. FAC ¶¶ 2, 65, 196-200, 207, 245-247. Shutt is not alleged to have been involved in the founding of Centra Tech nor otherwise involved in the "official" initial coin offering. Nevertheless, Plaintiffs seek to hold Shutt responsible for securities violations based on the appearance in two online company "videos" describing his job duties and discussing the Centra Card developments and his attendance at industry conferences.

The FAC alleges that the first company video which featured Shutt occurred on or about November 4, 2017. The FAC quoted Shutt in part as stating: "We have a third-party provider for our international cards and we have a provider for our domestic cards. And those individuals have the relationships with Mastercard and Visa. Um. They have a relationship with banks who have the relationship with Mastercard and Visa to offer pre-paid cards on their network. So I think we're on track with where we want to be and what we've been telling individuals." FAC ¶¶ 197, 245.

The FAC alleges that the second company video which featured Shutt posted "Shortly thereafter." FAC ¶¶ 198, 246. To clarify, the actual date the video was on or about December 8, 2017. The FAC quoted Shutt in part as stating in the video that the Wallet and the Centra Card: "[w]ill allow the user to go into a store, with that card, and actually make a purchase, in real-time,

converting the digital currency into fiat currency and paying the merchant in U.S. dollar. This process allows the everyday person to actually spend their digital currencies, in a normal store, like Best Buy or Walmart or Walgreens or if you're international, in a store that accepts a Visa or Mastercard. FAC ¶¶ 198, 246.

The FAC states that the first industry conference that Shutt attended was "Consensus Invest 2017." FAC, ¶ 200. Consensus Invest 2017 occurred at the New York Marriott Marquis on November 28, 2017. *See* https://www.coindesk.com/events/invest-2017.

Conspicuously absent in the FAC, is any specific allegation that any Plaintiff actually viewed and relied upon the two online company "videos" describing Shutt's job duties and discussing the Centra Card developments or viewed anything regarding his attendance at industry conferences ("challenged conduct"). This is because, six of the seven Plaintiffs (Rensel, He, Poon, Poon, Lee, and Ganczarek) purchased their first CTR Tokens before Shutt started employment at Centra Tech in October of 2017. FAC, ¶¶ 34-47, 65. Three of the seven Plaintiffs (Poon, Poon, and Lee) purchased all of their CTR Tokens before Shutt started employment at Centra Tech. FAC, ¶¶ 40-44, 65. Five of the seven Plaintiffs (Rensel, Poon, Poon, Lee, and Ganczarek) purchased all of their CTR Tokens before Shutt's challenged conduct. FAC, ¶¶ 34-36, 40-47, 197-200. One Plaintiff (He) provided a date range for an alleged additional purchase on the secondary market of CTR Tokens before Shutt's challenged conduct but possibly after. FAC, ¶¶ 38-39, 197-200.  However, the Plaintiff (He) doesn't know when the alleged purchase was actually made. Finally, only one Plaintiff (Warren) purchased his CTR Tokens on the secondary market after Shutt' challenged conduct. FAC, ¶¶ 49, 197-200. However, the Plaintiff in that instance does not allege in the FAC that he was influenced or relied upon any specific conduct or information provided by Shutt when he purchased the alleged CTR Tokens on the secondary

market.  FAC, ¶¶ 49-50.

Thus, rather than allege reliance upon Shutt's statements in the challenged conduct, the FAC instead states that Plaintiffs are attempting to invoke an offshoot of the "fraud-on-the-market" presumption of reliance known as the "fraud-created-the-market" doctrine to plead reliance. FAC ¶¶ 329-30. The Plaintiffs assert that the challenged conduct is sufficient (1) to make Shutt a "seller" of securities and liable for violations of the Securities Act despite the fact that the FAC doesn't designate Shutt as an investor in CTR Tokens; and (2) to make Shutt liable for securities fraud despite the failure to allege actual reliance on any statements in the challenged conduct.

**D.      Plaintiffs Jacob Zowie Thomas Rensel, Wang Yun He, Chi Hao Poon, King Fung Poon, Jae J. Lee, And Mateusz Ganczarek First Purchases Of CTR Tokens Pre-dated Shutt's Challenged Conduct**

All seven of the Plaintiffs have failed to allege with any specificity that any of their purchases of CTR Tokens were influenced by Shutt's challenged conduct. The reason for this failure is calculated. As previously mentioned above, six of the seven Plaintiffs (Rensel, He, Poon, Poon, Lee, and Ganczarek) purchased their first CTR Tokens before Shutt started employment at Centra Tech in October of 2017. FAC, ¶¶ 34-47, 65. Three of the seven Plaintiffs (Poon, Poon, and Lee) purchased all of their CTR Tokens before Shutt started employment at Centra Tech. FAC, ¶¶ 40-44, 65. Five of the seven Plaintiffs (Rensel, Poon, Poon, Lee, and Ganczarek) purchased all of their CTR Tokens before Shutt's challenged conduct. FAC, ¶¶ 34-36, 40-47, 197-200. One Plaintiff (He) provided a date range for an alleged additional purchase on the secondary market of CTR Tokens before Shutt's challenged conduct but possibly after. FAC, ¶¶ 38-39, 197-200.  However, the Plaintiff (He) doesn't know when the alleged purchase was actually made. Finally, only one Plaintiff (Warren) purchased his CTR Tokens on the secondary market after Shutt' challenged conduct. FAC, ¶¶ 49, 197-200. However, the Plaintiff in that

instance does not allege in the FAC that he was influenced or relied upon any specific conduct or information provided by Shutt when he purchased the alleged CTR Tokens on the secondary market. FAC, ¶¶ 49-50. Plaintiffs have not established that the alleged injury suffered when they purchased CTR Tokens is in fact traceable to the challenged conduct of Shutt.

## IV. LEGAL STANDARD

A complaint must be dismissed if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007)); see also *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1287 (11th Cir. 2010) ("[f]actual allegations must be enough to raise a right to relief above the speculative level") (quoting *Twombly*, 550 U.S. at 555). For a claim to be facially plausible, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and the pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

In addition, a claim brought under Rule 10b-5(b) must satisfy the special fraud pleading requirements of Fed. R. Civ. P. 9(b) and the heightened pleading requirements set forth in the PSLRA. *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016). Rule 9(b) requires that a complaint based on fraud set forth "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Garfield v.*

10

*NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citations and internal quotations omitted). The PSLRA requires complaints alleging Rule 10b-5(b) claims predicated on allegedly false or misleading statements to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," and where scienter is a required element "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (b)(2); *Galectin Therapeutics*, supra at 1270.

## V.  LEGAL ARGUMENT

### A.    Plaintiffs' Claim For Violations of Section 12(a) of the Securities Act (Count I) Fails Because Shutt Did Not "Sell" Securities To Plaintiffs

Shutt moves to dismiss Plaintiffs' first claim for alleged violations of Section 12(a) of the Securities Act. In relevant part, Section 12(a)(1) provides that "[a]ny person who . . . offers or sells a security in violation of [Section 5] of this title . . . shall be liable . . . to the person purchasing such security from him...." 15 U.S.C. § 77l(a)(1). Shutt does not concede that CTR Tokens constitute a "security" within the meaning of Section 2(a)(1) of the Securities Act. 15 U.S.C. § 77b(a)(1). Shutt merely has not contested the sufficiency of Plaintiffs' allegations that CTR Tokens are a security at the initial pleading stage.

"There are three elements to a prima facie case [under Section 12]: (1) the sale or offer to sell securities; (2) the absence of a registration statement covering the securities; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer." *Swenson v. Engelstad*, 626 F.2d 421, 424-25 (5th Cir. 1980). Plaintiffs' Section 12 claim against Shutt fails at the first step because Shutt did not sell or offer to sell unregistered securities to any of the Plaintiffs. In *Pinter v. Dahl*, 486 U.S. 622 (1988), the Supreme Court articulated the two

circumstances in which a defendant can be deemed the one who sold unregistered securities to the plaintiff-purchaser for purposes of Section 12. The defendant must either (1) be "the person who transfers title to, or other interest in, that property;" or (2) "successfully solicit[] the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 642, 647. This is referred to in *Pinter* as, a "statutory seller." *Id.* at 642-43, 646.

The Supreme Court made clear that liability under Section 12 does not extend beyond those who "transfer[] title to," or "successfully solicit[] the purchase" of unregistered securities. Section 12 does not apply to those who are merely "collateral participants" in the sale process. *Id.* at 650-51 n.26. *Pinter* explains that Section 12 contains limiting language that entitles only a "person purchasing such security from" the one who "offers or sells" the unregistered security to obtain relief. *Id.* at 641. This "purchase from" language "focuses on the defendant's relationship with the plaintiff-purchaser" and limits Section 12 to situations where the defendant who is soliciting plaintiff successfully induces the plaintiff to buy the securities from him. *Id.* at 651.

*Pinter* makes clear that there must be a link between the alleged solicitation and the purchase of an unregistered security. *Pinter* states that causation alone is insufficient under Section 12 because the statutory "purchase from" language calls for a closer nexus between the plaintiff-purchaser and the seller than mere causation. *See Id.* at 650-52. As the Supreme Court explained, using mere causation as a substitute for the narrower "purchase from" requirement would improperly broaden liability in a way that is not contemplated by Section 12. *Id.* For this reason, the Supreme Court in *Pinter* rejected the now discredited substantial-factor test as inconsistent with Section 12's "purchase from" requirement:

> The deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme. Those courts that have adopted the approach have not attempted to ground their analysis in the

> statutory language. . . . Instead, they substitute the concept of substantial participation in the sales transaction, or proximate causation of the plaintiff's purchase, for the words "offers or sells" in § 12. The "purchase from" requirement of § 12 focuses on the defendant's relationship with the plaintiff-purchaser. The substantial-factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances. Indeed, it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.

*Pinter*, 486 U.S. at 561. To suggest that causation is not required under Section 12 would be incorrect. Thus, to state a Section 12 claim, Plaintiffs must satisfy Section 12's "purchase from" requirement and demonstrate Shutt either transferred title to them or successfully solicited their purchase of CTR Tokens. This is more difficult to establish than mere causation.

As mentioned above, the Supreme Court in *Pinter* rejected the now discredited substantial-factor test as inconsistent with Section 12's "purchase from" requirement and carved out examples of professionals, such "accountants and lawyers," to which application of the now discredited substantial-factor test would be erroneous:

> The deficiency of the substantial-factor test is that it divorces the analysis of seller status from any reference to the applicable statutory language and from any examination of § 12 in the context of the total statutory scheme. . . . The "purchase from" requirement of § 12 focuses on the defendant's relationship with the plaintiff- purchaser. The substantial-factor test, on the other hand, focuses on the defendant's degree of involvement in the securities transaction and its surrounding circumstances. Indeed, it might expose securities professionals, such as *accountants and lawyers*, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, "purchas[e] the security from" such a person.

(emphasis added) *Id.* In this case, Shutt is a lawyer whose only involvement was the performance of his professional services to Centra Tech. Thus, the Plaintiffs did not in any meaningful sense purchase CTR Tokens from Shutt.

It is also important to note that Plaintiffs' reference and application of Section 5 in Count

13

I is misguided because Section 5 does not contain an analogous "purchase from" requirement and instead permits the U.S. Securities and Exchange Commission ("SEC") to pursue claims for both direct and indirect sales of unregistered securities. See *Zacharias v. SEC*, 569 F.3d 458, 467 (D.C. Cir. 2009) (holding that in an enforcement action brought by the SEC under Section 5, *Pinter* is inapplicable because Section 5 does not contain the "purchase[e]. . . from" language); *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1256 n.5 (9th Cir. 2013) (same). However, Plaintiffs are not the SEC pursuing a Section 5 claim. To the contrary, the Plaintiffs are private parties attempting to pursue a Section 12 claim and accordingly are required to allege facts that plausibly suggest they purchased unregistered securities from Shutt because he successfully solicited them. Thus, any application of Section 5 would be improper and would have no bearing on the Plaintiff's Section 12 claim as alleged.

      **1.**    **Shutt Did Not "Transfer Title To" Securities To Plaintiffs**

It is indisputable that Shutt is not alleged to fall within the first *Pinter* category because the FAC does not allege that Shutt owned any of the CTR Tokens that Plaintiffs allege are securities. Moreover, the FAC does not allege that Shutt was given any CTR Tokens, bought any CTR Tokens, owned any CTR Tokens, invested in any CTR Tokens, offered to sell CTR Tokens to the Plaintiffs, sold any CTR Tokens to the Plaintiffs, transferred any CTR Tokens to the Plaintiffs, discussed CTR Tokens with the Plaintiffs, or directly solicited the Plaintiffs to buy CTR Tokens. Therefore, Shutt could not have and did not pass title to the purchased CTR Tokens that Plaintiffs allege are securities. Therefore, Shutt cannot be liable under Section 12, under the first *Pinter* category.

      **2.**    **Shutt Did Not "Successfully Solicit" Plaintiffs To Purchase Securities**

There likewise can be no legitimate dispute that Shutt does not fall within the second

*Pinter* category because Shutt is not alleged to have "successfully solicited" any of the Plaintiffs to purchase CTR Tokens from him. As the Supreme Court explained in *Pinter*, the "purchase from" language in Section 12 "focuses on the defendant's relationship with the plaintiff-purchaser" and limits Section 12's applicability to situations where the alleged solicitation is what actually caused the plaintiff to purchase the security from the solicitor. *Id.* at 651.

In this case, the Plaintiffs have not, and cannot, establish that they were "successfully solicited" to purchased CTR Tokens from Shutt as a result of Shutt's two videos and attendance at industry conferences (the "challenged conduct"). In fact, for almost all of the Plaintiffs it is a factual impossibility that they were "solicited" by Shutt to purchase CTR Tokens from him or had the opportunity to rely on anything he did or said in the challenged conduct. FAC ¶¶ 32-47. As previously delineated, six of the seven Plaintiffs (Rensel, He, Poon, Poon, Lee, and Ganczarek) purchased their first CTR Tokens before Shutt started employment at Centra Tech in October of 2017. FAC, ¶¶ 34-47, 65. Three of the seven Plaintiffs (Poon, Poon, and Lee) purchased all of their CTR Tokens before Shutt started employment at Centra Tech. FAC, ¶¶ 40-44, 65. Five of the seven Plaintiffs (Rensel, Poon, Poon, Lee, and Ganczarek) purchased all of their CTR Tokens before Shutt's challenged conduct. FAC, ¶¶ 34-36, 40-47, 197-200. One Plaintiff (He) provided a date range for an alleged additional purchase on the secondary market of CTR Tokens before Shutt's challenged conduct but possibly after. FAC, ¶¶ 38-39, 197-200. However, the Plaintiff (He) doesn't know when the alleged purchase was actually made. Finally, only one Plaintiff (Warren) purchased his CTR Tokens on the secondary market after Shutt' challenged conduct. FAC, ¶¶ 49, 197-200. However, the Plaintiff in that instance does not allege in the FAC that he was influenced or relied upon any specific conduct or information provided by Shutt when he purchased the alleged CTR Tokens on the secondary market. FAC, ¶¶ 49-50. Since the FAC is

absent any meaningful allegation that Shutt "successfully solicited" any of the Plaintiffs to actually purchase CTR Tokens from him, Shutt cannot be liable under Section 12, under the second *Pinter* category.

But beyond that, the Plaintiff's Section 12 argument has another fatal flaw. Simply, Shutt's challenged conduct—being featured in two online company "videos" where he describes his job duties and discusses the Centra Card developments and attended industry conferences—is simply not "solicitation" under *Pinter*. The prevailing view throughout the country is that "[t]o count as 'solicitation,' the seller must, at minimum, directly communicate with the buyer." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003); see also *In re CNL Hotels & Resorts, Inc.*, No. 6:04CV1231ORL-31KRS, 2005 WL 2291729, at *4 (M.D. Fla. Sept. 20, 2005) (citing *Rosenzweig*); *Shain v. Duff & Phelps Credit Rating Co.*, 915 F. Supp. 575, 581 (S.D.N.Y. 1996) (finding § 12 claim inadequate where plaintiff did not allege that defendant "ever directly 'solicited' him, or indeed that he ever had any direct communication, oral or written"); *Montcalm County Bd. of Commissioners v. McDonald & Co. Sec., Inc.*, 833 F. Supp. 1225, 1232 (W.D. Mich. 1993) (granting defense summary judgment because plaintiff "failed to produce evidence that defendants actually contacted plaintiff and urged plaintiff to purchase the commercial paper in dispute").

In *Kerrigan v. Visalus, Inc.*, No. 14-CV-12693, 2016 WL 892804, at *1 (E.D. Mich. Mar. 9, 2016), Plaintiffs alleged that a group of individual defendants engaged in solicitation including "us[ing] scripted materials at the conventions... appear[ing] in ads and [] giv[ing] false testimonials... and us[ing] social media to coat the Internet in the message that [the securities were] a great income opportunity." *Id.* at *11. The court found these allegations insufficient to make the individual defendants "sellers" under *Pinter* because solicitation requires the seller "at

a minimum, [to] directly communicate with the buyer." *Id.* at \*17 (citing *Rosenzweig*).

Likewise, Shutt's involvement with Centra Tech cannot be considered "solicitation" because he had no direct communication, oral or written, with any of the Plaintiffs before they purchased their CTR Tokens.

**B.      Plaintiffs' Claim for Violations of Section 10(b) and Rule 10b-5(b) (Count III) Fails As a Matter of Law**

Shutt moves to dismiss Plaintiffs' second claim for alleged violations of Section 10(b) and Rule 10b-5(b). Shutt challenges Plaintiffs' allegations concerning reliance and scienter, disputing both the legal validity of Plaintiffs' attempt to rely upon the "fraud-created-the-market" theory and the adequacy of Plaintiffs' allegations that Shutt was aware of Centra Tech's alleged deception under the PSLRA's heightened pleading requirements.

Rule 10b-5 makes it "unlawful for any person...(a) To employ any device, scheme, or artifice to defraud, (b) *To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading*, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." (emphasis added). 17 C.F.R. § 240.10b-5.

Plaintiffs alleged violations of Rule 10b-5(b). The elements of a securities fraud claim brought under Rule 10b-5(b) are: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005). As set forth above, Plaintiffs' claim alleging a Rule 10b-5(b) violation must be pled with particularity, and plead facts giving rise to a strong inference of scienter.

Similarly, the elements of a claim under 10b-5(a) and (c) are: "(1) that the defendant

committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, No. 14-81156-CIV- WPD, 2015 WL 11988900, at \*5 (S.D. Fla. Dec. 22, 2015) (citing *In re Alstom SA*, 406 F. Supp. 2d 433, 474 (S.D.N.Y. 2005)). However, the Plaintiffs have not alleged in the FAC a claim for a violation under 10b-5(a) and (c).

In regard to Shutt, the Plaintiffs have failed to adequately allege reliance and scienter for the below reasons.

### 1. Plaintiffs Cannot Rely On The "Fraud-Created-The-Market" Doctrine To Establish Reliance

"Reliance is one of the essential elements that a plaintiff must prove to recover in a Rule 10b-5 action." *Lipton v. Documation, Inc.*, 734 F.2d 740, 742 (11th Cir. 1984). "Requiring the plaintiff to show that he reasonably relied on the defendants' misrepresentations is a means of establishing the 'causal link between the misrepresentation or omission and the injuries suffered by the private plaintiff,' . . . and of ensuring that the federal securities laws do not expose defendants to limitless liability or become transformed into merely private enforcement mechanisms." *Id.* (quoting *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir. 1977).

In this case, Plaintiffs do not adequately allege in the FAC that they actually relied on anything Shutt purportedly did or said in purchasing their CTR Tokens. Plaintiffs instead attempt to invoke an offshoot of the "fraud-on-the-market" presumption of reliance known as the "fraud-created-the-market" doctrine to establish reliance. FAC, ¶¶ 329-30. Plaintiffs allege that under this theory "[a]ll that is necessary is that the securities are so tainted by fraud as to be unmarketable." FAC, ¶ 329. Plaintiffs further allege that "absent the Founder Defendants' fraudulent conduct, CTR Tokens could not have been sold for any price." FAC, ¶ 330. To be clear, nowhere in the FAC do Plaintiffs allege the facts (i.e. a well-developed and efficient market)

necessary to plead the "fraud-on-the-market" doctrine articulated in *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988). That doctrine is based on the principle that an established and efficient market reflects all public information, and that misleading public statements will automatically be reflected in a securities' purchase price and thus harm purchasers even if they do not actually rely on the misleading statements themselves. *Basic Inc.*, 485 U.S. at 244.

As explained below, Plaintiffs' reliance on the "fraud-created-the-market" doctrine is erroneous for two very important reasons.

### a. The "Fraud-Created-The-Market" Doctrine Cannot Be Invoked For Rule 10-5(b) Claims Like Those Plaintiffs Have Alleged Against Shutt

The "fraud-created-the-market" doctrine was created by the Fifth Circuit's pre-division decision in *Shores v. Sklar*, 647 F.2d 462 (5th Cir. 1981), which became part of the Eleventh Circuit precedent under *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc). *Bonner* adopted all pre-September 30, 1981 decisions of the Fifth Circuit as precedent within the Eleventh Circuit. *Bonner*, 661 F.2d at 1209. The doctrine is said to apply and create a presumption of reliance where "defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers." *Ross v. Bank South*, N.A., 885 F.2d 723, 729 (11th Cir. 1989). The fraud-created-the-market theory is premised upon the idea that "it is reasonable to rely on the market to screen out securities that are so tainted by fraud as to be totally unmarketable." *Id.* In other words, Plaintiffs must show that but for the fraudulent scheme, the securities in question would have been unmarketable. *Id.*

The doctrine as articulated in *Shores*, however, applies only to Rule 10b-5(a) and Rule 10b-5(c) claims—so called "scheme" and "course of business" frauds. *Shores*, 647 F.2d at 469-70. It does not apply to Rule 10b-5(b) claims like the one asserted against Shutt in this case. In *Shores*, the plaintiff alleged an offering circular contained material misrepresentations and

omissions but admitted that he had neither read nor otherwise relied on the document in deciding to purchase securities. The court held that this admission of non-reliance foreclosed plaintiff's ability to assert a claim based on Rule 10b-5(b), but that his "10b-5[a] and [c] claims…assert something more that prevents dismissal at this preliminary stage." *Id.* at 469. The *Shores* court refers to subsections (a), (b), and (c) of Rule 10b-5 as subsections (1), (2), and (3), respectively. To avoid confusion, this Memorandum will refer to Rule 10b-5's subsections as subsections (a), (b), and (c). In so holding, the *Shores* court clearly distinguished between the claims brought under Rule 10b-5(b) and the claims brought under Rule 10b-5(a) or Rule 10b-5(c), applying the fraud-created-the-market theory only to the latter. *Id.* The court explained that "[m]isrepresentation and omission cases under 10b-5(b) . . . require reliance on the document making the misrepresentation or omitting a material fact" and that "[t]he 'reliance' that produces causation in the [fraud on a broader scale] type of case cannot come from reading a document." *Id.* at 471-72.

In this case, Plaintiffs state in the FAC that they are asserting a claim under subdivision (b) of Rule 10b-5. Accordingly, Count III of the FAC is for violations of "Rule 10b-5(b)." FAC ¶ 334. However, the FAC contains boilerplate allegations that "Defendants" purportedly engaged in "a plan, scheme, conspiracy and course of conduct." These allegations implicate subdivisions (a) or (c) of Rule 10b-5, which has not been alleged in the FAC and therefore should be disregarded. FAC ¶ 34, 336.

In this case, Shutt was not alleged in the FAC to have been involved in the "official" initial coin offering, where the Founder Defendants allegedly created the "plan, scheme, conspiracy and course of conduct" to sell CTR Tokens as unregistered securities. As previously described, Shutt was hired after the "official" initial coin offering was completed. FAC, ¶¶ 1, 65.

Thus, all of the CTR Tokens had already been sold by Centra Tech before Shutt was hired.

Thus, it is unreasonable to imply that Shutt was in any way involved in a "Scheme" to solicit the Plaintiffs to purchase CTR Tokens from him as a result of Shutt's two videos and attendance at industry conferences—which Plaintiffs contend allegedly contained misleading misrepresentations about the functionality of the Centra Card (the "challenged conduct"). In fact, for almost all of the Plaintiffs it is a factual impossibility that they were "solicited" by Shutt to purchase CTR Tokens from him or had the opportunity to rely on anything he did or said in the challenged conduct. FAC ¶¶ 32-47. As previously delineated, six of the seven Plaintiffs (Rensel, He, Poon, Poon, Lee, and Ganczarek) purchased their first CTR Tokens before Shutt started employment at Centra Tech in October of 2017. FAC, ¶¶ 34-47, 65. Three of the seven Plaintiffs (Poon, Poon, and Lee) purchased all of their CTR Tokens before Shutt started employment at Centra Tech. FAC, ¶¶ 40-44, 65. Five of the seven Plaintiffs (Rensel, Poon, Poon, Lee, and Ganczarek) purchased all of their CTR Tokens before Shutt's challenged conduct. FAC, ¶¶ 34-36, 40-47, 197-200. One Plaintiff (He) provided a date range for an alleged additional purchase on the secondary market of CTR Tokens before Shutt's challenged conduct but possibly after. FAC, ¶¶ 38-39, 197-200.  However, the Plaintiff (He) doesn't know when the alleged purchase was actually made. Finally, only one Plaintiff (Warren) purchased his CTR Tokens on the secondary market after Shutt' challenged conduct. FAC, ¶¶ 49, 197-200. However, the Plaintiff in that instance does not allege in the FAC that he was influenced or relied upon any specific conduct or information provided by Shutt when he purchased the alleged CTR Tokens on the secondary market.  FAC, ¶¶ 49-50.

Given that the FAC does not come close to alleging facts that Shutt participated in a "scheme" or "course of conduct" fraud, the holding of *Shores* makes clear that Plaintiffs cannot

invoke the fraud-created-the-market presumption with respect to their claims against Shutt. As such, Plaintiffs' reliance allegations are defective. Simply, scheme liability requires manipulative acts impacting the market beyond alleged misrepresentations. *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016); see also *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) (same).

### b. The "Fraud-Created-The-Market" Doctrine Is Also Inapplicable Because Shutt Is Not Alleged To Have Created The Market

*Shores* explained that a plaintiff must show three things to be able to invoke the "fraud-created-the-market" presumption of reliance against a defendant:

(1)  [T]he defendants knowingly conspired to bring securities onto the market which were not entitled to be market[ed], intending to defraud purchasers,

(2)  [Plaintiff] reasonably relied on the [securities'] availability on the market as an indication of their apparent genuineness, and

(3)  [A]s a result of the scheme to defraud, [plaintiff] suffered a loss.

*Ross*, 885 F.2d at 729 (quoting *Shores*, 647 F.3d at 469-70).

Since the time that *Shores* was originally decided, the Supreme Court issued its decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), and rejected the idea that a defendant can be held derivatively liable for purportedly "aiding and abetting" another's violation of § 10(b). *Id.* at 176-77. As a result, the Fifth Circuit has explained that "[i]n the wake of *Central Bank* . . . conspiracy is no longer a viable theory of § 10(b) liability, so that aspect of *Shores* had been overruled." *Regents of the Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 391-392 (5th Cir. 2007). The § 10(b) implied private right of action does not extend to aiders and abettors under the Securities Act. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Thus, Shutt cannot be liable as an aider and abettor under the Securities Act for the alleged "plan, scheme, conspiracy and course of conduct" to sell

22

CTR Tokens as unregistered securities by the Founder Defendants.

In this case, even if the fraud-created-the-market doctrine were applicable to Plaintiffs' 10b-5(b) claim against Shutt, the presumption would still not apply because there are no reasonable allegations suggesting that Shutt brought unmarketable securities in the form of CTR Tokens to market. The allegations of the FAC establish that the formation of Centra Tech and the "official" initial coin offering was spearheaded by the Founder Defendants not Shutt. FAC ¶¶ 1, 52, 54, 56, 75, 77, 79. The Founder Defendants had the ultimate decision making authority at Centra Tech (FAC ¶¶ 75-79); actively marketed the "official" initial coin offering on social media, podcasts, and through the press (FAC ¶¶ 217-232); attempted to have the Centra Tokens listed on virtual currency exchanges (FAC ¶ 77); and they stood to profit from the fraudulent acts alleged in the FAC.

By the time Shutt was hired in October of 2017, the CTR Tokens had all been sold by Centra Tech in the "official" initial coin offering and thus already brought to market. FAC ¶¶ 1, 65. This was well before Shutt was featured in the two online company "videos" describing his job duties and discussing the Centra Card developments and attending industry conferences. FAC ¶ 200. This point cannot be understated. The controlling Eleventh Circuit precedent stressed in *Ross*, that the fraud-created-the-market theory requires a showing that what the defendant purportedly did caused unmarketable securities to be marketed—"[t]he burden imposed by th[is] [] element is a substantial one." *Ross*, 885 F.2d at 729. "In other words, the fraud must be so pervasive that it goes to the very existence of the [securities] and the validity of their presence on the market. If the plaintiff proves no more than that the [securities] would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover." *Id. See also Katz v. MRT Holdings, LLC*, No. 07-61438-CIV, 2008 WL 4725284,

at *5 (S.D. Fla. Oct. 24, 2008)(quoting *Ross*, 885 F.2d at 729); *accord In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Prods. Liab. Litig.*, 328 F. Supp. 3d 963, 971 (N.D. Cal. 2018).

Plaintiffs' allegations in the FAC incorrectly attempt to suggest that Shutt promoted the Centra Card and thus indirectly marketed CTR Tokens by being featured in the two online company "videos" describing his job duties and discussing the Centra Card developments and attending industry conferences. However, these allegations do not reasonably amount to a "scheme" by Shutt to bring "unmarketable securities to market." Regardless, this presumption is inapplicable in this case. Indeed, *In re Volkswagen*, provides an illustrative example of why the presumption cannot apply here. In that case, the court rejected the applicability of the fraud-created-the-market presumption against Volkswagen precisely because its alleged scheme of failing to disclose that its diesel vehicles were designed to cheat on emissions tests did not create a fraudulent market for its bonds. As that court explained, "despite the gravity of VW's emissions fraud," the emissions fraud did not create a fraudulent market for what would otherwise have been unmarketable bonds. *In re Volkswagen*, 328 F. Supp. 3d at 971. That is analogous to the scenario presented here.

In this case, the FAC alleges that CTR Tokens were being sold long before Shutt was hired by Centra Tech. For this reason, Shutt could not have engaged in a scheme to bring completely unmarketable securities to market. Further, Shutt did not inject any new information into the marketplace based on his alleged conduct, which certainly did not amount to the type of fraudulent scheme that would enable Plaintiffs to rely on the fraud-created-the-market theory to avoid pleading actual reliance. For all these reasons, the Plaintiffs have failed to allege reliance.

    **2.**    **Plaintiffs Fail To Adequately Allege Scienter And Ignore The Compelling**

**Inference Of Non-Fraudulent Intent**

As mentioned previously, the PSRLA creates a heightened standard for pleading the element of scienter in a securities fraud claim. The PSRLA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Rosenberg v. Gould*, 554 F.3d 962, 965 (11th Cir. 2009). "An inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 965 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). See also *Druskin v. Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1323-24 (S.D. Fla. 2004) (holding that plaintiffs failed to allege "relevant facts" sufficient to raise inference of scienter and survive motion to dismiss 10b-5 claim); *In re SportsLine.com Sec. Litig.*, 366 F. Supp. 2d 1159, 1174 (S.D. Fla. 2004) (same).

In determining whether this heightened pleading standard is met, the court must (1) accept all factual allegations as true; (2) consider the complaint in its entirety and determine whether the alleged facts, taken collectively, give rise to a strong inference of scienter; and (3) take into account plausible opposing inferences. *Rosenberg*, 554 F.3d at 965.

Here, Plaintiffs have failed to allege sufficient facts against Shutt in order to meet the PSRLA's heightened pleading standard. *Rosenberg* provides a useful measuring stick by which to judge the inadequacy of Plaintiffs' scienter allegations. In *Rosenberg*, a CEO of a company was alleged to have granted and received backdated options but signed SEC filings that represented that the options were granted at fair market value resulting in overstated earnings. *Id.* at 964. The Plaintiffs asserted the following facts were sufficient to establish a strong inference of scienter: (1) defendant had the sole authority to grant non-officer stock options; (2) the inaccurate measurement dates were used for substantially all grants prior to 2002; (3) defendant

had been granted misdated stock options himself; (4) defendant made materially false statements during the class period; (5) defendant sold approximately 39 percent of his shares during the class period; and (6) defendant resigned from his position once the discrepancies came to light. *Id.* at 966. The court found that these allegations were *insufficient* to establish scienter because "[t]he inference that [defendant] knew that backdated options in 2000 to 2001 had led to overstated earnings during the class period in 2004 to 2006 is not as compelling as the competing inference that he was unaware that backdated options had affected financial statements several years later." *Id.*

Comparing Plaintiffs' allegations of scienter as to Shutt to those in *Rosenberg*, Plaintiffs' allegations are significantly less compelling. The FAC goes to great lengths to detail the steps the "Founder Defendants" took to allegedly misrepresent the purported partnership with Visa and MasterCard and functionality of the Centra Card (see e.g. FAC ¶¶ 91-92, 94, 220-225, 228, 230, 232). These allegations occurred during the "official" initial coin offering, which was from approximately July 23, 2017 through October 5, 2017. FAC, ¶ 1. The Plaintiffs' allegations in the numerous sections listed above occurred *before* Shutt was employed with Centra Tech. FAC, ¶ 65. Thus, Shutt had no involvement with the "official" initial coin offering and the communications made with customers during that time. Further, it was during the "official" initial coin offering, where all but one Plaintiff purchased their first CTR Tokens. Thus, it is impossible to establish a strong inference of scienter when Shutt was not even involved with Centra Tech at that time.

Nevertheless, in a feeble attempt to establish scienter for Shutt, Plaintiffs allege that the Centra Card could never work. FAC ¶ 216, 244, 253. The Plaintiffs then allege that because the Centra Card could never work, it can be assumed that "Shutt knew or was grossly reckless in not

knowing that Centra Tech could not issue Visa or Mastercard branded Centra Cards, directly or indirectly." FAC ¶ 247.

Like in *Rosenberg*, Plaintiffs' scienter allegations are nowhere near as compelling as the opposing inference of non-fraudulent intent—which is that Shutt was *actually* working on the legal and compliance aspects of the Centra Card, which had not yet been issued to customers. The FAC establishes that "Shutt was Centra Tech's General Counsel, Chief Compliance Officer, and Bank Secrecy Officer from October 2017 until the Company was effectively shut down in April 2018. Shutt was responsible for ensuring that Centra Tech complied with all federal and state regulatory requirements." FAC ¶ 65.

In order to dispel any notions of scienter, it is important to recognize that Shutt is a seasoned financial services attorney who has worked for several national companies and financial institutions over the last 19 years. Shutt has always been in good standing in Massachusetts where he has maintained his license as an attorney. Shutt was also licensed in Florida as Authorized House Counsel for Centra Tech and was in good standing. Shutt was hired after the "official" initial coin offering was completed, which offering was from approximately July 23, 2017 through October 5, 2017. FAC, ¶¶ 1, 65.

Within days of being hired, Shutt was instrumental in having Centra Tech retain the highly esteemed law firm of Ballard Spahr LLP to advise on the rapidly evolving cryptocurrency regulations, U.S. Securities and Exchange issues regarding ICOs and cryptocurrencies, state money transmitter licensing requirements for cryptocurrencies and prepaid cards, and other corporate governance matters. Ballard Spahr remained active counsel for Centra Tech the entire time that Shutt was employed by Centra Tech. It is well established that Shutt, on behalf of Centra Tech, sought the expert advice of outside legal counsel regarding the development of the Centra

Card and other matters.

Plaintiffs incorrectly allege in the FAC that "Shutt knew or was grossly reckless in not knowing that Centra Tech could not issue Visa or Mastercard branded Centra Cards, directly or indirectly." FAC, ¶ 247. To the contrary, Centra Tech had two different third-party processors who had established certain facilities in order to perform services to support card programs such as transaction cards. The third-party processors had the relationship with banks, who had the ability to issue pre-paid cards. The relationship with the two third-party processors was already established before Shutt was hired. After Shutt was hired he worked with the respective legal and compliance departments of the third-party processors on legal requirements for the Centra Card to operate and contract issues between the parties.

In November of 2017, Centra Tech was issued several prototype pre-paid cards from one of the third-party processors for testing purposes. Shutt received one of the prototype pre-paid cards (the card was not branded Centra) and the card is still in his possession. The pre-paid testing cards successfully converted several different cryptocurrencies to fiat money (USD in this case). The prototype pre-paid cards operated on the Mastercard network. The prototype pre-paid cards were successfully tested by IT over a period of about 30 days. On or about December 27, 2017, Centra Tech started shipping the first phase of the Centra Card (the card was not branded Centra) to about 100 international and domestic customers who participated in Centra Tech's "official" ICO. The initial Centra Cards that were shipped were used by the customers. Only customers from the "official" ICO were able to obtain a Centra Card. As mentioned previously, Centra Tech's "official" ICO was completed before Shutt was hired.

It goes without saying that Shutt would not knowingly or recklessly risk his legal reputation working on a product that he knew to be fraudulent. There was no nonfraudulent intent

by Shutt. For the above reasons, Plaintiffs' allegations are insufficient to allege *scienter* under the PSLRA's heightened standard and therefore the Plaintiffs have failed to allege reliance.

**C.    Plaintiffs Jacob Zowie Thomas Rensel, Wang Yun He, Chi Hao Poon, King Fung Poon, Jae J. Lee, Mateusz Ganczarek, And Rodney Warren Lack Standing To Sue Shutt**

Shutt moves to dismiss Plaintiffs' claims I and III against him because they have failed to demonstrate U.S. Constitution Article III standing as they have not, and cannot, establish that the alleged injury suffered when they purchased CTR Tokens is in fact traceable to Shutt. Article III of the U.S. Constitution limits the jurisdiction of the federal courts to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1; *Raines v. Byrd*, 521 U.S. 811, 818 (1997). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). The "irreducible constitutional minimum" of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* Further, "Article III standing of a named plaintiff must be established on a claim-by-claim basis . . . ." *Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) (citation and internal quotation marks omitted).

In this case, the Plaintiffs have absolutely failed to demonstrate U.S. Constitution Article III standing as they have not, and cannot, establish that the alleged injury suffered when they purchased CTR Tokens is in fact traceable to Shutt's two videos and attendance at industry conferences (the "challenged conduct"). In fact, for almost all of the Plaintiffs it is a factual impossibility that they had the opportunity to rely on anything Shutt did or said. Specifically, six of the seven Plaintiffs (Rensel, He, Poon, Poon, Lee, and Ganczarek) purchased their first CTR Tokens before Shutt started employment at Centra Tech in October of 2017. FAC, ¶¶ 34-47, 65.

Three of the seven Plaintiffs (Poon, Poon, and Lee) purchased all of their CTR Tokens before Shutt started employment at Centra Tech. FAC, ¶¶ 40-44, 65. Five of the seven Plaintiffs (Rensel, Poon, Poon, Lee, and Ganczarek) purchased all of their CTR Tokens before Shutt's challenged conduct. FAC, ¶¶ 34-36, 40-47, 197-200. One Plaintiff (He) provided a date range for an alleged additional purchase on the secondary market of CTR Tokens before Shutt's challenged conduct but possibly after. FAC, ¶¶ 38-39, 197-200.  However, the Plaintiff (He) doesn't know when the alleged purchase was actually made. Finally, only one Plaintiff (Warren) purchased his CTR Tokens on the secondary market after Shutt' challenged conduct. FAC, ¶¶ 49, 197-200. However, the Plaintiff in that instance does not allege in the FAC that he was influenced or relied upon any specific conduct or information provided by Shutt when he purchased the alleged CTR Tokens on the secondary market.  FAC, ¶¶ 49-50.

According to the FAC, the "official" initial coin offering was from approximately July 23, 2017 through October 5, 2017. FAC, ¶ 1. The FAC alleges that Shutt was employed in October 2017. FAC, ¶ 65. More precisely, Shutt started employment with Centra Tech on or about October 10, 2017. The FAC alleges that "each of the Plaintiffs were actively involved in researching Centra Tech and its products prior to purchasing their CTR Tokens. Such research included reviewing virtual currency online forums, reading Centra Tech's publications and viewing the Company's promotional videos." FAC, ¶ 171. According to the FAC, the first video that Shutt was featured in was available online "on or about November 4, 2017." FAC, ¶ 197. The FAC, states that the second video that Shutt was featured in was "posted shortly thereafter." FAC, ¶ 198. Specifically, the second video, which referenced Consensus Invest 2017, and was available online on or after December 8th, 2017. The FAC states that the first industry conference that Shutt attended was "Consensus Invest 2017." FAC, ¶ 200. Consensus Invest 2017 occurred at the New

York Marriott Marquis on November 28, 2017. *See* https://www.coindesk.com/events/invest-2017. The U.S. Constitution Article III standing for each of the named Plaintiffs to sue Shutt is delineated below on a claim-by-claim basis.

**Co-Lead Plaintiff Jacob Zowie Thomas Rensel** allegedly purchased CTR Tokens in the "official" Centra Tech ICO on July 30, 2017. FAC, ¶ 34. On August 11, 2017 and August 25, 2017, Rensel allegedly purchased additional CTR Tokens on the secondary market. FAC, ¶ 36. The period for these purchases was before Shutt was employed by Centra Tech. It is a factual impossibility that Rensel relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. On October 18, 2017, Rensel allegedly purchased his final CTR Tokens on the secondary market. FAC, ¶ 36. This purchase date was only a few days after Shutt started employment with Centra Tech and before Shutt's challenged conduct. It is a factual impossibility that Rensel relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. Thus, Rensel has absolutely failed to demonstrate U.S. Constitution Article III standing as he has not, and cannot, establish that the alleged injury suffered when he purchased CTR Tokens on July 30, 2017, August 11, 2017, August 25, 2017, and October 18, 2017 is in fact traceable to the challenged conduct of Shutt. Therefore, Rensel's claims against Shutt must be dismissed —with prejudice.

**Co-Lead Plaintiff Wang Yun He** allegedly purchased CTR Tokens in the "official" Centra Tech ICO between September 21, 2017 and October 1, 2017.  FAC, ¶ 38. The period for these purchases was before Shutt was employed by Centra Tech. It is a factual impossibility that He relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. He also allegedly purchased CTR Tokens on the secondary market from the Binance virtual currency exchange between October 12, 2017 and November 22, 2017.

FAC, ¶ 39. The date range provided in the FAC for the alleged CTR Token purchase is vague and ambiguous. However, what is clear is that He has not adequately established that the alleged purchase occurred, since He doesn't know when it occurred. Nevertheless, the period for the alleged purchase on the secondary market starts well before Shutt's challenged conduct. Further, He does not specifically allege in the FAC that he relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. In this case, He had already made two prior purchases of CTR Token before Shutt's employment. Thus, He has absolutely failed to demonstrate U.S. Constitution Article III standing as he has not, and cannot, establish that the alleged injury suffered when he purchased CTR Tokens on September 21, 2017, October 1, 2017, and the date range starting on October 12, 2017 is in fact traceable to the challenged conduct of Shutt. Therefore, He's claims against Shutt must be dismissed —with prejudice.

**Plaintiff Chi Hao Poon** allegedly purchased CTR Tokens in the "official" Centra Tech ICO on August 17, 2017 and September 15, 2017.  FAC, ¶ 40. The period for these purchases was before Shutt was employed by Centra Tech. It is a factual impossibility that Poon relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. Thus, Poon has absolutely failed to demonstrate U.S. Constitution Article III standing as he has not, and cannot, establish that the alleged injury suffered when he purchased CTR Tokens on August 17, 2017 and September 15, 2017 is in fact traceable to the challenged conduct of Shutt. Therefore, Poon's claims against Shutt must be dismissed —with prejudice.

**Plaintiff King Fung Poon** allegedly purchased CTR Tokens in the "official" Centra Tech ICO on August 25, 2017.  FAC, ¶ 42. The period for the purchase was before Shutt was employed by Centra Tech. It is a factual impossibility that Poon relied upon any conduct or information

provided by Shutt, which influenced his purchase of the alleged CTR Tokens. Thus, Poon has absolutely failed to demonstrate U.S. Constitution Article III standing as he has not, and cannot, establish that the alleged injury suffered when he purchased CTR Tokens on August 25, 2017 is in fact traceable to the challenged conduct of Shutt. Therefore, Poon's claims against Shutt must be dismissed —with prejudice.

**Plaintiff Jae J. Lee** allegedly purchased CTR Tokens in the "official" Centra Tech ICO on September 12, 2017.  FAC, ¶ 44. The period for the alleged purchase was before Shutt was employed by Centra Tech. It is a factual impossibility that Lee relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. Thus, Lee has absolutely failed to demonstrate U.S. Constitution Article III standing as he has not, and cannot, establish that the alleged injury suffered when he purchased CTR Tokens on September 12, 2017 is in fact traceable to the challenged conduct of Shutt. Therefore, Lee's claims against Shutt must be dismissed —with prejudice.

**Plaintiff Mateusz Ganczarek** allegedly purchased CTR Tokens in the "official" Centra Tech ICO on September 11, 2017 and September 16, 2017. FAC, ¶ 46. The period for the alleged purchases was before Shutt was employed by Centra Tech. It is a factual impossibility that Ganczarek relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. Additionally, on October 25, 2017, Ganczarek purchased alleged CTR Tokens on the secondary market. FAC, ¶ 47. The period for the alleged purchase was only a few days after Shutt started employment with Centra Tech and before Shutt's challenged conduct. It is a factual impossibility that Ganczarek relied upon any conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens. Thus, Ganczarek has absolutely failed to demonstrate U.S. Constitution Article III standing as he has

not, and cannot, establish that the alleged injury suffered when he purchased CTR Tokens on September 11, 2017, September 16, 2017, and October 25, 2017 is in fact traceable to the challenged conduct of Shutt. Therefore, Ganczarek's claims against Shutt must be dismissed — with prejudice.

**Plaintiff Rodney Warren** purchased alleged CTR Tokens on the secondary market from the Binance virtual currency exchange on December 17, 2017. FAC, ¶ 49. The FAC states that "each of the Plaintiffs were actively involved in researching Centra Tech and its products prior to purchasing their CTR Tokens. Such research included reviewing virtual currency online forums, reading Centra Tech's publications and viewing the Company's promotional videos." FAC, ¶ 171. However, Warren does not specifically allege in the FAC that he relied upon any challenged conduct or information provided by Shutt, which influenced his purchase of the alleged CTR Tokens on the secondary market. In fact, Warren provides no details at all regarding his knowledge of Shutt or his alleged challenged conduct. Simply, the generic allegations applicable to all Defendants contained in FAC at paragraph 171 are the type of "'naked assertion[s]' devoid of 'further factual enhancement'" that are insufficient to state a viable claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The FAC simply implies, in conclusory fashion, that the Plaintiffs researched Centra Tech prior to purchasing their CTR Tokens. Warren has alleged nothing linking Shutt to the alleged "research." That is exactly the type of unsupported "the-defendant-unlawfully-harmed-me accusation" that is meaningless in evaluating the sufficiency of a complaint's allegations. *Ashcroft*, 556 U.S. at 678. Thus, Warren has absolutely failed to demonstrate U.S. Constitution Article III standing as he has not established that the alleged injury suffered when he purchased CTR Tokens is in fact traceable to the challenged conduct of Shutt.

Therefore, Warren's claims against Shutt must be dismissed —with prejudice.

## VI. CONCLUSION

For the foregoing reasons, Shutt respectfully requests that the Court dismiss Counts I and III claims against him with prejudice.  Defendant Shutt respectfully adopts and incorporates by reference the memorandum filed by Defendant Khaled and Maywather in support of their respective motions to dismiss, to the extent the memorandums contain arguments that are equally applicable to Shutt.


Dated: April 25th, 2019                    Respectfully submitted,

                                           /s/ Allan Shutt
                                           Allan Shutt
                                           allanjShutt@gmail.com
                                           9962 Equus Circle
                                           Boynton Beach, FL 33472
                                           Telephone: (702) 335-3940

                                           Pro Se

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 25, 2019, I filed a true and correct copy of the foregoing document with the Clerk of the Court using USPS Priority Mail Express. I also certify that the foregoing document is being served this day on all counsel of record via email. Other pro se defendants are being served via email and in some cases via first-class mail as shown below.

<u>/s/ Allan Shutt</u>
Allan Shutt

Clerk of the Court

> Southern Florida District Court
> 400 North Miami Avenue
> Miami, FL 33128
> (305) 523-5100

Plaintiffs are being served via electronic mail on their counsel at:

> KOMLOSSY LAW P.A.
> Emily Cornelia Komlossy
> Florida Bar No. 7714
> 4700 Sheridan Street
> Suite J Hollywood, FL 33021
> Telephone: (954) 842-2021
> Facsimile: (954) 416-6223
> eck@komlossylaw.com
>
> -and-
>
> LEVIN & KORSINSKY, LLP
> Donald J. Enright
> Admitted Pro Hac Vice
> John A. Carriel
> Admitted Pro Hac Vice
> 1101 30th Street, N.W., Suite 115
> Washington, DC 20007
> Telephone: (202) 524-4290
> denright@zlk.com
> jcarriel@zlk.com

Defendant Floyd Mayweather, Jr. is being served via electronic mail on his counsel at:

Christina Olivos
Edward Maurice Mullins
REED SMITH LLP
1001 Brickell Bay Drive, Suite 900
Miami, FL 33131
(786) 747-0200
(786) 747-0299 (fax)
colivos@reedsmith.com
emullins@reedsmith.com

-and-

Francisca M. Mok
James L. Sanders
Kasey J. Curtis
REED SMITH LLP
1901 Avenue of Stars, Suite 700
Los Angeles, CA 90067
fmok@reedsmith.com
jsanders@reedsmith.com
kcurtis@reedsmith.com

-and-

Richard A. Wright
WRIGHT MARSH & LEVY
300 S. 4th Street, Suite 701
Los Vegas, NV 89101
(702) 382-4004
rick@wmllawlv.com

Defendant Khaled Mohamed Khaled is being served via electronic mail on his counsel at:

Curtis Bradley Miner
COLSON HICKS EIDSON
255 Alhambra Circle,
PH Coral Gables, FL 33134-2351
(305) 476-7400
(305) 476-7444 (fax)
curt@colson.com

-and-

Charles T. Spada
Jeannie Rose Rubin
LANKLER SIFFERT & WOHL LLP

500 Fifth Avenue
New York, New York 10110
(212) 921-8399
cspada@lswlaw.com
jrubin@lswlaw.com

Defendant Centra Tech is being served via electronic mail on its counsel at:

Centra Tech, Inc.
c/o Gennaro Cariglio, Esq.
8101 Biscayne Boulevard, Penthouse 701
Miami, FL 33138
sobeachlaw.aol.com

Defendant Sohrab Sharma is being served via electronic mail at:

Sohrab Sharma
8101 Biscayne Boulevard, Penthouse 701
Miami, FL 33138
(516) 724-3158
ssharma491@gmail.com

Defendant Robert Farkas is being served via electronic mail at:

Robert Farkas
8101 Biscayne Boulevard, Penthouse 701
Miami, FL 33138
rjfarkas6@gmail.com

Defendant Steven Sykes is being served via electronic mail on his counsel at:

Windsor Daniel, Jr.
WINDSOR DANIEL Jr. PL
15800 Pines Blvd., Third Floor
Pembroke Pines, FL  33027
(954) 362-5225
(888) 409-8375
wdaniel@thedanielfirm.com

Defendant Steven Stanley is being served via electronic mail at:

machesta@gate.net

Defendant Trapani is being served via U.S. mail and email at:

1. Trapani's last known residence at Raymond Trapani

2000 Meredith Avenue
Virginia Beach, VA 23455

2.  Trapani's believed to be current but unverified address at:

Raymond Trapani
54 Acapulco St. Atlantic Beach
New York 11509

3.  The address of his defense attorney in the proceedings pending in New York at:

Raymond Trapani
c/o Joseph A. Bondy
The Law Offices of Joseph A. Bondy
1841 Broadway, Suite 910
New York, New York 10023
josephbondy@mac.com

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS™

USPS.COM®

**PRIORITY MAIL EXPRESS®**

CUSTOMER USE ONLY

FROM: (PLEASE PRINT)
Allan Shutt
9962 Equus Circle
Boynton Beach, FL 33472
PHONE 702-335-3940

TO: (PLEASE PRINT)
Southern FL District Court
400 N. Miami Ave
Miami, FL 33128
PHONE 305-523-5100

ORIGIN (POSTAL SERVICE USE ONLY)
PO ZIP Code: 33472
Date Accepted (MM/DD/YY): 4/25/19
Time Accepted: 2:40 □AM ☑PM
Weight
Scheduled Delivery Date (MM/DD/YY): 4/26/19
Postage: $25.50
Total Postage & Fees: $25.50

EE 404 846 450 US



**MAIL EXPRESS™**

OUR FASTEST SERVICE IN THE U.S.

WHEN USED INTERNATIONALLY,
A CUSTOMS DECLARATION
LABEL MAY BE REQUIRED.

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

• For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
• $100.00 insurance included.

PEEL FROM THIS CORNER

EP13F July 2013   OD: 12.5 x 9.5

PS10001000006

This product is for use with Priority Mail Express.™ Misuse may be a violation of federal law. This label is not for resale.