United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Jacob Zowie Thomas Rensel and others, Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 17-24500-Civ-Scola ) |
| Centra Tech, Inc. and others, Defendants. | ) ) ) |

**<u>Omnibus Order on Defendants' Motions to Dismiss</u>**

This matter comes before the Court on Defendant Floyd Mayweather's motion to dismiss (ECF No. 141), Defendant Khaled Khaled's motion to dismiss (ECF No. 142), Defendant Steven Sykes' motion to dismiss (ECF No. 140), and Defendant Steven Stanley's motion to dismiss (ECF No. 157) the Plaintiffs' First Amended Complaint. After reviewing the parties' written submissions, the record, and the applicable law, the Court **grants** the Defendants' motions. (**ECF Nos. 140, 141, 142, 157**.)

I. **<u>Background</u>**

Defendant Centra Tech was a company founded in May 2016 which purported to sell CTR Tokens in an initial coin offering ("ICO"). The ICO allegedly raised funds for, among other things, a debit card backed by Visa and Mastercard that would allow users to instantly use cryptocurrencies to make purchases. Between July 23, 2017 and April 20, 2018, Centra Tech's ICO raised more than $32 million from thousands of investors. The founders of Centra Tech, Defendants Sharma, Farkas, and Trapani are currently the subjects of an SEC enforcement action (*S.E.C. v. Sharma et al.,* No. 18-cv-2909-DLC (S.D.N.Y.)[1] and are being criminally prosecuted in the Southern District of New York for the fraudulent Centra Tech scheme (*United States v. Sharma et al.,* No. 18-cr-340-LGS (S.D.N.Y.)). (Compl. at ¶¶ 60-61, ECF No. 1.) The Plaintiffs' Amended Complaint in this case incorporates by reference the SEC complaint and the criminal complaint. (*Id.* at ¶ 61 n.9.)

In order to promote their product, the founders of Centra Tech engaged in a marketing campaign. In a July 2017 press release, Centra Tech stated that it had created "the world's first Debit Card that is designed for use with compatibility on 8+ major cryptocurrency blockchain assets. . . [this is] truly a

---

[1] The SEC action is currently stayed during the pendency of the criminal prosecution.

ground floor opportunity . . . that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." (*Id.* at ¶ 91.) Centra Tech also advertised that it worked "anywhere that accepted Visa and Mastercard." (*Id.* at 92.) Centra Tech also published a series of white papers which touted the profit potential of investing in the ICO. (*Id.* at ¶¶ 94-95.) None of the claims made by Centra Tech were true. (*Id.* at ¶ 98.)

To further promote its product, Centra Tech created fictional executives with impressive backgrounds. (*Id.* at ¶ 270.) For example, Centra Tech listed Michael Edwards as its CEO and Co-Founder. Centra Tech created a LinkedIn profile for Mr. Edwards using the picture of a Canadian professor with no relationship to the company. (*Id.*) Mr. Edward's LinkedIn profile stated that he had "established licensing and other partnership terms with Visa & Mastercard" and that he had an MBA from Harvard University. (*Id.* at ¶¶ 271, 275.) Centra Tech also created Jessica Robinson, the Chief Financial Officer, who had previously been the CFO of Johnson Communications. (*Id.* at ¶¶ 272-74.) The presentations made to potential investors also included bios for Edwards and Robinson. (*Id.* at ¶ 281.)

Centra Tech had some real employees, including Defendant Sykes and Defendant Stanley. Sykes was the Chief Technology Officer ("CTO") of Centra Tech from August 2017 through April 2018. (*Id.* at ¶ 64.) Sykes was responsible for "driving the delivery of the Centra product to completion." (*Id.* at ¶ 244.) According to the complaint, Sykes was responsible for all customer experiences related to Centra Tech's website, personally familiar with the content and maintenance of Centra Tech's website, and personally familiar with the process customers had to complete to purchase Centra Tokens during the Centra Tech ICO. (*Id.* at ¶ 243.)

Another real employee was Defendant Stanley. Stanley was Centra Tech's Director of Public Relations. (*Id.* at ¶ 63.) Stanley promoted Centra Tech through message boards on Bitcointalk. (*Id.* at ¶ 186.) On July 31, 2017, Stanley posted an announcement on Bitcointalk directing readers to a link used to sell CTR Tokens. (*Id.*) Stanley also answered investor's questions and responded to inquiries on behalf of Centra Tech. (*Id.* at ¶ 190.)

Centra Tech also recruited celebrities to promote its product. Defendant Floyd Mayweather, a professional boxer, was compensated for promoting Centra Tech. (*Id.* at ¶ 208.) On September 14, 2017, Mayweather posted a tweet with a picture of himself holding a Centra Tech debit card and captioned the picture: "Spending bitcoins Ethereum and other types of cryptocurrency in Beverly Hills…" (*Id.* at ¶ 209.) On September 18, 2017, Mayweather tweeted "Centra's (CTR) ICO starts in a few hours. Get yours before they sell out, I got mine." (*Id.*

at ¶ 210.) He also participated in a video for Centra Tech which showed him using the Centra Tech debit card. (*Id.* at ¶ 251.)

Defendant Khaled, a well-known celebrity and music producer, also promoted Centra Tech. (*Id.* at ¶ 213.) For example, in September 2017, Khaled posted a picture of himself holding the Centra Tech debit card on his Instagram account and the caption read, "I just received my titanium centra debit card. The Centra Card & Centra Wallet app is the ultimate winner in Cryptocurrency debit cards powered by CTR tokens! Use your bitcoins, ethereum, and more cryptocurrencies in real time across the globe. This is a game changer here. Get your CTR tokens now!" (*Id.* at ¶ 213.) Khaled posted another picture of himself with the same caption on September 27, 2018. (*Id.* at ¶ 214.)

The Plaintiffs filed a four-count complaint for securities fraud based on the sale of unregistered securities in the form of CTR Tokens. Counts I and III are asserted against *all* Defendants. Counts II and IV are asserted against Defendants Sharma, Farkas, and Trapani only. This opinion only addresses the motions to dismiss Counts I and III by Defendants Mayweather, Khaled, Sykes, and Stanley.

## II. Legal Standard

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all the complaint's allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008). A pleading must only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b)(6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Bell Atlantic Corp*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

### III. Analysis

#### A. Mayweather's Motion to Dismiss

1. <u>Count I - Violation of Section 12(a)(1) of the Securities Act</u>

Count I is a claim for violation of Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77*l*. (ECF No. 1 at ¶ 314.) Section 12(a)(1) makes it unlawful to offer or sell an unregistered security. 15 U.S.C. § 77*l*(a)(1). To establish a prima facie case under Section 12, the plaintiff must allege (1) the sale or offer to sell securities; (2) the absence of a registration statement covering the securities; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer. *Swenson v. Engelstad*, 626 F.2d 421, 424-25 (5th Cir. 1980). In *Pinter v. Dahl*, the Supreme Court articulated two circumstances in which a defendant can be considered one who "sold" unregistered securities. 486 U.S. 622 (1988). The defendant must either (1) "be the person who transfers title to, or other interest in, that property;" or (2) "successfully solicits the purchase, motivated at least in party by a desire to serve his own financial interests or those of the securities owner." *Id.* at 642, 647.

The parties do not dispute that the CTR Tokens are unregistered securities and that the Defendant used the facilities of interstate commerce. The question is whether Mayweather qualifies as someone who "sold or offered to sell" securities. The Defendant argues that there is no evidence that Mayweather transferred title to the CTR Tokens. Therefore, Mayweather would fall under the second category articulated in *Pinter*, one who *successfully solicits* the purchase of unregistered securities. 486 U.S. at 647. However, according to Mayweather, the Plaintiffs fail to allege successful solicitation because there is no evidence that Mayweather's tweets actually resulted in the purchase of CTR Tokens. (ECF No. 141 at 10.) Furthermore, the Defendant argues that direct communication between the seller and buyer is required under Section 12(a)(1). (*Id.*)

The Plaintiffs respond by arguing that causation is not a necessary element under Section 12. The only two elements necessary to make Mayweather a "seller" are: (1) he solicited the purchase and (2) the participant or the owner of the security sold benefited. (ECF No. 162 at 12.) Because Mayweather solicited the purchase by encouraging his followers to buy the CTR Tokens and he benefited financially by making this public endorsement, he is a "seller" for purposes of Section 12(a). Upon careful review, the Court agrees with the Defendant.

The authoritative case on this issue is the Supreme Court's decision in *Pinter v. Dahl*, 486 U.S. 622 (1988). In *Pinter,* the Supreme Court addressed the issue of who qualifies as a "seller" within the meaning of Section 12 of the Securities Act. *Id* at 647. In defining the scope of liability for those who "solicit"

the purchase of securities, the *Pinter* Court held that the language of Section 12 extends liability to "the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* The Court explained that the "solicitation of a buyer is perhaps the most critical stage of the selling transaction. It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale." *Id.* at 646. In defining this test, the Court rejected the Fifth Circuit's "substantial-factor" test which imposed liability if the seller's participation in the buy-sell transaction "is a substantial factor in causing the transaction to take place." *Id.* at 649. The Court held that this would impose liability on "participants collateral to the offer or sale." *Id.* at 650. Instead, the *Pinter* test focuses on "the defendant's relationship with the plaintiff-purchaser" rather than the "defendant's degree of involvement in the securities transaction." *Id.* at 651.

The Eleventh Circuit in *Ryder Int'l Corp. v. First Am. Nat'l Bank,* 749 F. Supp. 1569 (11th Cir. 1990) focuses on this relationship between the plaintiff and defendant. In applying this test, the Eleventh Circuit refers to a scholarly article which states that "*Pinter* apparently requires someone to be an issuer or a paid participant who actually contacted a buyer and *urged* the buyer to purchase before such participation would meet the first prong of the solicitation test." *Id.* at 1579 (emphasis in original). Therefore, "a plaintiff must allege not only that the defendant actively solicited investors, but that the plaintiff purchased securities as a result of that solicitation. Mere conclusory allegations that a defendant solicited the sale of stock and was motivated by financial gain to do so are insufficient to state a claim under Section 12." *In re CNL Hotels & Resorts, Inc.*, No. 04-cv-1231ORL-31KRS, 2005 WL 2291729, at *5 (M.D. Fla. Sept. 20, 2005).

The Plaintiff's complaint fails to establish that Mayweather "successfully solicited" the Plaintiffs to purchase CTR Tokens. The allegations against Mayweather establish that he posted two tweets from his Twitter account related to CTR Tokens. (ECF No. 97 at 64-65.) One of the posts urges his followers to "get yours before they sell out, I got mine." (*Id.* at ¶ 210.) This is the closest thing to "solicitation" in the complaint. However, there are no allegations that this was a *successful* solicitation, that Mayweather had any contact with Plaintiffs, or that Plaintiffs even saw the posts. *See Pinter*, 486 U.S. at 647. In order to be considered a seller under Section 12, *Pinter* requires the Court to look at the defendant's relationship with the plaintiff-purchaser. *Id* at 651; *see In re CNL Hotels & Resorts,* 2005 WL 2291729 at *5 (the plaintiff's assertions "must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser."). Mayweather has no relationship with the Plaintiffs. The complaint does not allege that Plaintiffs

follow Mayweather's twitter account or that they saw his posts or video with Centra Tech. In fact, two of the Plaintiffs, Fung Poo and Lee, made their purchases before Mayweather posted on Twitter about Centra Tech. (ECF No. 1 at ¶¶ 42-45.)

The Plaintiffs point to the following paragraph as evidence that "each of the Plaintiffs who purchased CTR following Mayweather's endorsement were successfully solicited to purchase CTR Tokens by Mayweather." (*Id.* at 12.):

> Each of the Plaintiffs actively researched Centra Tech and the Centra Products, prior to making their purchases of CTR Tokens and throughout the period in which they held their CTR Tokens. Accordingly, each of the Plaintiffs were personally, and successfully, solicited by each of the Defendants in connection with Defendants' public representations and active solicitations to purchase CTR Tokens outlined herein.

(*Id.* at 12-13 (quoting ECF No. 1 at ¶ 33).) This type of conclusory allegation, vaguely referring to "research," fails to establish that Mayweather reached out to the Plaintiffs and successfully solicited Plaintiffs to purchase CTR Tokens. Accordingly, Count I is dismissed as to Defendant Mayweather.

### 2. Count III – Violation of Section 10(b) of the Exchange Act

Count III is a claim against all Defendants for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC. (ECF No. 1 at ¶ 335.) A claim brought under Rule 10b-5 must satisfy the special fraud pleading requirements of Federal Rule of Civil Procedure 9(b) and the heightened pleading requirements set forth in the Private Securities Litigation Reform Act ("PSLRA"). *In re Galectin Therapeutics, Inc. Securities Litigation,* 843 F.3d 1257, 1269 (11th Cir. 2016). Rule 9(b) requires the complaint to set forth:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud.

*Id.* In addition, the PSLRA requires heightened pleading requirements for Rule 10b-5(b) claims. The PSLRA requires that the plaintiff "specify each statement alleged to have been misleading, the reason or reasons why the statement is

misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.*

There are three subsections to Rule 10b-5. While there is disagreement in the briefs as to whether the Plaintiffs are asserting a claim under subsection a, b, or c, the Court will assume that Plaintiffs intended to assert a claim under all three subsections. Under Rule 10b-5(b), it is unlawful to make any "untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." This is considered "misrepresentation" liability. Under Rule 10b-5(a) and (c), it is unlawful to "employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." These subsections are considered "scheme" liability. *See In re: Altisource Portfolio Solutions, S.A. Securities Litigation,* No. 14-81156, 2015 WL 11988900, at *5 (S.D. Fla. Dec. 22, 2015) (Dimitrouleas, J.). Under all three subsections of 10b-5, the plaintiff must plead reliance. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 342 (2005); *In re: Altisource,* 2015 WL 11988900 at *5.

Mayweather's motion argues that plaintiffs have failed to plead the element of reliance because, as is the case with Count I, there are no allegations that the Plaintiffs even saw Mayweather's posts or video, much less relied on them to make investment decisions. Plaintiffs attempt to rely on the presumption of reliance under the "fraud-created-the-market" exception. (ECF No. 141 at 18-19.) This theory is premised on the idea that "it is reasonable to rely on the market to screen out securities that are so tainted by fraud as to be totally unmarketable." *Ross v. Bank South, N.A.*, 885 F.2d 723, 729 (11th Cir. 1989). According to the Plaintiffs, Mayweather is alleged to have engaged in the fraudulent scheme that created the market for CTR Tokens. (ECF No. 162 at 18.) "Here, the alleged fraud was Defendants' scheme to unload patently worthless CTR Tokens by pretending, as Mayweather did, that the Centra Debit Card functioned and thus CTR Tokens had value." (*Id.*) Mayweather responds that he cannot be held liable under this theory because he did not participate in the "scheme" to bring the tokens to market. (ECF No. 182 at 6.) In fact, the allegations in the complaint indicate that most of the Plaintiffs purchased CTR Tokens before Mayweather is alleged to have done anything. (*Id.* at 7.)

For the reasons stated by the Court in dismissing Count I, a claim under Rule 10b-5(b) also fails. The Plaintiffs fail to allege actual reliance because Mayweather had no contact with Plaintiffs and Plaintiffs are not alleged to have even seen Mayweather's social media activity. (ECF No. 162 at 16.) Therefore, the Court must determine whether the fraud-created-the-market presumption

of reliance is applicable to Mayweather under Rule 10b-5(a) and (c). Upon careful consideration, the Court holds that it is not.

In order to sustain a claim based on the fraud-created-the-market theory, the Plaintiffs must show that *but for* Mayweather's fraud, the securities in question could not have been marketed. *Ross v. Bank South, N.A.*, 885 F.2d 723, 729 (11th Cir. 1989); *In re Amerifirst Securities Litigation*, 129 F.R.D. 423, 432 (S.D. Fla. 1991) (Hoeveler, J.). The complaint alleges that Mayweather posted two items on Twitter on September 14, 2017 and September 18, 2017 and participated in a video in "mid-September" of 2017. (ECF No. 1 at 64-65, 79.) Plaintiffs' allegations, however, establish that the CTR Tokens were selling *before* Mayweather was even involved. (*Id.* at ¶¶ 34, 40, 42, 44, 46.) For example, Plaintiff Rensel purchased CTR Tokens on July 30, 2017. (*Id.* at ¶ 34.) Plaintiff Chi Hao Poon purchased CTR Tokens on August 17, 2017. (*Id.* at ¶ 40). And Plaintiff King Fung Poon purchased CTR Tokens on September 12, 2017. (*Id.* at ¶ 44.) It is clear that Mayweather's "fraud" did not create the market nor was his fraud a but for cause of bringing the securities to market. "If a plaintiff proves no more than that the [securities] would have been offered at a lower price or at higher rate, rather than they would never have been issued or marketed, he cannot recover." *In re Amerifirst*, 129 F.R.D. at 432. Accordingly, Plaintiffs are unable to establish reliance based on the fraud-created-the-market theory and Count III must be dismissed as to Mayweather.

### B. DJ Khaled's Motion to Dismiss

Counts I and III of the Plaintiffs' complaint are also asserted against Defendant Khaled. Khaled's motion to dismiss puts forth largely the same arguments as Mayweather's motion to dismiss. (ECF No. 142.) With regard to Count I, Khaled argues that *Pinter's* "successfully solicited" test "focuses on the defendant's relationship with the plaintiff-purchaser." (ECF No. 142 at 6.) As is the case with the Plaintiffs' claims against Mayweather, the complaint fails to allege that the Plaintiffs followed Khaled on social media or even saw Khaled's two social media posts. Therefore, Plaintiffs cannot assert that Khaled "successfully solicited" the Plaintiffs to purchase CTR Tokens. For the reasons stated above, the Court dismisses Count I as to Khaled.

As to Count III, the Court applies the same analysis it applied to the claims against Mayweather. The Plaintiffs' claim under Rule 10b-5(b) fails because there are no allegations that the Plaintiffs relied on Khaled's posts. The complaint does not allege that the Plaintiffs follow Khaled on social media or even saw the posts before they purchased the CTR Tokens. Therefore, the Plaintiffs are relying on the fraud-created-the-market exception to sustain a claim under Rule 10b-5(a) or (c). (ECF No. 161 at 20.) The Plaintiffs' response brief, however, does not even

bother to address the reliance argument in Khaled's motion to dismiss. Instead, in a footnote, the Plaintiffs incorporate by reference their arguments in response to Mayweather's motion to dismiss, "in particular those relating to reliance." (*Id.* at 20 n.9.) As the Court held with regard to Mayweather, the Plaintiffs cannot sustain their claim based on a fraud-created-the-market theory of reliance. Like Mayweather, Khaled's two posts occurred in September 2017, after some of the purchases of CTR Tokens had already taken place. (ECF No. 97 at ¶¶ 213-214.) Plaintiffs cannot assert that Khalid's alleged fraud *created* the market for CTR Tokens nor was his fraud a but for cause of bringing the securities to market. Accordingly, Count III must be dismissed as to Khaled.

### C. Steven Sykes' Motion to Dismiss

Also before the Court is Defendant Steven Sykes's motion to dismiss Counts I and III of the complaint. (ECF No. 140.) Sykes was Centra Tech's CTO from August 2017 through April 2018. (ECF No. 1 at ¶ 64.) He was responsible for the content and maintenance of Centra Tech's website, including the website's "customer experience." (*Id.*) Sykes's motion to dismiss argues that his involvement with Centra Tech's website does not make him a seller of securities under Section 12(a)(1) of the Securities Act. (ECF No. 140 at 4.) In response, the Plaintiffs argue that "any and all solicitations for the purchase of CTR Tokens contained on the Centra Tech website are equally attributable to him and hence, he was a 'seller' of unregistered securities." (ECF No. 163 at 6.)

As discussed above, *Pinter* held that "[b]eing merely a 'substantial factor' in causing the sale of unregistered securities is not sufficient in itself to render a defendant liable under § 12(1)." 466 U.S. at 654. To state a claim under Section 12(1), the "plaintiff must allege not only that the defendant actively solicited investors, but that the plaintiff purchased securities as a result of that solicitation. Mere conclusory allegations that a defendant solicited the sale of stock and was motivated by financial gain to do so are insufficient to state a claim under Section 12." *In re CNL Hotels & Resorts, Inc.*, No. 04-cv-1231ORL-31KRS, 2005 WL 2291729, at *5 (M.D. Fla. Sept. 20, 2005). Sykes's general involvement with the company in his capacity as CTO does not establish that he had any contact with investors or in any way solicited investors to purchase CTR Tokens. *See Ryder*, 749 F. Supp. 1569 at 1579 ("Such general solicitation of business does not convert a broker into a . . . 'seller,' 'offeror,' or 'solicitor.'"). While a functional website may have helped convince customers that Centra Tech was a legitimate business, the Plaintiffs' allegations fall short of establishing that Sykes *successfully solicited* the purchase of CTR Tokens directly from the Plaintiffs. Therefore, the Court must dismiss Count I as to Defendant Sykes.

Count III is also asserted against Sykes for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5. Plaintiffs' complaint does not make clear which subsection of Rule 10b-5 they are pursuing, nor does Sykes' motion help provide clarity as to the applicable law. The parties' positions can be summarized as follows. Sykes was responsible for Centra Tech's website and for the technology behind the Centra debit card. Therefore, any statements on Centra Tech's website about the credit card's functionality was necessarily a misrepresentation by Sykes. (ECF No. 163 at 8.) Sykes's motion to dismiss, without a single citation to relevant legal authority, states that "there is simply no objective basis in which one can conclude, based on the information asserted, that Sykes made any false statements." (ECF No. 140 at 5.)

As discussed above, a claim brought under Rule 10b-5 must satisfy the pleading requirements of Rule 9(b) and the heightened pleading requirements set forth in the Private Securities Litigation Reform Act ("PSLRA"). *In re Galectin Therapeutics, Inc. Securities Litigation,* 843 F.3d 1257, 1269 (11th Cir. 2016). Rule 9(b) requires the complaint to set forth:

> (1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff, and; (4) what the defendant obtained as a consequence of the fraud.

*Id.* Here, the complaint fails to meet the heightened pleading requirements of Rule 9(b). The allegations against Sykes are based on his involvement with the website. The Complaint, however, is devoid of any specificity with regard to the content of the website, when the website was launched, the alleged misstatements on the website, who determined the content on the website, and if the Plaintiffs ever even visited the website. Accordingly, the Count III is dismissed as to Defendant Sykes.

### D. Steven Stanley's Motion to Dismiss

Also before the Court is Defendant Stanley's pro se motion to dismiss Counts I and III of Plaintiffs' complaint. (ECF No. 157.) Similar to their claims against Khaled and Mayweather, the Plaintiffs' claims against Stanley are based on Stanley's online posts or public representations about Centra Tech. (ECF No. 1 ¶¶ 186-94.) As Centra Tech's Director of Public Relations, Stanely answered questions in online forums and posted press releases about Centra Tech. (*Id.*) However, as was the case with Khaled and Mayweather, there are no allegations

that Stanley directed his communications to any particular Plaintiff or that Plaintiffs read this information. Instead, the Complaint generally refers to Stanley publicly posting answers to questions posed by a "a user on the Bitcointalk online forum." (*Id.* at ¶ 187.)

> Although the [company] may make public statements . . . these statements are usually not directed at any particular investor. The [company] therefore does not engage in the type of one-to-one exchange of information which is typical of the broker-investor relationship and which the Supreme Court viewed as the most typical example of solicitation. To find "solicitation" in a case in which no attempt has been made by a defendant to channel information to the particular plaintiff would result in the broadening of the definition of a statutory "seller" to such an extent as to render meaningless the Supreme Court's statement that "a buyer cannot recover against his seller's seller."

*PPM America, Inc. v. Marriot Corp.*, 853 F. Supp. 860, 875 (D. Md. 1994) (citing *Pinter,* 786 U.S. at 644, n.21).

Referring to its analysis above, the Court also dismisses Count III as to Stanley. With regard to the element of reliance necessary to state a claim under Rule 10b-5(b), the Complaint fails to allege that the Plaintiffs saw Stanley's online posts, frequented the forums, or relied on this information in any way. Similarly, the Plaintiffs cannot rely on the-fraud-created-the-market presumption of reliance for a claim under Rule 10b-5(a) and (c) because there is no indication that *but for* Stanley, a person posting in online investor forums, the CTR Tokens could not have been offered on the market. *See Ross,* 885 F.2d at 729.

### IV. Conclusion

Based on the foregoing, the Court **grants** the Defendants' motions to dismiss Counts I and III of the Plaintiffs' First Amended Complaint as to Defendants Mayweather, Khaled, Sykes and Stanley. (**ECF Nos. 140, 141, 142, 157**.)

**Done and ordered**, in chambers, in Miami, Florida on May 13, 2019.

_____
Robert N. Scola, Jr.
United States District Judge